UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| AZMIE MADANAT, | ) | Case No. 11-cv-00364 (LDW)(ETB) |
| Individually and on behalf of all others | ) | |
| similarly situated, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **PLAINTIFF'S FIRST AMENDED** |
| vs. | ) | **COMPLAINT** |
| | ) | |
| FIRST DATA CORPORATION; | ) | |
| | ) | <u>**JURY TRIAL DEMANDED**</u> |
| FIRST DATA MERCHANT SERVICES | ) | |
| CORPORATION; | ) | |
| | ) | |
| and | ) | |
| | ) | |
| DOES 1-25, inclusive, | ) | |
| | ) | |
| Defendants. | ) | |

## I.   <u>INTRODUCTION</u>

1.     Processing credit card transactions is an essential service for business owners.  Small merchants, however, have commonly been overcharged by First Data Corporation ("First Data"), a credit card processing company that is supposed to be working for them.

2.     First Data and its subsidiary, First Data Merchant Services Corporation ("FDMS"), form one of the largest credit card processing companies in the United States. As part of their business model, Defendants lease credit card Point of Service ("POS") equipment, including credit card processing terminals, printers, PIN pads, and similar equipment (collectively "POS Terminals") to merchants.

3.     Unbeknownst to the merchants, First Data and FDMS engage in a pattern of predatory business practices that are patently unlawful, unfair, and fraudulent.  First, First Data and FDMS commonly overcharge customers on their monthly lease payments.

4.     Second, Defendants treat the POS Terminal leases as <u>non-cancellable</u> and unilaterally impose an unfair and unlawful penalty on merchants who return their leased POS Terminals.  Even after merchants have returned their POS Terminals, Defendants continue to charge merchants for monthly payments.  They also routinely attempt to enforce an acceleration clause in an attempt to collect all remaining lease payments, as well as demand the POS Terminal's cost -- as unilaterally determined by First Data and FDMS.

5.     Defendants' unfair and unlawful conduct has resulted in great economic harm to Plaintiff and class members (alternatively the "Class").  Plaintiff and the Class are entitled to compensatory damages and other relief, including an injunction against Defendants' unlawful practices.

## II.     <u>JURISDICTION AND VENUE</u>

6.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one class member is of diverse citizenship from one Defendant and the aggregate amount in controversy exceeds five million dollars ($5,000,000.00), exclusive of interest and costs.

7.     Venue is proper in this district under 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to the claims occurred and/or arose from this district, and Defendants have caused harm to class members residing in this district.  Venus is also proper pursuant to the Order Granting Defendants' Motion and Transferring Case that was entered by the Honorable Susan Illston of the United States District Court for the Northern District of California on January 21, 2011.

### III.   THE PARTIES

#### A.   Plaintiff Azmie Madanat

8.     Plaintiff Azmie Madanat is a resident of the County of Contra Costa, California.  In 2009, Mr. Madanat opened "Hot Wings," a small food stand operated inside the food mart of a gas station located in Oakland, California.

9.     At all relevant times, Mr. Madanat leased a POS Terminal from Defendants.  As a small merchant, Mr. Madanat acted as a consumer by purchasing, leasing, or renting credit card processing goods or services from Defendants.  Moreover, Defendants obtained a purported *personal guarantee* from Mr. Madanat, and have attempted to collect the fees and charges at issue herein from Mr. Madanat in his *personal* capacity.  Accordingly, Mr. Madanat is a consumer within the scope of New York's consumer protection laws.

#### B.   Defendants

##### 1.   First Data Corporation

10.     Defendant First Data is a Delaware Corporation with its principal place of business in Atlanta, Georgia.  First Data is a payment processing company that provides merchants throughout the United States with electronic commerce and payment services that allow their customers to make purchases via debit and credit cards.

##### 2.   First Data Merchant Services Corporation

11.     Defendant FDMS Corporation is a subsidiary of First Data.  FDMS is a Florida corporation with its principal place of business in Atlanta, Georgia.  First Data leases POS Terminals either directly or indirectly through its joint ventures with financial institutions, and those leases are assigned to FDMS.

### 3.    Agency, Joint Venture, and Aiding and Abetting Allegations

12.    At all relevant times, each Defendant was, and is, the agent of each of the remaining Defendants.  In doing the acts alleged herein within the course and scope of such agency, each Defendant ratified and/or authorized the wrongful acts of each of the other Defendants.  In particular, FDMS acts as an agent of First Data in leasing the POS Terminals and attempting to collect payments from merchants.

13.    At all relevant times, each Defendant was and is in a joint venture with each of the remaining Defendants.  In doing the acts alleged herein within the course and scope of such joint venture, each Defendant ratified and/or authorized the wrongful acts of each of the other Defendants.  Each Defendant was also a participant as an aider and abettor in the improper acts, plans, and schemes alleged herein.

### 4.    Doe Defendants

14.    Plaintiff is ignorant of the true names or capacities of Defendants sued herein as Doe 1 through Doe 25, and therefore sues these Defendants by such fictitious names.  Plaintiff further alleges that each fictitious Doe Defendant is in some manner responsible for the acts and occurrences set forth in the First Amended Complaint. Plaintiff will seek leave to amend this First Amended Complaint to show their true names and capacities when the same are ascertained, as well as the manner in which each fictitious Defendant is responsible for the damages sustained by Plaintiff.

## IV.    FACTUAL BACKGROUND

### A.    First Data's Business Model

15.    First Data is a payment processing company. The company handles multiple aspects of credit card payment processing, including merchant transaction

processing services, debit processing, card production, billing and correspondence, and the sale and/or lease of POS Terminals to merchants.

16.     As part of its business model, First Data enters into partnerships or joint ventures with banks and similar financial institutions.  Such customers are then steered to merchant accounts provided by banks and POS Terminal leases provided by First Data's subsidiary (FDMS).  Small business owners are required to give personal guarantees to First Data and the joint-venturing bank.  First Data and FDMS then deduct the monthly lease payments and other fees through direct withdrawals from the merchants' bank accounts.

17.     As part of the joint ventures, First Data commonly enters into "Revenue Sharing Alliances" with banks.  (Ex. A.)  Under the Revenue Sharing Alliance, First Data commits its sales staff to work ostensibly as the bank's agents.  First Data's sales staff work under a bank's name in an effort to leverage the bank's brand name and goodwill and to lure the bank's business account customers into subscribing to First Data's credit card processing services.  In return, First Data shares revenues with the joint venturing bank.  (*Id.*)

18.     The joint ventures may also include a Referral Bank Partnership Program, which allows banks to refer its banking customers to First Data.  (Ex. A.)  Under the referral program, the bank representative fills out a referral form and sends it to First Data for approval and completion.  (*Id.*)  First Data subsequently establishes the merchant account, determines the set-up requirements for the referred merchant, and completes the application process.  (*Id.*)  In return for the referral, the bank receives referral fees, a cash

advance fee for the branch transaction, and a monthly residual fee for the merchant's processed sales.  (*Id.*)

19.     First Data has entered into a joint venture with several financial institutions.  In 1993, for example, First Data partnered with Wells Fargo & Company to form Wells Fargo Merchant Services, LLC ("WFMS").  Despite using the "Wells Fargo" name, First Data was the majority and controlling shareholder in WFMS until December 2008.  Similarly, in June 2009, First Data announced that it had teamed up with Bank of America to create Banc of America Merchant Services, LLC ("BAMC").   Despite the "Bank of America" name, First Data is the largest and controlling shareholder in BAMC.

**B.     Defendants Systematically Engage in Unlawful, Unfair, and Fraudulent Business Practices Directed at Unsuspecting Merchants.**

20.     First Data and FDMS routinely engage in an unfair, predatory, and fraudulent scheme commonly targeted towards small business owners.  Such practices include overcharging merchants on their monthly lease payments and imposing unlawful lease break penalties.

**1.     Defendants Commonly Overcharge Merchants on Their Monthly Lease Payments and Make Unauthorized Withdrawals From Merchants' Bank Accounts.**

21.     First Data and its agents commonly assign merchants to long-term lease options, which are typically 36 or 48 months in length.  The costs of the monthly payments for the POS Terminals greatly exceed the purchase price of the terminal by multiple times.

22.     Defendants often overcharge merchants for the already inflated monthly lease payments.  Specifically, Defendants make monthly withdrawals for purported lease payments that are above the contractual lease rates.  Moreover, after merchants end their

lease with First Data and return their POS terminal, First Data commonly makes unauthorized electronic debits from the Merchant's bank accounts even after the POS terminal is returned.  First Data even goes as far as making unauthorized debits from merchants' *personal* bank accounts, despite having never received authorizations for electronic withdrawals.

23.     In Mr. Madanat's case, First Data leased him a Verifone VX570 terminal for 48 months at $39.00 per month.  Over 48 months, the total payments equal $1,872.00. That same Verifone terminal is available in new condition and without contract from multiple online retailers and can be purchased outright for between $200 and $300.

24.     Defendants significantly overcharged Mr. Madanat in two of the four months in which they withdrew money from his bank account.  In November 2009, for example, Defendants debited $55.66 from Mr. Madanat's account.  In February 2010, Defendants made several unauthorized debits totaling $78.79 for the purported monthly lease payment.  Moreover, as discussed below, after Mr. Madanat returned his POS terminal to First Data, Defendants made several unauthorized withdrawals from a *personal* checking account that Mr. Madanat and his wife had established primarily for personal, family, or household purposes.

> ### 2.     Defendants Commonly Impose an Unfair and Unconscionable Lease Break Penalty on Merchants Who Seek to Cancel their Lease.

25.     Defendants' standard from agreement provides First Data with discretion to choose between one of two remedies: one accounting for repossessing the terminal and no acceleration clause; the other for the terminal's fair market value and an acceleration clause.  (Exs. B and C.)  Despite repossessing the terminals, Defendants routinely choose the remedy that allows them to accelerate all remaining lease payments *and* demand the

terminal's fair market value *and*, in the event that a merchant returns their terminal, sell or re-lease the terminal to another merchant.

26.     First Data and FDMS have a standard policy of unilaterally imposing a penalty on merchants who seek to cancel their equipment lease and return their POS Terminal ("Lease Break Penalty").  Under the Lease Break Penalty, First Data commonly (1) treats the POS Terminal leases as non-cancellable; and (2) attempts to enforce an acceleration clause that purports to require merchants to pay in one lump sum all of the remaining lease payments *and* the POS Terminal's fair market value (as unilaterally determined by Defendants).  As a result, First Data forces merchants who seek to cancel their leases to either continue making monthly lease payments or pay thousands of dollars in penalties, even after such merchants have returned the leased POS Terminals to First Data.

27.     First Data's standard policy of imposing a Lease Break Penalty is reflected in its standard form Equipment Lease Agreement, which provides in pertinent part:

> Upon the occurrence of any default, we may at our option, effective immediately without notice, either (i) terminate this lease and our future obligations under this Agreement, repossess the Equipment and proceed in any lawful manner against you for collection of all charges that have accrued and are due and payable, or (ii) **accelerate and declare immediately due and payable all monthly lease charges for the remainder of the applicable lease period together with the fair market value of the Equipment (as determined by us),** not as a penalty but as liquidated damages for our loss of the bargain. . . .  You agree that we shall be entitled to recover any amounts due to us under this Agreement by charging your bank account or any other funds of yours that come into our possession or control, or within the possession or control of our affiliates, alliances or joint ventures, or by setting off amounts that you owe to use against any amount we may owe you, in any case without notifying you prior to doing so.

(Ex. B; emphasis added.)

28.     The same policy is also reflected in the terms and conditions that First Data has developed as part of its joint ventures with financial institutions.  The WFMS Program Guide, for example, contains a substantially identical provision that is unilaterally imposed and buried on page 28 of that 42-page "Program Guide:"

> Upon the occurrence of any default, we may at our option, effective immediately without notice, either (i) terminate this lease and our future obligations under this Lease Agreement, repossess the Leased Equipment and proceed in any lawful manner against you for collection of all charges that have accrued and are due and payable, or **(ii) accelerate and declare immediately due and payable all monthly lease charges for the remainder of the applicable lease period together with the fair market value of the Leased Equipment (as determined by us)**, not as a penalty but as liquidated damages for our loss of the bargain. . . .  You agree that we shall be entitled to recover amounts due to us under this Lease Agreement by charging your Settlement Account or any other funds of yours that come into our possession or control, or within the possession or control of our affiliates or joint ventures, or by setting off amounts that you owe to us against any amounts we may owe to you, in any case without notifying you prior to doing so.

(Ex. C; emphasis added.)

29.     Although First Data has the express option of terminating its lease agreement and collecting only charges that have accrued, First Data systematically treats leases as non-cancellable and demands remaining lease payments even after merchants have returned the leased POS Terminal to First Data.  First Data also attempts to enforce the acceleration clause and seeks payments of all sums due under the lease without mitigating for the amounts it receives for releasing the returned terminal to another merchant.  This conduct is particularly egregious because it results in a *triple-recovery* windfall for First Data.

30.     The Lease Break Penalty is highly unfair and unreasonable because it bears no reasonable relationship to the range of damages that could be anticipated from a merchant's breach of the lease.  It allows First Data to recover (1) the remaining lease payments *and* (2) the fair market value of the POS Terminal *and* (3) proceeds obtained from releasing or reselling the same POS Terminal to another merchant.

31.     By requiring a defaulting merchant to pay the sum of all remaining lease payments *and* the fair the value of the equipment (while failing to mitigate for the sums that First Data stands to recover from releasing the returned terminal), the implementation of the acceleration clause multiplies First Data's actual damages, if any, many times over.  With respect to merchants who have returned their POS Terminal to First Data, this formula for calculating damages constitutes an unenforceable penalty.

### C.     Plaintiff Azmie Madanat's Experience

32.     In summer 2009, Plaintiff Azmie Madanat set out to start a small food stand called "Hot Wings," which he planned to operate in the food mart of a gas station in Oakland, California.  In or about July 2009, Mr. Madanat opened a business checking account for "Hot Wings" at Wells Fargo Bank.

33.     In October 2009, Mr. Madanat applied for a credit card account with his bank.  The Merchant Processing Application was filled out entirely by a bank and/or First Data agent, who faxed the signature pages of the application to Mr. Madanat.  However, Mr. Madanat never received or signed a First Data Equipment Lease, nor did he receive the WFMS Program Guide.

34.     During the application process, Mr. Madanat was unilaterally assigned a 48-month lease for a Verifone VX570 credit card terminal, and upon information and belief, the lease was subsequently assigned to FDMS.   First Data and its agents

unilaterally approved a four-year lease for the Verifone terminal.  First Data and its agents failed to disclose the key terms of the lease, and also failed to disclose alternative options such as shorter lease terms, month-to-months rentals, or whether terminals were available for purchase.

35.     The monthly lease for the Verifone terminal was $39.00 per month (without taxes).[1]  As indicated above, over the course of 48 months, the total payments equal $1,872.00.  However, the same terminal is available online in new condition and without a contract for $200-$300.

36.     First Data and FDMS substantially over-debited Mr. Madanat's bank account in two out of the four months in which they made debits.  In November 2009 and February 2010, Defendants made unauthorized debits of $55.66 and $78.79, respectively. These debits constitute a significant overcharge to Mr. Madanat's contractual lease payment of $39.00 per month.  In fact, in February 2010, Defendants made three separate debits from Mr. Madanat's bank account.

37.     Within a few month of starting "Hot Wings," Mr. Madanat was no longer able to proceed with his "Hot Wings" business.  In or about January 2010, Mr. Madanat informed his bank that he would cancel his merchant services account.  However, Mr. Madanat continued to keep the bank account from which First Data made monthly lease deductions.

38.     Despite the fact that Mr. Madanat notified Defendants' joint venture partner that he wanted to cancel his account in February 2010, Defendants continued to

---

[1]     Assuming a tax rate of 9.75%, Mr. Madanat's total monthly lease payments would equal $42.80.

charge Mr. Madanat for monthly lease payments.  In fact, in February 2010, Defendants made multiple unauthorized deductions from Mr. Madanat's bank account.  Mr. Madanat was forced to close his bank account to prevent any further unauthorized deductions by First Data or FDMS.

39.    On April 22, 2010, Mr. Madanat returned the Verifone terminal to First Data.  Despite the fact that Mr. Madanat returned the terminal, First Data continued to bill Mr. Madanat for monthly lease payments.  On May 12, 2010, First Data sent Mr. Madanat an invoice and attempted to collect monthly lease payments for March, April, and May 2010.[2]  (Ex. D.)

40.    First Data then accelerated Mr. Madanat's lease and has demanded a lump-sum payment of $2,026.72, which is nearly $200 more than the total amount of payments under the *entire* lease period.  (Ex. E.)  Defendants have also made reports to credit reporting agencies indicating that Mr. Madanat continues to owe the total remaining payments on the lease.

41.    On or about July 26, 2010, Mr. Madanat sent a check for $165.22 to First Data to pay an invoice that First Data transmitted in May 2010, and which covered a period of time after Plaintiff's return of the POS Terminal.  That check was drawn from a joint personal checking account between Mr. Madanat and his wife at Chase Bank, which Mr. Madanat and his wife had established primarily for personal, family, or household purposes.  Although Mr. Madanat submitted a paper check to First Data from that

_____

[2]    First Data also imposed junk fees, including a purported "Returned ACH Fee" of $10.98, an "Invoice Fee" of $15.38, and purported "Late Charges" of $10.43.

account, they never authorized First Data to make electronic withdrawals from their *personal* Chase account.

42.     Subsequently, Defendants made a number of unauthorized withdrawals from that account. These included withdrawals of $162.59 (August 6, 2010); $42.81 (August 10, 2010); and $30.20 (September 1, 2010).   Notably, these unauthorized withdrawals were made during the pendency of this litigation.

43.     The following chart summarizes Defendants' debits from Mr. Madanat's accounts:

| Date | Description | Amount |
|------|-------------|--------|
| 11/10/2009 | Fdgl Lease Pymt | $55.66 |
| 12/10/2009 | Fdgl Lease Pymt | $42.81 |
| 1/11/2010 | Fdgl Lease Pymt | $42.81 |
| 2/10/2010 | Fdgl Lease Pymt | $42.81 |
| 2/11/2010 | Preauthorized Debit Reversal | ($42.81) |
| 2/17/2010 | Fdgl Lease Pymt | $53.79 |
| 2/23/2010 | Fdgl Lease Pymt | $25.00 |
| 8/6/2010 | Fdgl Lease Pymt | $165.29 |
| 8/10/2010 | Fdgl Lease Pymt | $42.81 |
| 9/1/2010 | Fdgl Lease Pymt | $30.20 |

44.     Mr. Madanat has suffered economic injury and has lost money as a result of First Data's unlawful, unfair, and fraudulent business practices by, among other things, (1) First Data withdrawing excessive payments from Mr. Madanat's business account; (2)

Mr. Madanat paying First Data's monthly lease charges after returning the terminal; and (3) First Data making unauthorized electronic withdrawals from Mr. Madanat's personal bank account.

## V.    CLASS ALLEGATIONS

45.    Plaintiff brings this action against Defendants on behalf of himself and a nationwide Class of all others similarly situated.  Due to a choice of law provision, New York law will uniformly apply to the claims of the Class. (Ex. C, § 33.1.)  The proposed Class is defined in three parts: (1) a Lease Overcharge Class; (2) a Lease Break Penalty Class; and (3) an Unauthorized Withdrawal Class (and an Electronic Funds Transfer Act Subclass).

46.    The proposed Lease Overcharge Class is defined as follows:

> All merchants in the United States who during any billing period were charged for monthly lease payments in an amount above the contractual rate for that period.

47.    The proposed Lease Break Penalty Class is defined as follows:

> All merchants in the United States who returned their POS Terminal(s) to Defendants prior to their lease expiration and who were charged for lease payments for any period of time after the return of the POS Terminal.

48.    The proposed Unauthorized Withdrawal Class is defined as follows:

> All merchants in the United States from whose bank accounts Defendants made electronic funds withdrawals either (1) after the return of the POS Terminal(s) to Defendants or (2) without prior written authorization for transfer from the specific account debited.

49.   The Electronic Funds Transfer Act Subclass is defined as follows:

> All natural persons in the United States from whose personal bank accounts Defendants made electronic funds withdrawals either (1) after the return of the POS Terminal(s) to Defendants or (2) without prior written authorization for transfer from the specific account debited.

50.   Plaintiff may also seek the to certify additional subclasses, as the Court would deem appropriate.  Excluded from the Class are:  (1) employees of First Data Corporation and First Data Merchant Services Corporation, including their officers and directors; (2) any judge to whom this action is assigned and the judge's immediate family; and (3) persons who timely and validly opt to exclude themselves from the Class.

**A.    The Proposed Class Satisfies Rule 23(a).**

**1.    Numerosity and Ascertainability**

51.   On information and belief, the Class is comprised of many merchants throughout the United States, making joinder impracticable.

52.   The Class is composed of an easily ascertainable, self-identifying set of individuals and entities billed by Defendants for POS Terminal leases.  The information as to the identity of class members can be readily determined from records maintained by Defendants and their affiliates.

**2.    Predominance of Common Issues**

53.   There are numerous questions of law and fact common to all class members, and those questions predominate over any questions that may affect only individual class members.

54.   The predominant common questions include the following:

a.   Whether the Lease Break Penalty is enforceable under New York law;

b.   Whether Defendants' conduct constitutes a violation of the Electronic Funds Transfer Act, 15 U.S.C. § 1693;

c.   Whether Defendants violated N.Y. Gen. Bus. § 349;

d.   Whether Defendants' conduct constitutes breach of contract;

e.   Whether Defendants' conduct constitutes a breach of the covenant of good faith and fair dealing;

f.   Whether Defendants have been unjustly enriched;

g.   Whether Defendants are liable for intentional acts of deceit;

h.   Whether Defendants' conduct constitutes conversion;

i.   Whether Plaintiff and the Class are entitled to compensatory damages;

j.   Whether Plaintiff and the Class are entitled to restitution; and

k.   Whether Defendants should be enjoined from imposing and collecting the Lease Break Penalty.

### 3.   Typicality

55.   Plaintiff's claims are typical of the claims of the Class.  Plaintiff and the Class were subjected to the same kind of unlawful conduct and the claims of Plaintiff and the Class are based on the same legal theories.

### 4.   Adequacy

56.   Plaintiff will fairly and adequately represent and protect the interests of the Class.  Plaintiff has retained counsel with substantial experience in prosecuting consumer class actions.  Plaintiff and his counsel are committed to vigorously

prosecuting this action on behalf of the Class.  Neither Plaintiff nor his Counsel have interests adverse to those of the Class.

> **B.      The Proposed Class Satisfies Rule 23(b).**

57.      Injunctive relief is appropriate as to the Class as a whole because Defendants have acted or refused to act on grounds generally applicable to the class.

58.      A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because of the relatively modest economic value of the individual class members' claims, few would likely seek their rightful legal recourse.

59.      Without a class action, individual class members would face burdensome litigation expenses, deterring them from bringing suit or adequately protecting their rights.  A class action will allow class members whose claims are too small to warrant an individual action to be compensated for their losses.

60.      A class action will conserve judicial resources and promote a fair and consistent resolution of these claims.  Absent a class action, class members would continue to incur harm without remedy, while Defendants would continue to reap the benefits of their misconduct.

**VI.      CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**

**(Declaratory Relief)**

61.      Plaintiff incorporates the foregoing paragraphs by reference as though set forth fully herein.

62.     A real and actual controversy has arisen and now exists between Plaintiff and Defendants concerning the legality and enforceability of Defendants' practices complained of herein.

63.     Plaintiff and the Class contend that the Lease Break Penalty at issue herein is unenforceable for several independent reasons:

(1)     The Lease Break Penalty is grossly disproportionate to the actual harm, if any, suffered by First Data as a result of a merchant's breach of the lease agreement.   Specifically, the Lease Break Penalty leads to a *triple* recovery by Defendants, and it fails to consider mitigation of damages.   The provision allows Defendants to obtain: (1) the benefit of the bargain, in that it accelerates all remaining lease payments; (2) the so-called "fair market value" of the terminal, as determined solely by Defendants; and (3) lease payments from a new lease that it can sign with another merchant by re-leasing the repossessed terminal.   Such provisions are unlawful as a matter of law.   *See, e.g. Atel Fin. Corp. v. Quaker Coal Co.*, 132 F. Supp. 2d 1233 (N.D. Cal. 2001); and

(2)     The Lease Break Penalty is an option clause that give Defendants the option to disregard a liquidated sum and sue for actual damages.   Such provisions are invalid and unenforceable under New York law.

64.     Plaintiff, on behalf of himself and the Class, seeks a judicial determination as to the legality of the practices complained of herein.   A judicial declaration is necessary and appropriate at this time in order for Plaintiff and the Class to ascertain their rights and duties.

WHEREFORE, Plaintiff and the Class pray for relief as set forth below.

## SECOND CAUSE OF ACTION

### (Breach of Contract)

65.     Plaintiff incorporates the foregoing paragraphs by reference as though set forth fully herein.

66.     Plaintiff and the Class entered into agreements with Defendants for leasing the POS Terminals.  The lease agreements provide for fixed monthly lease payments.

67.     Plaintiff and the Class have done all, or substantially all, of the significant things that the contract required them to do, or alternatively, they were excused from doing those things.  All conditions required by the contract for Defendants' performance have occurred.

68.     Defendants breached their agreement with Plaintiff and the Class by making monthly charges that are in excess of that provided for in lease agreements.

69.     Plaintiff and the Class were harmed by Defendants' breach of contract in that they were required to make monthly lease payments that were in excess of that provided in the agreement.

WHEREFORE, Plaintiff and the Class pray for relief as set forth below.

## THIRD CAUSE OF ACTION

### (Breach of Covenant of Good Faith and Fair Dealing)

70.     Plaintiff incorporates the foregoing paragraphs by reference as though set forth fully herein.

71.     In every contract or agreement there is an implied promise of good faith and fair dealing. This means that each party will not do anything to unfairly interfere with the right of any other party to receive the benefits of the contract.  The covenant of good

faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another.   Such power must be exercised in good faith.

72.    Plaintiff and the Class entered into agreements with Defendants to lease the POS Terminals.   In the event of default, the contract provided First Data with discretion to choose between one of two remedies: (1) repossessing the terminal and collecting charges that have accrued (i.e. no acceleration clause); or (2) accelerating all payments due under the lease together with the terminal's fair market value.  (Ex. B and C; quoted above.)  Despite repossessing the terminals, Defendants routinely choose the remedy that allows them to accelerate all remaining lease payments *and* demand the terminal's fair market value *and*, in the event that a merchant returns their terminal, sell or re-lease the terminal to another merchant.

73.    Plaintiff and the Class have done all, or substantially all, of the significant things that the contract required them to do, or alternatively, they were excused from doing those things.  All conditions required by the contract for Defendants' performance have occurred.

74.    Defendants breached the covenant of good faith and fair dealing by pursuing the more punitive remedy even after they have repossessed the leased equipment.   This conduct lacks a good faith basis and falls outside the reasonable expectation of Plaintiff and class members.

WHEREFORE, Plaintiff and the Class pray for relief as set forth below.

## FOURTH CAUSE OF ACTION

### (Deceit, Fraud and/or Misrepresentation)

75.     Plaintiff incorporates the foregoing paragraphs as though set forth fully herein.

### Failure to Disclose Alternatives To Lease Options

76.     During the application process, Defendants and their agents unilaterally assigned long term and costly POS Terminal leases to merchants.  During this process, Defendants and their agents failed to disclose less-costly alternative options such as shorter lease terms, month-to-months rentals, or whether terminals were available for purchase.  As a result, Plaintiff and class members do not know and are unaware of less costly alternatives, such as the option to purchase the POS Terminal outright or to enter into a month-to month rental.

77.     These omitted and concealed facts are material and affect Plaintiff's and class members' decision regarding purchasing, renting, or leasing POS Terminals. Defendants' intended to deceive Plaintiff and class members into entering more costly POS Terminal leases with onerous Lease Break Penalties.

78.     Plaintiff and class members have relied on Defendants' deception by entering into costly POS Terminal leases that contain Lease Break Penalties.  Plaintiff and class members have suffered harm by virtue of being unable to cancel their POS Terminal Leases, and paying Lease Payments and other charges covering time periods after they have returned their POS Terminals to Defendants.

**<u>Unauthorized Electronic Funds Transfers</u>**

79.     Defendants have commonly attempted to obtain electronic withdrawals from depository institutions.  They have done so despite the fact that (1) merchants returned the equipment and canceled Defendants' authorization for such withdrawals; or (2) Defendants did not have written authorization for the specific account being debited. As such, Defendants' presentations of electronic fund transfer withdrawals are false, deceitful, and fraudulent in that the return of the POS terminals terminated Plaintiff's and class members' leases with Defendants, and in the case of unauthorized withdrawals, Defendants had no authority to make such withdrawals from Plaintiff's and class members' accounts.

80.     Defendants' presentment of requests for electronic funds transfer to financial institutions were known by Defendants to be false and material and were intended by the Defendants to mislead and deceive Plaintiff and members of the Class.

81.     Plaintiff and the Class were actually mislead and deceived, and were induced by the Defendants to incur charges and fees that otherwise would not have incurred.  Plaintiff and class members have suffered harm by virtue of Defendants' wrongfully taking such money directly from their bank accounts for fees and charges associated for the lease of POS Terminals -- despite the fact that Plaintiff and class members did not authorize such deductions.

WHEREFORE, Plaintiff and the Class pray for relief as set forth below.

## FIFTH CAUSE OF ACTION

### (Electronic Funds Transfer Act, 15 U.S.C. § 1693)

82. Plaintiff incorporates the foregoing paragraphs by reference as though set forth fully herein.

83. The Electronic Funds Transfer Act, 15 U.S.C. § 1693 *et seq.* ("EFTA"), was designed and enacted "to provide a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund and remittance transfer systems."  15 U.SC. § 1693(b).  To this end, the EFTA sets forth statutory mandates governing preauthorized electronic funds transfer from a consumer's account.

84. Plaintiff and class members are natural persons and "consumers" within the meaning of 15 U.S.C § 1693(a)(5).  Defendants have engaged and continue to engage in the business practice of initiating and effecting "preauthorized electronic fund transfers," (within the meaning of 15 U.S.C § 1693(a)(9)) from customer "accounts" (within the meaning of 15 U.S.C § 1693(a)(2)), for purposes of collecting monthly POS Terminal lease payments and other charges that are imposed by Defendants.

85. EFTA, 15 U.S.C. section 1693e, regulates preauthorized electronic fund transfers and provides as follows:

(a)     A preauthorized electronic fund transfer from a consumer's account may be authorized by the consumer only in writing, and a copy of such authorization shall be provided to the consumer when made. A consumer may stop payment of a preauthorized electronic fund transfer by notifying the financial institution orally or in writing at any time up to three business days preceding the scheduled date of such transfer. The

financial institution may require written confirmation to be provided to it within fourteen days of an oral notification if, when the oral notification is made, the consumer is advised of such requirement and the address to which such confirmation should be sent.

(b)      In the case of preauthorized transfers from a consumer's account to the same person which may vary in amount, the financial institution or designated payee shall, prior to each transfer, provide reasonable advance notice to the consumer, in accordance with regulations of the Board, of the amount to be transferred and the scheduled date of the transfer.

86.     Defendants have violated the EFTA in multiple respects.   <u>First</u>, Defendants have engaged and continue to engage in the business practice of limiting Plaintiff's and class members' rights to cancel or stop payment of a preauthorized electronic fund transfer.  Defendants accomplish this process by treating POS Terminal leases as non-cancellable and inserting provisions in their terms and conditions that purport to give Defendants the right to obtain any amount due under the lease agreement by charging any fund within the control of Defendants' affiliates.  (*See* Ex. C at ¶ 32.12(b) - "You agree that we shall be entitled to recover any amounts due to us under this Lease Agreement by charging your Settlement Account or any other funds of yours that come into our possession or control, or within the possession or control of our affiliates or joint ventures, or by setting off amounts that you owe to us against any amounts we may owe to you, in any case without notifying you prior to doing so.") These practices violate the EFTA, including 15 U.S.C. section 1693e(a), which permits a

consumer to stop payment of a preauthorized electronic fund transfer by notifying either orally or in writing up to three business days prior to the scheduled date of the transfer.

87.     <u>Second</u>, Defendants have withdrawn funds from Plaintiff's and class members' accounts without obtaining written authorization for each specific account from which they have electronic transfers.  These practices violate the EFTA, including 15 U.S.C. section 1693e(a), which provides that a preauthorized electronic fund transfer from a consumer's account may be authorized by the consumer only in writing.

88.     <u>Third</u>, in the case of preauthorized transfers that vary in amount, Defendants have failed to provide reasonable advance notice to the consumer prior to each transfer of the amount to be transferred and the scheduled date of the transfer, in violation of 15 U.S.C. § 1693e(b).

89.     As a direct and proximate result of these violations, Plaintiff and the Class were and continue to be damaged.  Plaintiff and the Class are entitled to relief, including an injunction against the practices complained of herein.  Plaintiffs and the Class are further entitled to recover actual damages sustained as a result of Defendants' violations of the EFTA, statutory damages, and attorneys' fees and costs in accordance with 15 U.S.C. section 1693m.

WHEREFORE, Plaintiff and the Class pray for relief as set forth below.

## <u>SIXTH CAUSE OF ACTION</u>

### (New York Deceptive Sales Practices Act)

90.     Plaintiff incorporates the foregoing paragraphs by references as set forth fully herein.

91.     Plaintiff is a consumer who has been deceived by acts that have broad impact on a large class of customers.

92.     Defendants engaged in material, deceptive, consumer-oriented acts in the conduct of their business that injured United States citizens in violation of N.Y. Gen. Bus. Law § 349 by deceitfully and wrongfully (1) imposing unlawful overcharges related to the leasing of POS Terminals from Defendants; and (2) by making unauthorized withdrawals from *personal* checking accounts held by Plaintiff and class members that were established primarily for personal, family, or household purposes.  These deceptive acts were conceived and implemented in New York.

93.     The unfair and deceptive acts and practices of Defendants have directly, foreseeably and proximately caused or will cause damages and injuries to Plaintiff and to the members of the Class.

94.     The actions and failures of the acts of the Defendants, and the above described course of conduct, constitutes acts, uses, or employment by Defendants of unconscionable commercial practices, deception, fraud, false pretenses, misrepresentations, and the knowing concealment, suppression, or omission of material facts with the intent that others rely upon such concealment, suppression, or omission of material facts in connection with the leasing of merchandise from Defendants, in violation of New York law.

95.     Plaintiff and class members relied upon Defendants' misrepresentations and omissions in applying for and entering into their equipment lease contracts and by reason of the unlawful acts engaged in by Defendants, Plaintiff and class members suffered ascertainable loss and damages.

96.     As a direct and approximate result of the Defendants' wrongful conduct, Plaintiff and the Class were damaged and are entitled to compensatory damages, treble damages, attorneys' fees, and costs of the suit.

WHEREFORE, Plaintiff and the Class pray for relief as set forth below.

### SEVENTH CAUSE OF ACTION

### (Conversion)

97.     Plaintiff incorporates the foregoing paragraphs as though set forth fully herein.

98.     Plaintiff and the class members own and the have the right to possess the money that is in their bank accounts.

99.     Defendants interfered with the Plaintiff's and with the class members' possession of this money by wrongfully taking such money directly from their bank accounts for fees and charges associated for the lease of POS Terminals -- despite the fact that Plaintiffs and class members did not authorize such deductions outright or at the rates charged.   Plaintiffs and class members never consented to Defendants taking such excessive fees and charges from their bank accounts.

100.     Plaintiffs and the class members have been damaged by the Defendants' wrongful taking of such fees and charges from their bank accounts, and these amounts are capable of identification through Defendants' records.

WHEREFORE, Plaintiff and the Class pray for relief as set forth below.

## EIGHTH CAUSE OF ACTION

### (Unjust Enrichment)

101.    Plaintiff incorporates the foregoing paragraphs by reference as though set forth fully herein.

102.    As a result of their wrongful acts and omissions described herein, Defendants have been unjustly enriched at the expense of Plaintiff and the Class. Defendants have wrongfully benefited by charging and receiving unlawful and unconscionable fees from Plaintiff and the Class.

103.    It would be inequitable for Defendants to retain the profits, benefits, and other compensation obtained by them from their wrongful conduct.  Plaintiff and the Class are entitled to full restitution and/or disgorgement of all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct.

WHEREFORE, Plaintiff and the Class pray for relief as set forth below.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on his behalf and on behalf of the Class, prays for relief as follows:

A.     For an order certifying the Class and appointing Plaintiff and his Counsel to represent the Class;

B.     For an order awarding Plaintiff and the Class compensatory damages, statutory damages, restitution and/or disgorgement, and other equitable relief as the Court deems proper;

C.     For an order enjoining the Defendants from engaging in the wrongful practices described herein;

D.    For an order awarding Plaintiff and the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees and other costs that may be deemed applicable; and

E.    For an order awarding such other further relief as this Court may deem just and proper.

## VIII.   DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury of all claims so triable herein.

Dated: March 23, 2011                          Respectfully submitted,

HANLY CONROY LLP


 *s/ Mitchell Breit*
Mitchell Breit
112 Madison Avenue
New York, NY  10016
212.784.6400
E-mail: mbreit@hanlyconroy.com

Ali Abtahi (admitted *pro hac vice*)
ABTAHI LAW FIRM
1528 S. El Camino Real, Suite 204
San Mateo, CA  94402
Tel: 650.341.1300
Fax: 650.341.1303
E-mail: aabtahi@abtahilaw.com

T. Christopher Tuck (*Pro hac vice* pending)
RICHARDSON, PATRICK,
WESTBROOK & BRICKMAN LLC
PO Box 1007
Mt. Pleasant, SC  29465
Tel: 843.727.6500
Fax: 843.216.6509
E-mail: ctuck@rpwb.com

ATTORNEYS FOR PLAINTIFF AZMIE
MADANAT AND THE CLASS