



# Program Guide



# PREFACE

Thank you for selecting us for your payment processing needs. Accepting numerous payment options provides a convenience to your customers, increases your customers' ability to spend at your establishment, and helps speed payment to your account.

The majority of this Program Guide presents terms governing the acceptance of Credit Card payments.

The Program Guide also includes provisions controlling the acceptance of PIN Debit and Non-PIN Debit Card payments, Electronic Benefits Transfer payments, and TeleCheck® Check Services. Your Merchant Processing Application will indicate the types of payments and services you have elected to accept.

Credit Cards present risks of loss and non-payment that are different than those with other payment systems. In deciding to accept Credit Cards, you should be aware that you are also accepting these risks.

Visa U.S.A. Inc. ("Visa") and MasterCard International, Incorporated ("MasterCard") and Discover Financial Services LLC ("Discover") are payment card networks that electronically exchange Sales Drafts and Chargebacks for Credits and Debits. (We will refer to Visa, MasterCard and Discover as "Associations.") Sales Drafts are electronically transferred from banks (in the case of Visa and MasterCard transactions) or network acquirers (in the case of Discover transactions) that acquire them from merchants such as yourself (these banks and network acquirers are referred to as "Acquirers") through the appropriate Association, to the bank that issued the Cardholder's Credit Card (referred to as "Issuers"). The Issuers then bill their Cardholders for the transactions. The Associations charge the Acquirers interchange fees and assessments for submitting transactions into their systems. A substantial portion of the Discount or Transaction Fees that you pay will go toward these fees and assessments.

Discover is not a bank card network. Bank is not a sponsor of Discover Card transactions under this Agreement and is not a party to this Agreement insofar as it relates to Discover Card transactions. The provisions of this Agreement regarding Discover Card constitute an agreement solely between you and Processor.

In order to speed up the payment process, the Issuer transfers the funds back through the Association to the Acquirer at approximately the same time that the Issuer receives the electronic Sales Drafts. Even though the payments under this system are made simultaneously, all payments made through the Associations are conditional and subject to reversals and adjustments.

Each Association has developed rules and regulations ("Association Rules") that govern their Acquirers and Issuers and the procedures, responsibilities and allocation of risk for this process. The Association Rules and applicable banking laws give Cardholders and Issuers certain rights to dispute transactions, long after payment has been made to the merchant. These disputed transactions are referred to as Chargebacks.

We do not decide what transactions are charged back and we do not control the ultimate resolution of the Chargeback. While we can attempt to reverse a Chargeback to the Issuer, we can only do so if the Issuer agrees to accept it or the Association requires the Issuer to do so after a formal appeal process. Sometimes, your customer may be able to successfully charge back a Credit Card transaction even though you have provided your goods or services and are otherwise legally entitled to payment from your customer. While you may still be able to pursue claims directly against that customer, neither we nor the Issuer will be responsible for such transactions.

You will be responsible for all Chargebacks and adjustments associated with the transactions that you submit for processing.

Please refer to the Glossary for defined terms used in the Agreement.

**This Program Guide, together with your Merchant Processing Application and the Schedules thereto (the "Agreement"), contains the terms and conditions under which we will provide Services for Card transactions and other types of payment. We will not accept any alterations or strike-outs to the Agreement. Please read this booklet completely as it contains important information.**

# Program Guide

## Table of Contents

**Operating Procedures**

1. MasterCard, Visa and Discover Acceptance ........................ 3
   - 1.1. Card Descriptions ................................. 3
   - 1.2. Effective/Expiration Dates ...................... 3
   - 1.3. Valid Signature ................................. 3
   - 1.4. Users Other Than Cardholders .................. 4
   - 1.5. Special Terms ................................... 4
   - 1.6. Delayed Delivery or Deposit Balance ........... 4
   - 1.7. Recurring Transaction and Preauthorized Order Regulations ............................... 4
   - 1.8. Honoring Cards .................................. 5
   - 1.9. Card Acceptance ................................ 5
   - 1.10. Deposits of Principals ........................ 5
   - 1.11. Merchants in the Lodging Industry ........... 5
   - 1.12. Customer Activated Terminals and Self Service Terminals ........................ 5
   - 1.13. Displays and Advertising ..................... 5
   - 1.14. Cash Payments by and Cash Disbursements to Cardholders ............................... 6
   - 1.15. Discover Cash Over Transactions ............. 6
   - 1.16. Telecommunication Transactions ............. 6
2. Suspect Transactions ................................... 6
3. Completion of Sales and Credit Drafts .................. 6
   - 3.1. Information Required ........................... 6
   - 3.2. Mail/Telephone/Internet (Ecommerce) Orders and Other Card Not Present Sales .............. 7
   - 3.3. Customer Service Telephone Numbers for Cards Other Than MasterCard, Visa and Discover ..... 8
4. Data Security ........................................... 8
5. Authorizations .......................................... 9
   - 5.1. Card Not Present Transactions ................ 9
   - 5.2. Authorization via Telephone (Other Than Terminal/Electronic Device Users) .......... 9
   - 5.3. Authorization via Electronic Devices ......... 10
   - 5.4. Third Party Authorization System ............ 10
   - 5.5. Automated Dispensing Machines ............... 10
   - 5.6. Pre-Authorization for T&E (Travel & Entertainment) and Restaurant Merchants ..... 10
   - 5.7. Discover Procedure for Request for cancellation of Authorization .............................. 11
6. Submission/Deposit of Sales and Credit Drafts ........ 11
   - 6.1. Submission of Sales for Merchants Other Than Your Business ............................... 11
   - 6.2. Timeliness ..................................... 11
   - 6.3. Mail/Branch Deposit Procedures .............. 11
   - 6.4. Electronic Merchants: Daily Batching Requirements & Media Submission .............. 11
7. Settlement ............................................. 11
8. Refunds/Exchanges (Credits) .......................... 12
   - 8.1. Refunds ....................................... 12
   - 8.2. Exchanges ..................................... 12
9. Retention of Records for Retrievals and Chargebacks ... 12
   - 9.1. Retain Legible Copies ......................... 12
   - 9.2. Provide Sales and Credit Drafts .............. 12
   - 9.3. Ensure Proper Retrieval Fulfillment .......... 12
10. Chargebacks and Other Debits ........................ 12
    - 10.1. Chargebacks ................................. 12
    - 10.2. Other Debits ................................ 15
    - 10.3. Summary (Deposit) Adjustments/Electronic Rejects ...... 15
    - 10.4. Disputing Other Debits and Summary Adjustments ........ 16
11. Account Maintenance ................................. 16
    - 11.1. Change of Settlement Account Number ....... 16
    - 11.2. Change in Legal Name or Structure ......... 16
    - 11.3. Change Company DBA Name, Address or Telephone/Facsimile Number ................ 16
    - 11.4. Other Changes in Merchant Profile ......... 16
12. Association Compliance .............................. 16
13. Supplies ............................................ 16

**General Terms**

14. Services ............................................. 17
15. Operating Procedures; Association Rules ............ 17
16. Settlement of Card Transactions .................... 17
17. Exclusivity .......................................... 17
18. Fees; Adjustments; Collection of Amounts Due ...... 17
19. Chargebacks ......................................... 18
20. Representations; Warranties; Limitations on Liability; Exclusion of Consequential Damages ............... 18
21. Confidentiality ..................................... 18
22. Assignments ......................................... 19
23. Term; Events of Default ............................ 19
24. Reserve Account; Security Interest ................. 20
25. Financial and Other Information .................... 21
26. Indemnification ..................................... 21
27. Special Provisions Regarding Non-Bank Cards ....... 21
28. Special Provisions for PIN Debit Card ............. 21
29. Special Provisions Regarding Electronic Benefit Transfer ........ 22
30. Special Provisions Regarding Wireless Services .... 23
31. Terms of Equipment Purchase or Rental ............. 24
32. **Equipment Lease Agreement** ..................... 26
33. Choice of Law; Venue; Waiver of Jury Trial ........ 29
34. Other Terms ......................................... 29

35. **Glossary** ........................................ 30

**Third Party Agreements**

36. TeleCheck Services Agreement ....................... 33

37. **Additional Important Information**
    - 37.1. Electronic Funding Authorization ........... 40
    - 37.2. Funding Acknowledgement .................... 40
    - 37.3. Additional Fees and Early Termination ...... 40
    - 37.4. Addresses For Notices ...................... 40

**Duplicate Confirmation Page** ......................... 41
**Confirmation Page** .................................. 42

# PROGRAM GUIDE

## OPERATING PROCEDURES

This part of the Program Guide (through Section 13) describes the procedures and methods for submitting Credit Card transactions for payment, obtaining authorizations, responding to Chargebacks and Media Retrieval requests, and other aspects of the operations of our services.

Processor is a full-service financial transaction processor dedicated, among other processing services, to facilitating the passage of your Sales Drafts back to the thousands of institutions who issue the MasterCard,® Visa® and Discover® Cards carried by your customers, as well as to the independent Card Issuers of American Express®/Optima,® and JCB.® The Operating Procedures contained in this part focus primarily on the MasterCard, Visa and Discover Associations' operating rules and regulations, and seek to provide you with the principles for a sound Card program. They are designed to help you decrease your chargeback liability and train your employees. (In the event we provide authorization, processing or settlement of transactions involving Cards other than MasterCard, Visa and Discover, you should also consult those independent Card Issuers' proprietary rules and regulations.)

The requirements set forth in these Operating Procedures will apply unless prohibited by law. You are responsible for following any additional or conflicting requirements imposed by your state or local jurisdiction.

## 1. MasterCard, Visa And Discover Acceptance

**1.1.  Card Descriptions.** At the point of sale, the Card must be carefully examined to determine whether it is a legitimate and valid Card. The name of the Card (e.g., Visa, MasterCard or Discover) should appear in bold letters on the Card. For all MasterCard and Visa Cards and some Discover Cards, the Card Issuer (e.g., XYZ Bank, etc.) should also appear in bold letters on the Card. The following is a description of the authorized Visa, MasterCard and Discover Card designs:

**Visa:** Visa Cards have the Visa symbol on the right-hand side of the Card. Above the Visa symbol is the 3-dimensional hologram of the Visa Dove design. The expiration date must be followed by one space and the symbol "V". Visa Cards contain a 16-digit account number embossed across the middle of the Cards and the first digit is always a four (4). In addition, the Classic and Preferred Cards have the first four digits of the account number printed directly below the embossed number. You must always check these numbers carefully to ensure that they are the same. Beginning January 2006, Visa has a new Card design which differs significantly from the previous description. You are required to familiarize yourself with the new design by consulting the document entitled "Rules for Visa Merchants – Card Acceptance and Chargeback Management Guidelines" (VRM 09.04.05). You may download the document free of charge from Visa's website at http://www.visa.com/merchant or order a hardcopy to be mailed to you for a nominal charge by telephoning Visa Fulfillment at 800-VISA-311. Both the old and new Visa Card designs will be circulating concurrently in the marketplace through the year 2010. Only Visa Cards fitting the old or new descriptions may be accepted.

**MasterCard:** MasterCard Cards are issued under the following names: MasterCard, EuroCard, Access, Union, Million and Diamond. The MasterCard symbol appears on the front or back of the Card. MasterCard and the Globe designs appear in a 3-dimensional hologram above the symbol. In addition, the words Classic, Preferred, Gold or Business may appear. MasterCard account numbers are sixteen (16) digits, and the first digit is always a five (5). The first four digits of the account must be printed directly below the embossed number. Only MasterCard Cards fitting this description may be accepted. Pursuant to an alliance with MasterCard, Diners Club Cards issued in the United States and Canada are being re-issued with a sixteen (16) digit account number the first two digits of which are now fifty-five (55) and with the MasterCard mark and hologram on the front of the Diners Club Card. These Diners Club Cards shall be accepted and processed in the same manner as MasterCard transactions.

Diners Club International Cards that are issued outside the U.S. and Canada may be re-issued with the MasterCard mark on the back of the Card. These Diners Club Cards will have account numbers that are fourteen (14) digits, the first two digits of which are thirty-six (36). When these Diners Club Cards are used within the United States, Canada and other designated areas, they will be processed as MasterCard transactions. Beginning Jan 2006, MasterCard has a new Card design significantly different from the previous description. You are required to familiarize yourself with the new design by consulting a document "MasterCard Card Identification Features." You may download the document free of charge from MasterCard's website at http://www.mastercardmerchant.com. Both the old and new MasterCard Card designs will be circulating concurrently in the marketplace through the year 2010. Only MasterCard Cards fitting the old or new descriptions may be accepted.

**Discover:** Most standard, rectangular Discover Cards display the Discover Network Acceptance mark in the lower right corner on both sides of the Card or, through October 2008, the Discover/Novus Acceptance mark only on the back of the Card. After October 2008, however, Discover Cards will only display the Discover Network Acceptance Mark on both sides of the Card. Either the words "DISCOVER" or "DISCOVER NETWORK" appear in ultraviolet ink on the front of the card which becomes visible when held under an ultraviolet light. Discover account numbers are sixteen (16) digits embossed in clear and uniform size and spacing, and where a hologram is present, the last four digits of the account number extend into the hologram. Cards issued before April 15, 2006 will display either a circular or rectangular three-dimensional hologram of a globe with an arrow through it. Newer Cards will have a holographic magnetic stripe, and the holographic globe art on the front of the Card will not be present. The embossed expiration date, if present, appears in a MM/YY format below the words "Valid Thru." An underprint of the word "VOID" becomes visible on the signature line of Discover Cards if erasure of the signature is attempted. Most standard, rectangular Discover Cards have the cardholder's name embossed on the front of the Card and a scripted "D" embossed beneath the account number on the front of the card on the same line as the embossed expiration date. Also, for most standard, rectangular Cards the account number or last four (4) digits of the account number appear in reverse indent printing on the signature panel and must match the last four (4) digits of the account number embossed on the front of the Card. Standard, rectangular plastic, stored value Cards are not required to bear the cardholder name, and for certain merchants, may not bear the globe pattern hologram or the Discover Network Acceptance Mark. Valid Cards will not always be rectangular in shape (e.g. Discover 2GO™ Cards). Discover may implement new Card designs and/or security features. You are required to remain familiar with Discover Card designs and may reference the document "Discover Network Security Features." You may download the document free of charge from Discover's website at http://www.discovernetwork.com/merchant/home/data/index.html.

**1.2.  Effective/Expiration Dates.** At the point of sale, the Card should be carefully examined for the effective (valid from) (if present) and expiration (valid thru) dates which are located on the face of the Card. The sale date must fall on or between these dates. Do not accept a Card prior to the effective date or after the expiration date. Otherwise, you are subject to a Chargeback and could be debited for the transaction.

**1.3.  Valid Signature.** Check the back of the Card. Make sure that the signature panel has not been disfigured or tampered with in any fashion (an altered signature panel may appear discolored, glued or painted, or show erasure marks on the surface). The signature on the back of the Card must compare favorably with the signature on the Sales Draft. The Sales Draft must be signed by the Card presenter in the presence of your authorized representative (unless a Card

Not Present Sale) and in the same format as the signature panel on the Card; e.g., Harry E. Jones should not be signed H.E. Jones. The signature panels of Visa, MasterCard and Discover Cards now have a 3-digit number (CVV 2/CVC 2/CID) printed on the panel known as the Card Validation Code.

**Visa:** If the signature panel on the Card is blank, in addition to requesting an Authorization, you must do all the following:

- Review positive identification bearing the Cardholder's signature (such as a passport or driver's license that has not expired) to validate the Cardholder's identity.

- Indicate the positive identification, including any serial number and expiration date, on the transaction receipt.

- Require the Cardholder to sign the signature panel of the Card prior to completing the Transaction.

**MasterCard:** If the Card is not signed and the Cardholder refuses to sign the Card, do not accept it for a transaction. If the Cardholder is willing to sign the Card in your presence, request two pieces of valid and current identification (e.g., driver's license, another payment Card, etc.).

**Discover:** If the Card is not signed you must request two pieces of valid and current identification, one of which must be a government issued picture identification. After you confirm that the person presenting the Card is the Cardholder, require the Cardholder to sign the back of the Card.

**1.4.   Users Other Than Cardholders.** A Cardholder may not authorize another individual to use his/her Card for purchases. Be sure the signature on the Card matches with the one on the Sales Draft. Furthermore, any Card having two signatures on the back panel is invalid and any sale made with this Card can result in a Chargeback. For Cards bearing a photograph of the Cardholder, ensure that the Cardholder appears to be the person depicted in the picture which appears on the Card. If you have any questions, call the Voice Authorization Center and request to speak to a Code 10 operator.

**1.5.   Special Terms.** If you limit refund/exchange terms or impose other specific conditions for Card sales, the words "No Exchange, No Refund," etc. must be clearly printed (in 1/4" letters) on the Sales Draft near or above the Cardholder's signature. The Cardholder's copy, as well as your copy, must clearly show this information. During a liquidation and/or closure of any of your outlets, locations and/or businesses, you must post signs clearly visible to customers stating that "All Sales Are Final," and stamp the Sales Draft with a notice that "All Sales Are Final."

Never give cash, check or in store credit refunds for Card sales. **NOTE:** A disclosure does not eliminate your liability for a Chargeback. Consumer protection laws and Association Rules frequently allow the Cardholder to dispute these items notwithstanding such disclosures.

**1.6.   Delayed Delivery or Deposit Balance.** In a delayed delivery transaction where a Cardholder makes a deposit toward the full amount of the sale, you should execute two separate Sales Drafts (each completed fully as described in Section 3.1.), the first for a deposit and the second for payment of the balance upon delivery of the merchandise or the performance of the services.

**Visa:** For Visa transactions, you must obtain separate authorizations for each of the two Sales Drafts. You must assign the separate authorization number to each Sales Draft, respectively. You must note on such Sales Drafts the words "delayed delivery," "deposit" or "balance," as appropriate, and the authorization dates and approval codes.

**MasterCard:** For MasterCard transactions, you must obtain one authorization. You must note on both Sales Drafts the words "delayed delivery," "deposit" or "balance," as appropriate, and the authorization date and approval code.

**Discover:** For Discover transactions, you must label one Sales Draft "deposit" and the other "balance," as appropriate. You must obtain the "deposit" authorization before submitting the sales data for the "deposit" or the "balance" to us. If delivery of the

merchandise or service purchased will occur more than ninety (90) calendar days after the "deposit" authorization, you must obtain a subsequent authorization for the "balance." In addition, you must complete Address Verification at the time of the "balance" authorization, and you must obtain proof of delivery upon delivery of the services/merchandise purchased. You may not submit sales data relating to the "balance" to us for processing until the merchandise/service purchased has been completely delivered.

**NOTE:** For Visa and MasterCard transactions, if delivery is more than twenty-five (25) days after the original transaction date and the initial authorization request (as opposed to the ninety (90) days in Discover transactions), you should reauthorize the unprocessed portion of the transaction prior to delivery. If the transaction is declined, contact the Cardholder and request another form of payment. For example: On January 1, a Cardholder orders $2,200 worth of furniture and you receive an authorization for the full amount; however, only a $200 deposit is processed. The above procedures are followed, with a $2,000 balance remaining on the furniture; the $2,000 transaction balance should be reauthorized.

**1.7.   Recurring Transaction and Preauthorized Order Regulations.** If you process recurring transactions and charge a Cardholder's account periodically for recurring goods or services (e.g., monthly insurance premiums, yearly subscriptions, annual membership fees, etc.), the Cardholder shall complete and deliver to you a Cardholder approval for such goods or services to be charged to his account. The approval must at least specify the Cardholder's name, address, account number and expiration date, the transaction amounts, the frequency of recurring charges and the duration of time for which the Cardholder's permission is granted. For Discover transactions, the approval must also include the total amount of recurring charges to be billed to the Cardholder's account, including taxes and tips and your Merchant Number.

- If the recurring transaction is renewed, the Cardholder must complete and deliver to you a subsequent written request for the continuation of such goods or services to be charged to the Cardholder's account. You may not complete a recurring transaction after receiving a cancellation notice from the Cardholder or Issuer or after a request for authorization has been denied.

- If we or you have terminated your Merchant Agreement, you may not submit authorization requests or sales data for recurring transactions that are due after the termination date of your Merchant Agreement.

- You must obtain an authorization for each transaction and write "Recurring Transaction" (or "P.O." for MasterCard transactions) on the Sales Draft in lieu of the Cardholder's signature. A positive authorization response for one recurring transaction Card Sale is not a guarantee that any future recurring transaction authorization request will be approved or paid.

- For all recurring transactions, you should submit the 3-digit Card Validation Code number with the first authorization request, but not subsequent authorization requests. Discover Association Rules specifically require that you follow this Card Validation Code procedure for Discover recurring transactions.

- Also, for Discover recurring transactions, the Sales Draft must include a general description of the transaction, your merchant name and a toll-free customer service number that the Cardholder may call to obtain customer assistance from you or to cancel the written approval for the recurring transaction.

- A Recurring Transaction or Preauthorized Order may not include partial payments for goods or services purchased in a single transaction.

- You may not impose a finance charge in connection with a Recurring Transaction or Preauthorized Order.

- If you process recurring payment transactions, the Recurring Payment Indicator must be included in each Authorization request. Penalties can be assessed by the Associations for failure to use the Recurring Payment Indicator.

**1.8.   Honoring Cards.** The following rules are requirements strictly enforced by Visa, MasterCard and Discover:

- You cannot establish minimum or maximum amounts as a condition for accepting a Card, except that for Discover transactions, you may limit the maximum amount a Discover Cardholder may spend if, and only if, you have not received a positive authorization response from the Card Issuer.

- You cannot impose a surcharge or fee for accepting a Card.

- You cannot establish any special conditions for accepting a Card.

- You cannot establish procedures that discourage, favor or discriminate against the use of any particular Card. However, you may choose not to accept either U.S. issued Debit Cards or U.S. issued Credit Cards under the terms described in Section 1.9.

- You cannot require the Cardholder to supply any personal information (e.g., home or business phone number; home or business address; or driver's license number) unless instructed by the Authorization Center. The exception to this is for a mail/telephone/Internet order or delivery-required transaction, and zip code for a Card-present key entered transaction in order to obtain an Address Verification ("AVS").

- Any tax required to be collected must be included in the total transaction amount and not collected in cash.

- You cannot submit any transaction representing the refinance or transfer of an existing Cardholder obligation deemed uncollectable.

- You cannot submit a transaction or sale that has been previously charged back.

- You must create a Sales or Credit Draft for each Card transaction and deliver at least one copy of the Sales or Credit Draft to the Cardholder.

- You cannot submit a transaction or sale to cover a dishonored check.

- If you accept Card checks, your Card check acceptance policy must treat the acceptance of checks from all payment card brands that you accept equally. (e.g., if you accept MasterCard, Visa and Discover, your check acceptance policy must treat checks for all three payment card brands equally.) You should handle these Card checks like any other personal check drawn upon a bank in the United States.

- Failure to comply with any of the Association Rules may result in fines or penalties.

**1.9.   Card Acceptance.** If you have indicated either in the Application or by registering with us at least thirty (30) days in advance that, as between Non-PIN Debit Card transactions and Credit Card transactions, you will limit your acceptance to either (i) only accept Non-PIN Debit transactions; or (ii) only accept Credit Card transactions, then the following terms in this Section 1.9 will apply:

**1.9.1.** You will be authorized to refuse to accept for payment either Non-PIN Debit Cards or Credit Cards that are issued within the United States. You will, however, continue to be obligated to accept all foreign issued Credit or Debit Cards issued by MasterCard, Visa or Discover so long as you accept any type of MasterCard, Visa or Discover branded Card.

**1.9.2.** While many Debit Cards include markings indicating debit (such as "Visa Checkcard, Visa Buxx, Gift Card, DEBIT, or Mastermoney), many Debit Cards do not include such markings and you will not have such markings until January 2007. It will be your responsibility to determine at the point of sale whether a Card is of a type that you have indicated that you will accept. You agree to institute appropriate systems and controls to limit your acceptance to the Card types indicated. You may purchase a table of ranges of numbers currently associated with Debit Card transactions upon execution of confidentiality/non-disclosure agreements required by the Associations. You will be responsible for updating your systems to utilize such tables and to obtain updated tables.

**1.9.3.** To the extent that you inadvertently or intentionally accept a transaction other than the type anticipated for your account, such transaction will downgrade to a higher cost interchange and you will be billed the difference in interchange (a Non-Qualified Interchange Fee), plus a Non-Qualified Surcharge (see Section 18.1 and Glossary).

**1.9.4.** Based upon your choice to accept only the Card types indicated in the application, you must remove from your premises any existing signage indicating that you accept all Visa, MasterCard or Discover Cards and use approved specific signage reflecting your policy of accepting only Non-PIN Debit or Credit Cards.

**1.9.5.** Even if you elect not to accept Non-PIN Debit Card transactions as provided above, you may still accept PIN Debit Card transactions if you have signed up for PIN Debit Services.

**1.10.   Deposits of Principals.** Owners, partners, officers and employees of your business establishment, and the guarantors who signed the Application, are prohibited from submitting Sales Drafts or Credit Drafts transacted on their own personal Cards, other than transactions arising from bona fide purchases of goods or services in the ordinary course of your business. Such use in violation of this Section 1.10 is deemed a cash advance, and cash advances are prohibited.

**1.11.   Merchants in the Lodging Industry.**

**1.11.1.   Generally.** There are additional rules and requirements that apply to merchants in the lodging industry for practices including, but not limited to, Guaranteed Reservations and charges for no shows, advance deposits, overbookings, and priority checkout. If you are a merchant in the lodging industry, you must contact us for these additional rules and requirements. Failure to do so could result in additional charges or termination of your Merchant Agreement.

**1.11.2.   Lodging Service Services Programs.** In the event you are a lodging merchant and wish to participate in Visa's and/or MasterCard's lodging services programs, please contact your sales representative or relationship manager for details and the appropriate MasterCard and Visa requirements.

**1.12.   Customer Activated Terminals and Self-Service Terminals.** Prior to conducting Customer Activated Terminal ("CAT") transactions or Self-Service Terminal transactions you must contact us for approval and further instructions, rules and requirements that apply to CAT and Self-Service Terminal transactions. Failure to do so could result in additional charges or termination of your Merchant Agreement.

**1.13.   Displays and Advertising.** You must prominently display appropriate Visa, Master-Card, Discover and, if applicable, other Association decals and program marks at each of your locations, in catalogs, on websites and on other promotional materials as required by Association Rules. You must not indicate that Visa, MasterCard, Discover or any other Association endorses your goods or services.

Your right to use the program marks of either MasterCard, Visa or Discover terminates upon the earlier of (i) if and when your right to accept the Cards of the respective Association terminates (e.g., if your right to accept Discover Cards terminates, your are no longer permitted to use Discover program marks), (ii) delivery of notice by us or the respective Association to you of the termination of the right to use the program mark(s) for that Association, or (iii) termination of the license to use the program marks by the respective Association to us.

**1.13.1.   Discover Sublicense to Use Discover Program Marks.** You are prohibited from using the Discover Program Marks, as defined below, other than as expressly authorized in writing by us. "Discover Program Marks" means the brands, emblems, trademarks and/or logos that identify Discover Cards. Additionally, you shall not use the Discover Program Marks other than as a part of the display of decals, signage, advertising and other forms depicting

the Discover Program Marks that are provided to you by us or otherwise approved in advance in writing by us.

You may use the Discover Program Marks only to promote the services covered by the Discover Program Marks by using them on decals, indoor and outdoor signs, advertising materials and marketing materials; provided that all such uses by you must be approved in advance by us in writing.

You shall not use the Discover Program Marks in such a way that customers could believe that the products or services offered by you are sponsored or guaranteed by the owners of the Discover Program Marks. You recognize that you have no ownership rights in the Discover Program Marks. You shall not assign to any third party any of the rights to use the Program Marks.

**1.14. Cash Payments by and Cash Disbursements to Cardholders.** You must not accept any direct payments from Cardholders for charges of merchandise or services which have been included on a Sales Draft; it is the right of the Card Issuer to receive such payments. You may not make any cash disbursements or cash advances to a Cardholder as part of a Card transaction unless you are a financial institution with express authorization except to the extent expressly authorized in writing in advance by Services and the Agreement .

**1.15. Discover Cash Over Transactions.** Cash Over transactions are not available for MasterCard or Visa transactions. You may issue Cash Over in connection with a Discover Card sale, provided that you comply with the provisions of this Program Guide including the following requirements:

- You must deliver to us a single authorization request for the aggregate total of the goods/services purchase amount and the Cash Over amount of the Card sale. You may not submit separate authorization requests for the purchase amount and the Cash Over amount.

- The Sales Draft must include both the purchase amount and the Cash Over amount, and you may not use separate Sales Drafts for the purchase amount and Cash Over amount.

- No minimum purchase is required for you to offer Cash Over to a Discover Cardholder, provided that some portion of the total Card sale must be attributable to the purchase of goods or services.

- The maximum amount of cash that you may issue as Cash Over is $100.00.

**(Cash Over may not be available in certain markets. Contact us for further information.)**

**1.16. Telecommunication Transactions.** Telecommunication Card Sales occur when a telephone service provider is paid directly using a Card for individual local or long-distance telephone calls. (NOTE: pre-paid telephone service cards are not and do not give rise to Telecommunication Card Sales). **Prior to conducting Telecommunication transactions you must contact us for approval and further instructions, rules and requirements. Failure to do so could result in additional charges or termination of your Merchant Agreement.**

## 2. Suspect Transactions

If the appearance of the Card being presented or the behavior of the person presenting the Card is suspicious in nature, you must immediately call the Voice Authorization Center and ask to speak to a Code 10 operator. Answer all their questions and follow their instructions. While not proof that a transaction is fraudulent, the following are some suggestions to assist you in preventing fraudulent transactions that could result in a Chargeback.

**Ask yourself, does the Customer:**

- appear nervous/agitated/hurried?

- appear to be making indiscriminate purchases (e.g., does not care how much an item costs, the size, etc.)?

- make purchases substantially greater than your usual customer (e.g., your average transaction is $60, but this transaction is for $360)?

- insist on taking the merchandise immediately (e.g., no matter how difficult it is to handle, is not interested in free delivery, alterations, etc.)?

- appear to be purchasing an unusual amount of expensive items?

- take an unusual amount of time to sign the Sales Draft, or look at the back of the Card as he signs?

- talk fast or carry on a conversation to distract you from checking the signature?

- take the Card from a pocket instead of a wallet?

- repeatedly come back, in a short amount of time, to make additional purchases?

- cause an unusual, sudden increase in the number and average sales transactions over a one- to three-day period?

- tell you he has been having some problems with his Card Issuer and request that you call a number (that he provides) for a "special" handling or authorization?

**Does the Card:**

- have embossed or imprinted characters the same size, height, style and all within alignment?

- appear to be re-embossed (the original numbers or letters may be detected on the back of the Card)?

- have a damaged hologram?

- have a Magnetic Stripe on the back on the Card?

- have an altered signature panel (e.g., appear discolored, glued or painted, or show erasure marks on the surface)?

- have "valid from" (effective) and "valid thru" (expiration) dates consistent with the sale date?

If you use an electronic terminal and swipe the Card, make sure the account number displayed on the terminal and/or the Sales Draft matches the embossed number on the Card. If you cannot or do not verify the account number and accept the sale, you are subject to a Chargeback and could be debited for the amount of the transaction. IF THE NUMBERS DO NOT MATCH, DO NOT ACCEPT THE CARD AS A FORM OF PAYMENT, EVEN THOUGH AN AUTHORIZATION CODE FOR THE MAGNETICALLY SWIPED CARD NUMBER MAY BE RECEIVED.

**Fraud-Prone Merchandise Tips:**

- Jewelry, video, stereo, computer and camera equipment, shoes and men's clothing are typically fraud-prone because they can easily be resold.

- Be suspicious of high dollar amounts and transactions with more than one fraud-prone item, e.g., two VCRs, three gold chains, etc.

**If you suspect fraud:**

- Call the Voice Authorization Center and ask to speak to a Code 10 operator.

- If the terminal does not display the Card number, call the POS Help Desk for terminal assistance.

**Remember:** An authorization code only indicates the availability of a Cardholder's credit at the time of the transaction. It does not warrant that the person presenting the Card is the rightful Cardholder. If proper procedures are not followed at the time of the transaction, you are subject to a Chargeback and your account may be debited for the amount of the transaction.

## 3. Completion of Sales and Credit Drafts

You must prepare a Sales Draft or Credit Draft, as applicable, for each Card transaction and provide a transaction receipt or copy of the Draft to the Cardholder at the time the Card transaction is completed.

**3.1. Information Required.** All of the following information must be contained on a single page document constituting a Sales Draft:

- Cardholder's account number. The complete account number must appear on the merchant copy of a Sales or Credit Draft. On the Cardholder's copy of the Sales or Credit Draft, the Cardholder's account number must be masked so that only the

last four digits appear, known as "PAN Truncation." You are responsible to determine if PAN Truncation is required in your jurisdiction for both the merchant or Cardholder copy of the Sales or Credit Draft. (Contact your state legislature to find out if truncation laws apply to your state.) ;

- The Card Expiration date must be masked on the Cardholder's Sales or Credit Draft;
- Clear imprint of the Card. Whenever the term "imprint" is used it refers to the process of using a manual imprinting machine to make an impression of the Card on a Sales Draft; It does not include the printout from a printer attached to an electronic device. If you use an electronic device (e.g., authorization/draft capture terminal, cash register, POS Device, etc.) and swipe the Card to read and capture the Card information via the Magnetic Stripe, you do not have to imprint the Card. **HOWEVER, IF THE TERMINAL FAILS TO READ THE MAGNETIC STRIPE OR IF YOU ARE REQUIRED TO OBTAIN A VOICE AUTHORIZATION, THEN YOU MUST IMPRINT THE CARD. IN ADDITION, THE SALES DRAFT MUST HAVE THE CARDHOLDER'S SIGNATURE. FAILURE TO FOLLOW THESE PROCEDURES WILL PREVENT YOU FROM DEFENDING A TRANSACTION IN THE EVENT THAT IT IS CHARGED BACK UNDER A CLAIM THAT THE RIGHTFUL CARDHOLDER DID NOT AUTHORIZE THE PURCHASE. ENTERING INFORMATION INTO A TERMINAL MANUALLY WILL NOT PREVENT THIS TYPE OF CHARGEBACK. FOR MAIL/ TELEPHONE/INTERNET AND OTHER CARD NOT PRESENT ORDERS SEE SECTION 3.2.;**
- Cardholder's Signature. However, eligible merchants participating in Master-Card's Quick Payment Service Program, Visa's Small Ticket, MasterCard's Small Ticket and/or certain Discover transactions (see note below) are not required to obtain the Cardholder's signature under certain conditions set forth by each program.
- Date of the transaction
- Amount of the transaction (including the approved currency of the sale);
- Description of the goods and/or services involved in the transaction (if there are too many items, combine them into one description; e.g. "clothing" instead of "one pair of pants, one shirt"). Do not carry information onto a second Sales Draft;
- A valid authorization code ; and
- Merchant's Doing Business As ("D/B/A") name and location (city and state required) and Merchant Account Number.
- When imprinting Sales Drafts, do not alter the Cardholder account number, circle or underline any information on the Sales Draft or alter a Sales Draft in any way after the transaction has been completed and signed. Stray marks and other alterations on a Sales Draft may render it electronically unscannable, unreadable or illegible. This may result in a Chargeback or summary adjustment to your account.
- For Discover sales using a paper Sales Draft (as opposed to Electronic Draft Capture), the paper sales draft must also contain the initials of your representative or employee that conducted the transaction. For Discover Credits, the Credit Draft must contain the signature of your authorized representative or employee that conducted the transaction.
- Eligible merchants participating in Quick Payment Service and/or Small Ticket are only required to provide the Cardholder with the completed Sales Draft when requested by the Cardholder.
- **NOTE:** For Discover transactions, if you are a merchant operating under certain merchant category codes approved by Discover, you are not required to obtain the Cardholder's signature so long as the full track data is transmitted in the authorization request and the sale amount is $25.00 or less.

**3.2. Mail / Telephone/ Internet (Ecommerce) Orders and Other Card Not Present Sales.** You may only engage in mail/ telephone/ Internet orders provided they do not exceed the percentage of your total payment Card volume reflected on your application. Failure to adhere to this requirement may result in cancellation of your Agreement. Merchants conducting Internet transactions using MasterCard or Visa Cards must have special codes (an "Electronic Commerce Indicator") added to their authorization and settlement records. Discover does not use an Electronic Commerce Indicator. Failure to register as a merchant conducting Internet transactions can result in fines imposed by the Associations.

- Mail, Telephone, Internet and other Card Not Present transactions have a substantially higher risk of Chargeback. Since you will not have an imprinted or magnetically swiped transaction and you will not have the Cardholder's signature on the Sales Draft as you would in a face-to-face transaction, you will assume all risk associated with accepting a mail/telephone/Internet or other Card Not Present transaction. The following procedures, while they will not eliminate Chargebacks, are useful in reducing them and should be followed by you:
- Obtain the expiration date of Card.
- On the Sales Draft, clearly print the Cardholder's account number; effective and expiration dates; date of transaction; description of the goods and services; amount of the transaction (including shipping, handling, insurance, etc.); Cardholder's name, billing address and shipping address; authorization code; and merchant's name and address (city and state required).
- For mail orders, write "MO"; for telephone orders, write "TO" on the Cardholder's signature line.
- If feasible, obtain and keep a copy of the Cardholder's signature on file on a form authorizing you to submit telephone and mail order transactions.
- You should utilize the Address Verification Service for all Card Not Present Transactions (see note below). Address Verification is specifically required for all Discover Card Not Present Transactions, and if you do not receive a positive match through AVS, you may not process the Discover Card Not Present Transaction. If you do not have AVS, contact us immediately.
- You should obtain the 3-digit Card Validation Code number and include it with each authorization request. Discover Association Rules specifically require that you submit the Card Validation Code with the authorization request for all Discover Card Not Present Transactions.
- For telephone orders, it is recommended that written verification of the sale be requested from the Cardholder (sent by mail or fax).
- You may not submit a transaction for processing until after the merchandise has been shipped or the service has been provided to the customer. (Visa will permit the immediate billing of merchandise manufactured to the customer's specifications [i.e., special/custom orders] provided the Cardholder has been advised of the billing details.)
- You should provide a copy of the Sales Draft to the Cardholder at the time of delivery. You must also obtain proof of delivery of the goods or services to the address designated by the Cardholder (i.e., by getting a signature of the Cardholder or person designated by the Cardholder through the delivery carrier). If the Cardholder visits one of your locations to receive the goods or services purchased, obtain an imprint of the card and the Cardholder's signature.
- Notify the Cardholder of delivery time frames and special handling and/or of cancellation policies. Merchandise shipping dates must be within seven (7) days of the date authorization was obtained. If, after the order has been taken, additional delays will be incurred (e.g., out of stock), notify the Cardholder and reauthorize the transaction.
- You may not require a Cardholder to complete a postcard or other document that displays the Cardholder's account number in clear view when mailed.

- If you accept orders via the Internet, your web site must include the following information in a prominent manner:
  - Complete description of the goods or services offered Merchandise return and refund policy;
  - Customer service contact, including email address and/or telephone number;
  - Transaction currency (U.S. dollars, unless permission is otherwise received from Servicers) ;
  - Any applicable export or legal restrictions;
  - Delivery policy;
  - Consumer data privacy policy;
  - A description of the transaction security used on your website; and
  - The sale or disclosure of databases containing Cardholder account numbers, personal information, or other Card transaction information to third parties is prohibited.
- You may not accept Card Account Numbers through Electronic Mail over the Internet.

**NOTE:** Address Verification Service ("AVS"), does not guarantee against Chargebacks, but used properly it assists in reducing the risk of fraud by confirming whether certain elements of the billing address provided by your customer match the billing address maintained by the Issuer. AVS also may help you avoid incurring additional interchange expenses. AVS is a separate process from obtaining an authorization and will provide a separate response. A transaction may not match addresses when submitted for AVS and still receive an authorization. It is your responsibility to monitor the AVS responses and use the information provided to avoid high-risk transactions.

**3.2.1. Discover Protocol for Internet Transactions.** Each Internet Discover Card transaction accepted by you and submitted to us shall comply with Discover standards, including, without limitation, Discover standards governing the formatting, transmission and encryption of data, referred to as the "designated protocol." You shall accept only those Internet Discover Card transactions that are encrypted in accordance with the designated protocol. As of the date of these Operating Procedures, the designated protocol for the encryption of data is Secure Socket Layer (SSL). We may, at our discretion, withhold Settlement until security standards can be verified. However, the designated protocol, including any specifications with respect to data encryption, may change at any time upon thirty (30) days advance written notice. You shall not accept any Internet Discover Card transaction unless the transaction is sent by means of a browser which supports the designated protocol.

**3.3.  Customer Service Telephone Numbers** for Card types which are funded by individual non-bank Associations include:

| | |
|---|---|
| American Express/Optima | 1-800-528-5200 |
| JCB, International | 1-800-366-4522 |
| TeleCheck | 1-800-366-1054 |

## 4. Data Security

**THE FOLLOWING IS IMPORTANT INFORMATION REGARDING THE PROTECTION OF CARDHOLDER DATA. PLEASE REVIEW CAREFULLY AS FAILURE TO COMPLY CAN RESULT IN SUBSTANTIAL FINES AND LIABILITIES FOR UNAUTHORIZED DISCLOSURE AS WELL AS TERMINATION OF THIS AGREEMENT.**

**4.1.  Payment Card Industry (PCI) Data Security.** Visa, MasterCard, American Express, Discover and JCB aligned data security requirements to create a global standard for the protection of Cardholder data. The resulting PCI Data Security Standard defines the requirements with which all entities that store, process, or transmit payment card data must comply. PCI is the name used to identify those common data security requirements. The Cardholder Information Security Program (CISP) is Visa USA's data security program, the Site Data Protection (SDP) program is MasterCard's data security program and Discover Information Security and

Compliance (DISC) is Discover's data security program, each based on the PCI Data Security Standard and industry aligned validation requirements. PCI enables Acquirers, Issuers and merchants to implement a single security program, based on common security requirements, validation requirements, and tools, to ensure the protection of Cardholder data. PCI compliance validation is focused on any system(s) or system component(s) where Cardholder data is retained, stored, or transmitted, including:

- All external connections into your network (i.e., employee remote access, third party access for processing, and maintenance).
- All connections to and from the authorization and settlement environment (i.e., connections for employee access or for devices such as firewalls, and routers); and
- Any data repository outside of the authorization and settlement environment.

The Associations or we may impose fines or penalties, or restrict you from accepting Cards if it is determined that you are not compliant with the applicable data security requirements. We may in our sole discretion, suspend or terminate Card processing services under your Merchant Agreement for any actual or suspected data security compromise.

The PCI Data Security Standard and detailed information, including the PCI Self-Assessment Questionnaire which you should complete, can be found at the PCI Data Security Counsel's website: www.pcisecuritystandards.org.

Detailed information about Visa's CISP program can be found at Visa's CISP website: www.visa.com/cisp.

Detailed information about MasterCard's SDP program can be found at the MasterCard SDP website: https://sdp.mastercardintl.com.

The PCI Data Security Standard and information about DISC can be found at Discover's DISC website: http://www.discovernetwork.com/resources/data/data_security_overview.html.

The PCI Data Security Standard and detailed information about SDP, including the MasterCard Security Self-Assessment which you should complete, can be found at MasterCard's SDP website: https://sdp.mastercardintl.com.

**4.2.  You must comply with the data security requirements shown below:**

- You must install and maintain a secure network firewall to protect data across public networks.
- You must encrypt stored data and data sent across networks.
- You must use and regularly update anti-virus software and keep security patches up-to-date.
- You must restrict access to data by business "need to know," assign a unique ID to each person with computer access to data and track access to data by unique ID.
- Don't use vendor-supplied defaults for system passwords and other security parameters.
- You must regularly test security systems and processes.
- You must maintain a policy that addresses information security for employees and contractors.
- You must restrict physical access to Cardholder information.
- You may not transmit Cardholder account numbers to Cardholders for Internet transactions.
- You cannot store or retain Card Validation Codes (three-digit values printed in the signature panel of most Cards, and a four-digit code printed on the front of an American Express Card).
- You cannot store or retain Magnetic Stripe data, PIN data or AVS data. Only Cardholder account number, Cardholder Name and Cardholder expiration date can be retained subsequent to transaction authorization.

- You must destroy or purge all Media containing obsolete transaction data with Cardholder information.

- You must keep all systems and Media containing Card account, Cardholder or transaction information (whether physical or electronic) in a secure manner so as to prevent access by, or disclosure to any unauthorized party.

- For Internet transactions, copies of the transaction records may be delivered to Cardholders in either electronic or paper format.

**4.3.** You may be subject to and we retain the right to conduct an audit performed by us or a third party designated by us to verify your compliance with security procedures and these Operating Procedures.

**4.4.** In the event that transaction data is accessed or retrieved by any unauthorized person or entity, you must contact Customer Service or your Relationship Manager immediately and in no event more than 24 hours after becoming aware of (i) any suspected or actual data security breach and (ii) any noncompliance by you with the security requirements.

**4.5.** You must, at you own expense (i) perform or cause to be performed an independent investigation (including a forensics analysis) of any data security breach of Card or transaction data, (ii) perform or cause to be performed any remedial actions recommended by any such investigation, and (iii) cooperate with us in the investigation and resolution of any security breach.

**4.6.** **Required Information for Discover Security Breaches.** For security breaches involving Discover transactions and/or data, you must provide us and/or Discover with the following information: (i) the date of breach; (ii) details concerning the data compromised (e.g., account numbers and expiration dates, Cardholder names and addresses, etc.); (iii) the method of such breach; (iv) your security personnel contacts; (v) the name of any person (including law enforcement) assisting you with your investigation of such breach; and (vi) any other information which we reasonably request from you concerning such breach, including forensics reports. You shall provide such information as soon as practicable, and the items listed in (i)-(v) shall be provided to us in any event within 48 hours of your initial notification to us of the breach.

**4.7.** **Third Parties.** The data security standards set forth above also apply to any agent or third party provider that you may use to store, process or transmit Cardholder data. In addition, such agents or third party providers must be registered with the applicable Association. Therefore, you must:

- Notify us in writing of any agent or third party processor that engages in, or proposes to engage in, the storing, processing or transmitting of Cardholder data on your behalf, regardless of the manner or duration of such activities.

- Ensure that all such agents or third party processors are (i) registered with the applicable payment card brands; and (ii) comply with all applicable data security standards, including, without limitation, the PCI Data Security Standard.

You are solely responsible for the compliance of any and all third parties that are given access by you, to Cardholder data, and for any third party software that you may use.

## 5. Authorizations

Each authorization request you submit to us must fully comply with the applicable provisions of this Agreement. Submission of an authorization request that does not fully comply may result in assessment of additional fees to you, a declined authorization response or a Chargeback.

You must obtain an Authorization Approval Codes from us (or as provided in Section 5.4) for all transactions. A positive authorization response for MasterCard and Visa transactions remains valid for thirty (30) days. A positive authorization response for Discover transactions remains valid for ninety (90) days.

Failure to obtain an Authorization Approval Code for a sales transaction may result in a Chargeback and/or the termination of your Agreement.

Authorization Approval Codes can be obtained through your POS Terminal or a Voice Response Unit ("VRU"). Any fees related to authorizations will be charged for a request for an Authorization Approval Code, whether or not the transaction is approved.

Do not attempt to obtain an Authorization Approval Code provided by someone other than us except as described in Section 5.4. If a Cardholder or another service provider provides you with either an authorization number or with a telephone number for obtaining authorizations, the Authorization Approval Code you receive may not be valid. Even if the transaction is initially processed and funded, it may be charged back at a later date. Also, if you receive a purported Authorization Approval Code from someone other than us, we will not have the supporting records and will be unable to verify that you received the authorization if that is later questioned in a Chargeback.

An Authorization Approval Code only indicates the availability of credit on an account at the time the authorization is requested. It does not warrant that the person presenting the Card is the rightful Cardholder, nor is it a promise or guarantee that you will not be subject to a Chargeback.

If you obtain Address Verification, you must review the AVS response separately from the authorization response and make your own decision about whether to accept the transaction. A transaction can receive an Authorization Approval Code from the Card Issuer even if AVS is unavailable or reflects that the address provided to you does not match the billing address on file at the Issuer. If the authorized Cardholder disputes such a transaction, you will be responsible for the resulting Chargeback.

If you receive a Referral response to an attempted authorization, you may not submit the transaction without calling for and receiving a voice authorization. After receiving a Referral response you may not attempt another authorization on the same Card through your POS Terminal.

If you fail to obtain an Authorization Approval Code or if you submit a Card transaction after receiving a decline (even if a subsequent authorization attempt results in an Authorization Approval Code), your transaction may be assessed fines or fees by the Associations for which you will be responsible. These currently range from $25 to $150 per transaction. To avoid these costs, always obtain an Authorization Approval Code directly from your terminal before submitting a transaction for settlement.

For Cards other than MasterCard, Visa and Discover (e.g., American Express, JCB, etc.) or for check acceptance, you must follow the procedures for authorization and acceptance for each.

You may not attempt to obtain multiple authorizations for a single transaction. If a sale is declined, do not take alternative measures with the same Card to obtain an approval of the sale from other authorization sources. Instead, request another form of payment. If you accept and process a transaction that was declined, or attempt multi-transactions and/or multi-authorizations, you are subject to a Chargeback, Association Fines and/or cancellation of your Agreement.

**5.1.** **Card Not Present Transactions.** You must obtain the 3-digit Card Validation Code (CVV2, CVC2, CID) and submit this Code with all authorization requests with respect to transactions where the Card is not present (e.g., telephone, mail or internet sales). However, for recurring transaction authorizations you should submit the Card Validation Code with the first authorization request only, and not with subsequent recurring transaction authorization requests. (See Section 1.7.) **NOTE: For each Card Not Present Discover transaction, you must also verify the name and billing address of the Discover Cardholder using the Address Verification System (AVS), and if you do not receive a positive match, do not process the Discover Card Not Present transaction.**

**5.2.** **Authorization via Telephone (Other than Terminal/Electronic Device Users).**

- Call your designated voice authorization toll free number and enter the authorization information into the VRU using a touch tone phone or hold for an authorization representative.

- If advised to pick up a Card, use reasonable and peaceful means to do so, and do not take any action that will alarm or embarrass the Card presenter. You will bear all responsibility for claims,

liabilities, costs and expenses as a result of any action by you, your employees, vendors or agents, that attempt to retain a Card without the Issuer's direct request or failure to use reasonable, lawful means in retaining or attempting to retain the Card. Forward the Card to: Attn: Rewards Department, P.O. Box 5019, Hagerstown, MD 21740. You may be paid a reward for the return of the Card.

- On occasion, the Authorization Center will ask you to obtain identification from the Cardholder before issuing an approval code. If you are instructed to do so, clearly write the appropriate identification source and numbers in the space provided on the Sales Draft unless otherwise prohibited by law.

- If the sale is declined, please remember that our operators are only relaying a message from the Card Issuer. The fact that a sale has been declined should not be interpreted as a reflection of the Cardholder's creditworthiness. The Cardholder should be instructed to call the Card Issuer.

### 5.3.  Authorization via Electronic Devices.

- If you use an electronic terminal to obtain Authorization Approval Code, all sales should be authorized through this equipment. Authorizations through other methods will result in additional charges to you.

- If your terminal malfunctions, refer to your Quick Reference Guide, if necessary, or call the POS Help Desk. The problem will either be corrected promptly or may require terminal programming or replacement. During the period in which your terminal is not functioning, remember to check it periodically since most terminal problems are temporary in nature and are quickly corrected.

- If a terminal is moved or if wires are disconnected, causing malfunction, call the POS Help Desk immediately and follow their instructions. You may be responsible for any service charges incurred for reactivation of the terminal.

- Until the terminal becomes operable, you must call your designated voice authorization toll free number and enter authorization information into the VRU using a touchtone phone. During this time, each transaction must be imprinted using a manual imprinter machine. Failure to obtain an Authorization Approval Code and to imprint these transactions could result in a chargeback to your account.

### 5.4.  Third Party Authorization System.  If you have contracted with
another authorization network to obtain Credit Card authorization, i.e., your terminal can Split Dial, liability resulting from discrepancies with that network must be resolved between you and that network. We will not research Chargebacks resulting from Authorization Approval Codes obtained from another authorization service organization. Such Chargebacks will be passed through to you for resolution. If an authorization provided by a third party authorization system is challenged in a Chargeback, you must obtain proof (e.g., third party authorization logs) from the authorization source and submit it to us within the time frame specified on the Chargeback documentation received.

IF YOU CONTRACTED TO USE ONE OF OUR AUTHORIZATION SERVICES, DO NOT USE ANOTHER THIRD PARTY SYSTEM WITHOUT NOTIFYING CUSTOMER SERVICE. OTHERWISE, WE WILL BE UNABLE TO SUCCESSFULLY RESEARCH AND DEFEND ANY AUTHORIZATION RELATED CHARGEBACKS ON YOUR BEHALF. THIS DELAY WILL SIGNIFICANTLY DECREASE YOUR TIME TO RESEARCH AND PROVIDE PROOF OF AUTHORIZATION, THUS REDUCING YOUR OPPORTUNITY TO REVERSE A CHARGEBACK.

If you utilize another authorization network, you will be responsible for the downgrade of any transactions to a higher cost interchange that result from a mismatch of information to our systems and those of third party authorization networks (see Section 18.1).

If you use a third party authorization network, you must also comply with Section 4.7.

Call the following for other Card types:

| | |
|---|---|
| **American Express/Optima** | 1-800-528-2121 |
| **JCB, International** | 1-800-522-8788 |
| **TeleCheck** | 1-800-366-5010 |

**Available 24 hours/day; 7 days/week**

All approved sales authorized in this manner must be entered manually as "post authorization" transactions into the terminal, once the terminal becomes operational. All credit transactions must be entered into the terminal for data capture. You may be subject to a Chargeback if you receive a Referral and subsequently receive an approval. To reduce the risk of such a Chargeback, the Card should be imprinted using a manual Imprinter machine. (For specific procedures on Electronic Data Capture, refer to the Terminal Operating Instructions/Users Guide.) If the terminal malfunctions for more than twenty-four (24) hours, contact Customer Service for further instructions on processing your transactions.

### 5.5.  Automated Dispensing Machines.  Records must be produced for
all transactions whose origin and data capture use automated dispensing machines or limited amount terminals. Records should include the Cardholder account number, merchant's name, terminal location, transaction date and amount.

### 5.6.  Pre-Authorization for T&E (Travel & Entertainment) and
**Restaurant Merchants.**  If you are a business engaged in providing travel and/or entertainment services (e.g., car rentals, hotels, motels, etc.) or a restaurant business, and engage in the practice of "pre-authorization." You must comply with the following general procedures:

- A hotel, motel, or car rental merchant may obtain an estimated Visa,MasterCard or Discover authorization at the time of check-in. A restaurant may obtain a pre-authorization for an amount which would include anticipated gratuities.

- You must notify the Cardholder of the dollar amount you intend to "Pre-Authorize."

- If the customer decides to use another form of payment (e.g., cash, check, etc.) you must promptly call the Voice Authorization Response Unit to delete the authorization hold. Provide the Cardholder's account number, original dollar amount and date of the transaction, and the authorization code. If a new transaction takes place, a new Imprinted and signed Sales Draft for the exact amount and a new authorization code for that amount must be obtained.

- **VEHICLE RENTAL PROVIDERS MAY NOT INCLUDE POTENTIAL VEHICLE DAMAGE OR INSURANCE DEDUCTIBLES IN ANY PREAUTHORIZATIONS.**

**For MasterCard and Visa:**

- If you receive a decline on a transaction, you must wait twenty-four (24) hours before attempting to reauthorize. If you reauthorize prior to this time frame and receive an approval, you may be subject to a chargeback and a fine imposed by the Associations.

- If the final amount charged to the Cardholder exceeds the original estimate by more than 15% above the preauthorization, you must authorize any additional amounts, and all incremental authorization codes must be written in the authorization area along with the date of authorization and the amount authorized.

- Restaurants are allowed up to a 20% (instead of 15%) variance above the amount authorized. If the final amount exceeds the amount "preauthorized" by more than 20%, you must authorize the additional amount.

**For Discover:**

- You should obtain an authorization for the initial estimated charges and then monitor the charges to ensure that the actual charges made do not exceed the estimated charges. If the actual charges exceed the amount of the initial estimated authorization (and any subsequent estimated authorizations), then you must

secure a positive authorization for the additional amount. **NOTE:** Subsequent authorizations should only be for the additional amount of total charges and not include amounts already authorized.

- The estimated amount of any pre-authorization for lodging accommodations must be based on (i) the intended length of stay; (ii) the room rate; (iii) applicable taxes and service charges; and (iv) other miscellaneous charges as dictated by experience.

- If an authorization request is declined, no charges occurring after that date will be accepted for that Cardholder.

- You do not need to obtain a final authorization if the total sum of charges (the final amount) does not exceed 120% of the previously authorized charges. You must record the dates, authorized amounts, and their respective Authorization Approval Codes on the Sales Draft(s).

**5.7.** **Discover Procedure for Request for Cancellation of Authorization.** If a Discover Card sale is cancelled or the amount of the transaction changes following your receipt of authorization for the sale, you must call your authorization center directly and request a cancellation of the authorization. An authorization may be cancelled at any time within eight (8) days of your receipt of the authorization, but must be cancelled before the sales data relating to the transaction is submitted to us, after which the authorization cannot be changed. For an authorization cancellation, you must provide us with the following information, in this order:

- The Discover Merchant Number used in the authorization;

- The Card number;

- The original amount of the authorization being cancelled;

- The new amount of the total transaction (if any);

- The original authorization code for the authorization being cancelled;

- The expiration date of the Card; and

- A brief reason for the authorization cancellation.

### 6. Submission/Deposit of Sales and Credit Drafts

**6.1.** **Submission of Sales for Merchants Other Than Your Business.** You may present for payment only valid charges that arise from a transaction between a bona fide Cardholder and your establishment. If you deposit or attempt to deposit transactions that arise from sales between Cardholders and a different business than the one approved by us in our agreement with you, then the transaction may be charged back, we may suspend or debit funds associated with all such transactions, and we may immediately terminate your account and the Agreement.

**6.1.1.** **Factoring.** For Discover transactions, Factoring is considered merchant fraud and strictly prohibited, unless you are registered with us. Factoring is the submission of authorization requests and/or Sales Drafts by a merchant for Card transactions transacted by another business. If you submit Sales Drafts on behalf of another Person, you will suffer any losses associated with the disputes of the Discover Card Sales. Also if any fraud is involved, you could face criminal prosecution.

**6.2.** **Timeliness.** In order to qualify for the lowest Interchange Discount Rate, all Sales and Credit Drafts must be properly completed and submitted daily. If you have not received payment for submitted Sales Drafts after one (1) week from your normal payment date, contact Customer Service. Late Submission of Sales or Credit Drafts may result in increased interchange rates or fees or in a Chargeback to you.

**6.3.** **Mail/Branch Deposit Procedures.** Complete the appropriate summary form designated for your use. Imprint the completed summary with your Merchant Identification Card, if applicable, and sign it. Please do not staple or clip Sales Drafts together or to summary forms. This will distort the Cardholder's account number and may result in a summary adjustment or Chargeback to you.

Mail your deposits daily to us, or, if your Agreement allows deposit at a local bank branch, you must make daily deposits.

Do not send us the merchant copies (which are for your records); submit only the Bank hard copies of the transactions. If merchant copies are submitted, they will be returned to you unprocessed.

**6.4.** **Electronic Merchants: Daily Batching Requirements & Media Submission.** Batches must be transmitted to us by the time indicated on the Additional Important Information Page in Section 37.2 of the Agreement in order to be processed on the date of transmission. Additionally, if you deposit via magnetic tape, electronic transmissions, or Electronic Data Capture terminal and have contracted to send the actual Sales and Credit Drafts to us for microfilming and retrieval, the Sales Drafts (Media) must be batched daily by register/terminal following the procedures below. Failure to do so may result in a processing fee and/or a Chargeback due to our inability to retrieve the Media as requested by the Card Issuer.

- A register/terminal Batch header form must be filled out for each Batch of Media.

- The Batch header must be imprinted with your Merchant Identification Card, and all areas completed properly (i.e., Batch number, date, amount, number of items, etc.).

- The Batch/deposit total must match to the settled/reconciled amount displayed on the terminal upon closing the Batch.

- Any discrepancies between the actual Media and electronic display must be reconciled and corrected before storing the Media (for merchants who contract to hold their Media) or before sending us the copies of the deposit. Otherwise, transactions may appear to be a new Submission and may be manually keyed (causing duplicate billing to Cardholders and resulting in Chargebacks) or we may not be able to retrieve an item when requested by the Card Issuer.

- It is your responsibility to ensure that the actual Media is Batched correctly and, depending on the terms of your Agreement, either stored at your location or sent to Processor. (In some cases, the actual Media is sent daily to your head office, and forwarded to Processor for microfilming.)

- **You must confirm that your equipment has transmitted its Batches to us at least once daily.** Even if your equipment is designed or programmed to close and submit Batches without your intervention, it is ultimately your responsibility to confirm that the Batches have been transmitted to us for processing.

### 7. Settlement

Your funds for MasterCard/Visa/Discover transactions will be processed and transferred to your financial institution within two (2) business days from the time a batch is closed (by 11:00 p.m. ET) if your financial institution is the Bank. If your financial institution is not the Bank, your MasterCard/Visa/Discover transactions will be processed and transferred to the Federal Reserve within two (2) business days from the time a batch is closed (by 11:00 p.m. ET); the Federal Reserve will transfer such amounts to your financial institution. Your Card transactions will be settled promptly after you submit Sales and Credit Drafts. You will be provided with settlement funds in one of the following manners:

- **Direct Settlement Account.** If you maintain a Settlement Account at a financial institution with which we have arrangements permitting direct payment of settlement funds, we will initiate a transfer of such applicable settlement funds through a credit to the Settlement Account. Such settlement will generally occur by the second banking day after we process the applicable Card transactions unless a different time is specified.

- **Wire Transfer.** If you receive payment of settlement funds by wire transfer, we will initiate a wire transfer of such applicable settlement funds to the Settlement Account. Settlement by wire generally occurs by 3:00 p.m. ET on the following banking day after we process the applicable Card transactions.

- **Automated Clearing House Credit.** If you receive payment of settlement funds through an automated clearing house ("ACH") credit, we will initiate a transfer of such applicable settlement funds through ACH to your Settlement Account. Settlement by ACH credit generally will take place on the second banking day after we process the applicable Card transactions.

## 8. Refunds/Exchanges (Credits)

**8.1. Refunds.**

- You must promptly complete and submit a Credit Draft for the total amount of the refund which must include the following information:

  – The account number and expiration date;

  – The Cardholder's name;

  – Your name, city, state and Merchant Account Number;

  – A description of the goods or services;

  – The transaction date of the Credit;

  – The total amount of the Credit; and

  – For Discover transactions, the approved currency used and the signature of your authorized representative or employee.

- Full refunds must be for the exact dollar amount of the original transaction including tax, handling charges, etc. (You must identify the shipping and handling charges incurred.) The refund amount may not be for more than the original Credit Card sale amount.

- All dollar amounts and other handwritten information must be clearly written. (Stray marks on the Credit Draft will render it unscannable/illegible.)

- Do not circle or underline any information on the Credit Draft.

- Imprint the draft with the same Card used by the Cardholder to make the original purchase. You should not credit an account that differs from the account used for the original transaction.

- Never give cash, check or in-store Credit refunds for Credit Card sales.

- Have the Cardholder sign the Credit Draft, give the Cardholder the appropriate copy, and deposit the Credit Draft immediately. Failure to process a credit within five (5) calendar days may result in a Chargeback.

- Authorization is not required for refunds.

- You cannot intentionally submit a sale and an offsetting credit at a later date solely for the purpose of debiting and crediting your own or a customer's account.

**8.2. Exchanges.**

- No additional paperwork is necessary for an even exchange. Just follow your standard company policy.

- For an uneven exchange, complete a Credit Draft (follow the procedures outlined in Section 8.1.) for the total amount of only the merchandise returned. The Cardholder's account will be credited for that amount. Then, complete a new Sales Draft for the total amount of any new merchandise purchased.

## 9. Retention of Records For Retrievals and Chargebacks

**9.1. Retain Legible Copies.**

**For MasterCard and Visa:** You must retain legible copies of all Sales and Credit Drafts or any other transaction records for a period of eighteen (18) months from the date of each transaction.

**For Discover:** You must retain legible copies of all Sales and Credit Drafts or any other transaction records for the longer of (i) 365 days or (ii) the resolution of any pending or threatened disputes, claims, disagreements or litigation involving the Card transaction. You must also keep microfilm or other copies of Sales Drafts for no less than three (3) years from the date of the Discover transaction.

**9.2. Provide Sales and Credit Drafts.** You must provide all Sales and Credit Drafts or other transaction records requested by us within the shortest time limits established by Association Rules. You are responsible for any deficiencies in Card transaction data transmitted or otherwise delivered to us.

**9.3. Ensure Proper Retrieval Fulfillment.** To ensure proper Retrieval fulfillment and/or chargeback processing, Sales and Credit Drafts must contain the full sixteen (16) digit account number and expiration date. Failure to retain this information could result in a future Chargeback to your account.

## 10. Chargebacks and Other Debits

**10.1. Chargebacks.**

**10.1.1. Generally.** Both the Cardholder and the Card Issuer have the right to question or dispute a transaction. If such questions or disputes are not resolved, a Chargeback may occur. A Chargeback is a Card transaction that is returned to us by the Card Issuer. As a result, we will debit your Settlement Account or settlement funds for the amount of the Chargeback. It is strongly recommended that, whenever possible, you contact the Cardholder directly to resolve a disputed transaction or Chargeback, unless the dispute involves a Discover Cardholder, in which case Discover rules and regulations expressly prohibit you from contacting the Discover Cardholder regarding the dispute. You are responsible for all Chargebacks and related costs arising from your transactions.

**10.1.2. Transaction Documentation Requests.** In some cases, before a Chargeback is initiated, the Card Issuer will request a copy of the Sales Draft via a request for transaction documentation. We will forward the request to you. You must respond to the request within the time frame and manner set forth in the request. We will then forward your response to the Card Issuer. If you fail to timely respond, we will so notify the Card Issuer and a Chargeback may result. Upon receipt of a transaction documentation request, immediately retrieve the requested Sales Draft(s) using the following guidelines:

- Make a legible copy, centered on 8-1/2 x 11-inch paper (only one (1) Sales Draft per page).

- Write the 'case number' from the request for transaction documentation on each copy/page.

- If applicable, make copies of a hotel folio, car rental agreement, or mail/phone/Internet order form, or other form of receipt.

- If a credit transaction has been processed, a copy of the Credit Draft is also required.

- Letters are not acceptable substitutes for Sales Drafts.

- Fax or mail legible copies of the Sales Draft(s) to the fax number or mail address provided on the request form.

- If you fax your response, please set your fax machine to print your fax number and name on the documents that you send. We can use this information to help know immediately where the documentation received originated from and to know whom to contact in the event the transmission is not clear or complete.

- Additionally, please set the scan resolution on your fax machine to the highest setting. The higher resolution setting improves the clarity of characters and graphics on the Sales Drafts transmitted and helps reduce the number of illegible fulfillments and/or Chargebacks.

- If we do not receive a clear, legible and complete copy of the Sales Draft within the timeframe specified on the request, you may be subject to a Chargeback.

- A handling fee may be charged by the Issuer and will be debited from your Settlement Account or settlement funds if a transaction documentation request results in a difference in the following information on the Sales Draft and the transmitted record: merchant name or an incorrect city, state, foreign country and/or transaction date.

- You need to respond to all transaction documentation requests within the specified timeframe indicated on the request, or you may be without recourse for a Chargeback. You must respond to all requests related to fraud investigations. Subsequent Chargebacks for "non receipt of requested item relating to a transaction for fraud request" cannot be contested or represented.

**10.1.3. Chargeback Process.** Regardless of whether you respond to a transaction documentation request, a Chargeback may be debited to your Settlement Account for numerous reasons (see below). If the Card Issuer submits a Chargeback, we will send you a Chargeback notification, which may also include a request for transaction documentation. **Due to the short time requirements imposed by MasterCard, Visa and Discover, it is extremely important that you respond to a Chargeback notification and transaction documentation request within the time frame set forth in the notification.** Do not process a credit transaction once a Chargeback is received; the Card Issuer will credit the Cardholder's account (unless the Chargeback is reversed).

If the information you provide is both timely and, in our sole discretion, sufficient to warrant a representment of the transaction and/or reversal of the Chargeback, we will do so on your behalf. However, representment and/or reversal is ultimately contingent upon the Card Issuer and/or Cardholder accepting the transaction under applicable Association guidelines. Representment or reversal is not a guarantee that the Chargeback has been resolved in your favor.

**For Visa Chargebacks:** If we reverse the Chargeback and represent the transaction to the Card Issuer, the Card Issuer, at its sole discretion, may elect to submit the matter for arbitration before Visa. Visa charges a $150 filing fee and a $250 review fee. If a decision is made in favor of the Cardholder and/or Card Issuer, and the Chargeback is upheld, you will be responsible for all such fees and any other applicable fees and penalties imposed by Visa; such fees and penalties will be debited from your Settlement Account or settlement funds, in addition to the Chargeback.

**For MasterCard Chargebacks:** If MasterCard refuses to accept our representment, it may resubmit the Chargeback. In such event, at the discretion of Processor, we will debit your Settlement Account or settlement funds for the Chargeback. However, if you feel strongly that it is an invalid Chargeback, we may, on your behalf and at your request, submit the matter for arbitration before MasterCard. MasterCard charges a $150 filing fee and a $250 review fee. If a decision is made in favor of the Cardholder and/or Card Issuer, and the Chargeback is upheld, you will be responsible for all such fees and any other penalties imposed by MasterCard; such fees and penalties will be debited from your Settlement Account or settlement funds, in addition to the Chargeback.

**For Discover Chargebacks:** If Discover rejects our representment request and you feel strongly that the Chargeback is invalid, we may, at the discretion of Processor and on your behalf and at your request, submit the matter for dispute arbitration before Discover. Discover charges fees for representment requests and an arbitration fee as published in their fee schedule.

If the Chargeback is not disputed within the applicable time limits set forth by MasterCard, Visa, and Discover Association Rules, reversal rights are lost. Our only alternative, on your behalf, is to attempt a "good faith collection" from the Card Issuer. This process can take from 30 to 100 days. Good faith collections must meet the Card Issuer's criteria (e.g., above a set dollar amount, usually $100.00; within a specified time limit; etc.). Sometimes Card Issuers will only accept good faith collections after assessing collection fees. A good faith collection is not a guarantee that any funds will be collected on your behalf. If the good faith collection case is accepted by the Card Issuer, you will receive the amount that we are able to recover from the Card Issuer (which may be reduced by fees Card Issuers sometimes impose for accepting good faith collection claims).

MasterCard and Visa Association Rules require that a merchant make a good faith attempt and be willing and able to resolve any disputes directly with the Cardholder. Discover rules and regulations, however, prohibit you and/or us from contacting the Cardholder

directly regarding dispute(s) or any other matter, except as required for acceptance of Discover transactions, and require you and/or us to submit any responses to dispute notices directly to Discover.

Due to Association Rules, you may not re-bill a Cardholder after a Chargeback is received for that transaction, even with Cardholder authorization.

We strongly recommend that you include a detailed rebuttal letter along with all pertinent documents when responding to a transaction request or a Chargeback notification (e.g., rental agreement, imprinted portion of the Invoice or Sales Draft; the portion signed by the Cardholder; and the area where the authorization codes, with amounts and dates, are located).

Due to the short time frames and the supporting documentation necessary to successfully (and permanently) reverse a Chargeback in your favor, we strongly recommend the following:

- Avoid Chargebacks by adhering to the guidelines and procedures outlined in these Operating Procedures.
- If you do receive a Chargeback, investigate, and if you dispute the Chargeback, submit the appropriate documentation within the required time frame.
- Whenever possible, contact the Cardholder directly to resolve the dispute , unless the dispute relates to a Discover Cardholder, in which case direct contact with the Discover Cardholder regarding the dispute is prohibited by Discover Association Rules.
- If you have any questions, call Customer Service.

**10.1.4. Chargeback Reasons.** The following section outlines the most common types of Chargebacks. This list is not exhaustive. For ease of understanding, we have combined like Chargebacks into seven groupings. We have included recommendations on how to reduce the risk of Chargebacks within each group. These are recommendations only, and do not guarantee that you will be able to prevent Chargebacks.

1. **Authorization Issues. The following scenarios could cause an authorization related Chargeback to occur.**
   - No account number verification (for transactions below the floor limit).
   - Negative Account number verification.
   - Full Authorization not obtained.
   - Fraudulent transaction – No authorization.
   - Fraudulent Transaction prior to embossed Valid Date.
   - Authorization Request Declined.
   - Expired Card.
   - Early Warning Bulletin.
   - Non-Matching account number.
   - Mail Order transaction on Expired or Never Issued Account number.

   **To reduce your risk of receiving an authorization-related Chargeback:**
   - Authorize all transactions and use the proper method of authorization.
   - A valid approval authorization response indicates the Card is valid and can be accepted for payment. An approval code is usually a 4-6 digit number, along with an authorization response of "approval."
   - A decline authorization response indicates the Card should not be accepted for payment. Request a different form of payment from the Cardholder or do not release the merchandise.
   - "Pick-up" authorization response from the Issuer indicates the Credit Card account number is lost or stolen. The Credit Card should not be accepted for payment. Additionally, you can choose to retain the Credit Card and return it to the Acquirer for a reward.

- Referral authorization response prompts you to call the Voice Authorization Center for further instructions.
- If you used a third party to authorize, you must contact them immediately for proof of authorization and submit such proof to us.

**2. Cancellations and Returns. The following scenarios could cause a cancellation and return related Chargeback to occur:**

- Credit transaction not processed.
- Cancelled recurring transaction.
- Cancelled guaranteed reservation.
- Advance deposit service.
- Cardholder not aware of your cancellation/return policies.

**To reduce your risk of receiving a cancellation and return related Chargeback:**

- For recurring transactions – ensure your customers are fully aware of the conditions of this type of transaction.
- Process credits daily.
- All credits must be applied to the account to which the debit originally posted.
- Pre-notify the Cardholder of billing within 10 days (domestic) and 15 days (international) prior to billing, allowing the Cardholder time to cancel the transaction.
- Do not continue to bill after proper cancellation or after receipt of Chargeback.
- Ensure proper disclosure of your refund policy is on the Sales Draft; if applicable, the words "NO EXCHANGE, NO REFUND", etc. must be clearly printed (in 1/4" letters) on the Sales Draft (or electronic equivalent,i.e., the receipt printed when a Card is swiped through a terminal) near or above the Cardholder's signature.
- Do not issue credit in the form of cash, a check or in-store/merchandise Credit.
- Do not issue in-store or merchandise credit.
- For Travel and Entertainment transactions, provide the cancellation policy at the time of reservation.
- For Internet transactions ensure that there is an area on the web page where the Cardholder must acknowledge an understanding of the cancellation policy prior to completing the transaction.

**3. Fraud. The following scenarios could cause a fraud related Chargeback to occur:**

- Unauthorized or fictitious account number.
- Unauthorized ATM transaction.
- Fraudulent processing of a transaction.
- Fraudulent mail/phone Order transaction.
- Counterfeit transaction.
- Fraudulent transaction – no imprint obtained.
- Fraudulent transaction – no signature obtained.
- Risk Identification service.
- Advance deposit service.

**To reduce your risk of receiving a fraud-related Chargeback:**

**For Face to Face (Card Present) Transactions:**

- If you are an electronic merchant, swipe the Card through the electronic authorization device to capture Cardholder information and ensure the displayed Card number matches the number on the Card.
- If you are unable to swipe a Card through an electronic authorization device to capture the Cardholder's information via the Magnetic Stripe, you must Imprint the Card to prove

the Cardholder was present at the time of transaction. Do not alter the imprint on the draft in any way. Manually entering the information into the terminal does not protect you from this type of Chargeback. All pertinent information relating to the transaction must be written on the manually imprinted ticket (date, dollar amount, authorization code, and merchandise description). This information ties the imprinted ticket to the transaction.

- Obtain the Cardholder's signature on the Draft.
- Carefully examine the front and back of the Card at the time of transaction, check the signature and compare it to the signature on the draft.
- If you swipe the transaction and receive a Referral response and a subsequent voice authorization, you must manually imprint the Cardholder's Credit Card to prove Card presence.
- Do not imprint the Cardholder's Credit Card on the back of the transaction receipt or a separate document unless all transaction elements are present.

**For Mail/Telephone/Internet (Card Not Present) Orders:**

- Follow recommended procedures – use Verified by Visa (VBV) for Internet transactions, obtain the 3-digit Card Validation Code (CVV2/CVC2/CID), and/or AVS. While transactions utilizing the AVS may still be disputed, the service may alert you to certain fraudulent transactions.
- Obtain a signed proof of delivery for shipped merchandise.
- Obtain the Cardholder's account number, name and address with city and state. At the time of the transaction, advise the Cardholder of any extra cost that they are responsible for (shipping, handling, insurance etc.).
- Confirm the account number provided by the customer by repeating the number back to the customer.
- Obtain the required Data Elements on the folio/registration documentation for a GNS (Guaranteed No Show) Transaction.

**4. Non-Receipt of Goods and Services. The following scenarios could cause a Non Receipt of Goods and Services related Chargeback to occur:**

- Services not rendered.
- Services not rendered at ATM.
- Non-receipt of merchandise.
- Advance deposit service.

**To reduce your risk of receiving a Non Receipt of Goods and Services related Chargeback:**

- Do not process a transaction until the merchandise is shipped.
- Do not process any Credit Card transaction where the Cardholder has already paid for the goods or services using another method of payment.
- Inform the Cardholder of any specific cancellation policies or advance deposits.
- Obtain a signed proof of delivery

**5. Processing Errors. The following scenarios could cause a processing error related Chargeback to occur:**

- Late presentment of Sales Draft.
- Services or merchandise paid by other means.
- Addition or transposition error.
- Altered amount.
- Incorrect account number, code or amount.
- Duplicate processing.
- Transaction exceeds limited amount.
- Services not rendered.
- Unauthorized ATM transaction.

- Credit posted as Debit.
- Incorrect transaction amount.
- Transaction amount changed.
- Merchandise paid by other means.

**To reduce your risk of receiving a processing error related Chargeback:**

- Settle and reconcile your Batches on your terminal/register daily. Ensure that the total amount settled and submitted (displayed on terminal) balances with, and matches to, the Credit Card receipts of the transactions.

- Obtain a Card imprint (or swipe the Card through an electronic authorization device to capture Cardholder information) and Cardholder signature.

- If you are a paper merchant or the Card cannot be magnetically stripe read, please clearly imprint the Card using the Imprinter machine and do not alter in any way.

- If you are an electronic merchant, swipe the Card through the electronic authorization device and ensure the displayed Card number matches the number on the Card. The Card must be imprinted if the Magnetic Stripe cannot be read or the electronic equipment is inoperable.

- Carefully examine the front and back of the Card at the time of transaction.

- Compare the signature on the back of the Credit Card with the signature on the Sales Draft.

- Telephone orders – confirm the account number provided by the customer by repeating the number back to the customer.

- Properly authorize all transactions.

- If you used a third party to authorize, you must contact them immediately for proof of authorization and submit to us.

- If the terminal does not display the Card number, call the POS Help Desk for a terminal upgrade.

**6. Quality of Goods and Services.** The following scenarios could cause a Quality of Goods and Services related Chargeback to occur:

- Defective merchandise.
- Not as described.

**To reduce your risk of receiving a Quality of Goods and Services related Chargeback:**

- Ensure all merchandise is shipped properly.
- Ensure all return policies are properly disclosed to the Cardholder at the time of sale.

**7. Non Receipt of Information.** The following scenarios could cause a Non Receipt of Information related Chargeback to occur:

- Transaction receipt not received.
- Copy illegible.
- Cardholder does not recognize the transaction.
- T&E document not fulfilled.

**To reduce your risk of receiving a Non Receipt of Information related Chargeback:**

- Prepare clean, legible Sales Drafts at the point of sale and send in your Media daily and/or respond to Media Retrieval requests within the required time frame (failure to properly respond to a fraud related Media Retrieval request eliminates any opportunity for a Chargeback reversal).

- Retain copies of transaction documents for MasterCard and Visa transactions for a minimum of eighteen (18) months from the original sales/post date, and for Discover transactions, the longer of (i) 365 days from the original sales/post date or (ii)

the resolution of any pending or threatened disputes, claims, disagreements or litigation involving the Card transaction.

- Ensure that the most recognizable merchant name, location, and/or customer service phone number is provided on all transaction documentation.

- Timely respond to all notifications and requests.

**10.2. Other Debits.** We may also debit your Settlement Account or your settlement funds in the event we are required to pay Association fees, charges, fines, penalties or other assessments as a consequence of your sales activities. Such debits shall not be subject to any limitations of time specified elsewhere in the Agreement. The following is a list of reasons for other debits. We may add to or delete from this list as changes occur in the Association Rules or our operational requirements:

- Association fees, charges, fines, penalties, registration fees, or other assessments including any fees levied against us or any amount for which you are obligated to indemnify us.

- Currency conversion was incorrectly calculated. **NOTE: For Discover transactions, you are not permitted to convert from your local Discover Network approved currency into another currency, nor may you quote the price of a transaction in U.S. Dollars if completed in another approved currency.**

- Discount not previously charged.
- Reversal of deposit posted to your account in error.
- Debit for Summary Adjustment not previously posted.
- Reversal of credit for deposit previously posted.
- Debit for Chargeback never posted to your account.
- Debit for EDC Batch error fee.
- Association Merchant Chargeback/Fraud Monitoring Fee – Excessive Chargeback Handling Fee.
- Failure of transaction to meet Member Controller Authorization Service ("MCAS") – Cardholder account number on exception file.
- Original transaction currency (foreign) not provided.
- Travel Voucher exceeds maximum value.
- Debit and/or fee for investigation and/or Chargeback costs related to our termination of the Agreement for cause, or for costs related to our collection activities.
- Costs arising from replacement or damage to equipment rented.
- Payment of current or past due amounts for any equipment purchase, rental or lease.
- Incorrect merchant descriptor (name and/or city, state) submitted.
- Incorrect transaction date submitted.
- Shipping and handling interchange fees.
- Costs or expenses associated with responding to any subpoena, garnishment, levy or other legal process associated with your account.

**10.3. Summary (Deposit) Adjustments / Electronic Rejects.** Occasionally, it is necessary to adjust the dollar amount of your summaries/Submissions (deposits) and credit or debit your Settlement Account or settlement funds accordingly. The following is a list of the most frequent reasons for Summary (Deposit) Adjustments/Electronic Rejects:

- Your summary reflected an arithmetic error.
- Submitted sales not included in your Agreement (e.g., American Express, JCB).
- The dollar amount is unreadable/illegible.
- The Cardholder's account number is unreadable/illegible.
- Duplicate Sales Draft submitted.
- Credit Card number is incorrect/incomplete.
- Summary indicated credits, but no credits were submitted.

**10.4. Disputing Other Debits and Summary Adjustments.** In order to quickly resolve disputed debits and Summary Adjustments, it is extremely important that the items listed in this section be faxed or sent to the address listed on the notification.

If the Summary Adjustment is for an unreadable or incorrect Cardholder number, resubmit the corrected Sales Draft with your next deposit. Also, if the transaction is over thirty (30) calendar days old, you must reauthorize and obtain a valid Authorization Code.

A clear and legible copy of the Sales Draft containing the following should be obtained from your files:

- Date of sale/Credit;

- Cardholder's account number, name and signature;

- Total amount of the sale and description of goods and services; and

- Date and Authorization Approval Code.

Include a dated cover letter detailing the reasons for requesting a review of the debit or Summary Adjustment and documentation to support your dispute. (You should retain a copy of the correspondence and all documentation for your files.) If the inquiry is related to prior correspondence, be sure to include the control number we previously used.

Immediately fax or mail the Sales or Credit Drafts to the fax number or address provided on your notification letter.

If you have any questions, please call the Customer Service number provided on the last page of this Program Guide. If a Customer Service Representative informs you that additional documentation is required in order to fully review the item, please immediately submit your rebuttal and transaction documentation to the fax number or address listed on the debit notification.

## 11. Account Maintenance

**11.1. Change of Settlement Number.** If you change the Settlement Account in which you receive the proceeds of your transactions, you must call Customer Service or your Relationship Manager immediately. If you accept payment types other than Visa, MasterCard and Discover (such as the American Express Card, and TeleCheck Services), you are also responsible for contacting the Associations or companies governing those Cards to notify them of this change.

**11.2. Change in Your Legal Name or Structure.** You must call Customer Service or your Relationship Manager and request a new Agreement.

**11.3. Change in Company DBA Name, Address or Telephone/ Facsimile Number.** To change your company DBA name, address or telephone/facsimile number, you must send the request in writing to the address on your statement.

**11.4. Other Change(s) in Merchant Profile.** You must immediately notify us of any change to the information on file with us in your merchant profile, including: (i) any new lines or types of business; (ii) change in ownership; (iii) closing or liquidation of business or any location; (iv) change in Card processing method (i.e., paper Sales Drafts to POS Device); (v) voluntary or involuntary party to a bankruptcy case; (vi) entry into a loan or other agreement with a third party that seeks to affect this Merchant Agreement; and/or (vii) change from a business that exclusively conducts card-present retail sales to one that accepts Card sales by mail, telephone or Internet transactions. We retain the right to terminate this Agreement if you fail to notify us of any change to the information in your merchant profile.

## 12. Association Compliance

MasterCard, Visa and Discover have established guidelines, merchant monitoring programs and reports to track merchant activity such as, but not limited to excessive credits and Chargebacks, and increased deposit activity. In the event you exceed the guidelines or submit suspicious transactions as identified by an Association or any related program or reports, you may be subject to: (i) operating procedure requirement modifications; (ii) incremental Chargebacks and/or fees; (iii) settlement delay or withholding; (iv) termination of your Agreement; or (v) audit and imposition of fines.

## 13. Supplies

**Placing Orders.**

- To order additional supplies, call Customer Service when you have two months' inventory left. We will ship you an adequate amount of supplies. The amount of supplies (based on usage) on hand should not exceed a three to six-month supply.

- In an EMERGENCY, please contact Customer Service using the number provided on the last page of this Program Guide. If supplies are sent via an express delivery service, the delivery charges will be debited to your account.

- You are responsible for unauthorized use of sales/credit and summary Media. We recommended that you store all supplies in a safe location.

- You may be charged for supplies and applicable shipping and handling charges.

## GENERAL TERMS

In addition to the preceding Operating Procedures, our Agreement with you includes the following General Terms. If you fail to follow any of the provisions of the Operating Procedures or General Terms, you may incur certain liabilities or we may terminate our Agreement.

### 14. Services

Subject to Association Rules, Services may be performed by one or more of our affiliates, including the provision of terminals or other equipment and local support functions in connection with this Agreement.

### 15. Operating Procedures; Association Rules

You agree to follow all requirements of this Agreement in connection with each Card transaction and to comply with all applicable Association Rules. From time to time, we may amend the Operating Procedures, by providing you with at least 30 days' prior written notice, and those provisions will be deemed incorporated into this Agreement. However, for changes in the Association Rules or for security reasons, certain changes in Card procedures may become effective on shorter notice. If there are any inconsistencies between the General Terms and the Operating Procedures, the General Terms will govern.

### 16. Settlement of Card Transactions

**16.1.** We will only be required to settle Card transactions for Card types specified in your Application. Promptly after presentment of Sales Drafts pursuant to the Operating Procedures, we will initiate a transfer of the applicable settlement funds to you.

**16.2.** All settlements for Visa, MasterCard and Discover Card transactions will be net of credits/refunds, adjustments, applicable discount fees when due, Chargebacks and any other amounts then due from you. We may also set off from any payments otherwise due, any amounts owed to our affiliates (and/or affiliates of Bank) whether or not arising out of or related to this Agreement.

**16.3.** All credits to your Settlement Account or other payments to you are provisional and are subject to, among other things, our final audit, Chargebacks (including our related losses), fees and fines imposed by the Associations. You agree that we may debit or credit your Settlement Account for any deficiencies, overages, fees and pending Chargebacks, or may deduct such amounts from settlement funds due to you. Alternatively, we may elect to invoice you for any such amounts, net due 30 days after the invoice date or on such earlier date as may be specified.

**16.4.** We will not be liable for any delays in receipt of funds or errors in debit and credit entries caused by third parties including but not limited to any Association or your financial institution.

**16.5.** In addition to any other remedies available to us under this Agreement, you agree that should any Event of Default (see Section 23.4) occur, we may, with or without notice, change processing or payment terms and/or suspend credits or other payments of any and all funds, money and amounts now due or hereafter to become due to you pursuant to the terms of this Agreement, until we have had reasonable opportunity to investigate such event.

### 17. Exclusivity

During the term of this Agreement, you shall use us as your exclusive provider of all Services.

### 18. Fees; Adjustments; Collection of Amounts Due

**18.1.** You shall be charged fees for the Services, which shall be calculated and payable pursuant to this Agreement and any additional pricing supplements. You acknowledge that the fees agreed to are based on the assumption that your transactions will qualify for certain reduced interchange levels (your Anticipated Interchange Levels), as set by the applicable Association. If a transaction fails to qualify for any Anticipated Interchange Levels, then the Association will downgrade the transaction and process it at a more costly interchange level for which it does qualify. In

that event, you shall be charged a Non-Qualified Interchange Fee, which is the difference in the interchange fee associated with the Anticipated Interchange Level and the interchange fee associated with the interchange level at which the transaction actually was processed; plus, any applicable Non-Qualified Surcharge for each non-qualifying transaction, the amount of which is set forth in the service fee schedule. For more information on visa's and MasterCard's interchange rates, please go to www.visa.com and www.mastercard.com.

**18.2.** Should you have questions regarding any Non-Qualified fees (including Non-Qualified Interchange Fees or Non-Qualified Surcharge), submit a Non-Qualified Fee Inquiry (NFI) request in writing (either letter, fax or email) within 90 days from the mail date (post mark) of the monthly statement in question. Note that NFI requests received after the 90 day limit may not be considered for refund review. The subject line or reference at the top of your NFI request must state "Non-Qualified Fee Inquiry." Your NFI request must include your merchant name, merchant number, billing address, and the month of the processing statement on which the non-qualified fees appeared. When possible, also include a copy of the statement on which the fees in question appear. Written fee inquiries should be submitted by email to nfirequest@wellsfargomerchantservicesllc.com; via fax to (954) 509-1822; or if mailed, sent to: **Wells Fargo Merchant, Services, LLC, P.O. Box 6699, Hagerstown, MD 21740, Attn: NFI Investigations Unit.**

We will provide a written response to your NFI with an explanation. If through our research, we find that a refund is due, we will credit your account within 30 days from the date our research was completed. NFI requests not received in accordance with the foregoing shall not be subject to the response times set forth in this Section.

**18.3.** Authorization/EDC Fees will be charged for each transaction that you attempt to authorize. Capture and/or Transaction fees will be charged for each transaction that you transmit to us for settlement.

**18.4.** The fees for Services set forth in this Agreement are based upon assumptions associated with the anticipated annual volume and average transaction size for all Services as set forth in this Agreement and your method of doing business. If the actual volume or average transaction size are not as expected or if you significantly alter your method of doing business, we may adjust your fees for Services without prior notice.

**18.5.** The fees for Services set forth in this Agreement may be adjusted to reflect increases or decreases by Associations in interchange, assessments and other Association fees or to pass through increases charged by third parties for on-line communications and similar items. All such adjustments shall be your responsibility to pay and shall become effective upon the date any such change is implemented by the applicable Association or third party.

**18.6.** Subject to Section 23.3, we may also increase our fees for Services for any other reason by notifying you thirty (30) days prior to the effective date of such change.

**18.7.** If you receive settlement funds by wire transfer, we may charge a wire transfer fee per wire.

**18.8.** To the extent the Automated Clearing House (ACH) settlement process is used to effect debits or credits to your Settlement Account, you agree to be bound by the terms of the operating rules of the National Automated Clearing House Association, as in effect from time to time. You hereby authorize us to initiate credit and debit entries and adjustments to your account through the ACH settlement process and/or through direct instructions to the financial institution where your Settlement Account is maintained for amounts due under this Agreement and under any agreements with us or our affiliates for any related services, as well as for any credit entries in error. You hereby authorize the financial institution where your Settlement Account is maintained to effect all such debits and credits to your account. This authority will remain in

full force and effect until we have given written notice to the financial institution where your Settlement Account is maintained that all monies due under this Agreement and under any other agreements with us or our affiliates for any related services have been paid in full.

**18.9.** You agree to pay any fines imposed on us by any Association resulting from Chargebacks and any other fees or fines imposed by an Association with respect to your acts or omissions.

**18.10.** If your Chargeback percentage for any line of business exceeds the estimated industry Chargeback Percentage, you shall, in addition to the chargeback fees and any applicable Chargeback handling fees or fines, pay us an excessive Chargeback fee for all Chargebacks occurring in such month in such line(s) of business. Each estimated industry Chargeback Percentage is subject to change from time to time by us in order to reflect changes in the industry Chargeback Percentages reported by Visa, MasterCard or Discover. Your Chargeback Percentage will be calculated as the larger of (a) the total Visa, MasterCard and Discover Chargeback items in any line of business in any calendar month divided by the number of Visa, MasterCard and Discover transactions in that line of business submitted that month, or (b) the total dollar amount of Visa, MasterCard and Discover Chargebacks in any line of business received in any calendar month divided by the total dollar amount of your Visa, MasterCard and Discover transactions in that line of business submitted in that month.

**18.11.** If you believe any adjustments should be made with respect to your Settlement Account, you must notify us in writing within 45 days after any debit or credit is or should have been effected. If you notify us after such time period, we may, in our discretion, assist you, at your expense, in investigating whether any adjustments are appropriate and whether any amounts are due to or from other parties, but we shall not have any obligation to investigate or effect any such adjustments. Any voluntary efforts by us to assist you in investigating such matters shall not create any obligation to continue such investigation or any future investigation.

### 19. Chargebacks

**19.1.** You shall be responsible for reimbursing us for all transactions you submit that are charged back. See the Operating Procedures for additional information regarding Chargebacks and Chargeback procedures.

**19.2.** You shall reimburse us for any Chargebacks, return items, or other losses resulting from your failure to produce a Card transaction record requested by us hin the applicable time limits.

### 20. Representations; Warranties; Limitations on Liability; Exclusion of Consequential Damages

**20.1.** Without limiting any other warranties hereunder, you represent and warrant as to each Card transaction submitted under our Agreement that:

**20.1.1.** the Card transaction represents a bona fide sale/rental of merchandise or services not previously submitted;

**20.1.2.** the Card transaction represents an obligation of the Cardholder for the amount of the Card transaction;

**20.1.3.** the amount charged for the Card transaction is not subject to any dispute, setoff or counterclaim;

**20.1.4.** the Card transaction amount is only for the merchandise or services (including taxes, but without any surcharge) sold or rented and, except for any delayed delivery or advance deposit Card transactions expressly authorized by this Agreement, the merchandise or service was actually delivered to or performed for the person entering into the Card transaction simultaneously upon your accepting and submitting the Card transaction for processing;

**20.1.5.** the Card transaction does not represent the refinancing of an existing obligation of the Cardholder (including any obligation otherwise owed to you by a Cardholder or arising from the dishonor of a personal check);

**20.1.6.** you have no knowledge or notice of any fact, circumstances or defense which would indicate that the Card transaction was fraudulent or not authorized by the Cardholder or which would otherwise impair the validity or collectibility of the Cardholder's obligation arising from such Card transaction or relieve the Cardholder from liability with respect thereto;

**20.1.7.** the Card transaction submitted to us was entered into by you and the Cardholder;

**20.1.8.** the Card transaction was made in accordance with these General Terms, Association Rules and the Operating Procedures; and

**20.1.9.** the Card transaction is not a payment for a product or service that violates federal, state or local law in any jurisdiction that may be applicable.

**20.2.** THIS AGREEMENT IS A SERVICE AGREEMENT. WE DISCLAIM ALL REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, MADE TO YOU OR ANY OTHER PERSON, INCLUDING WITHOUT LIMITATION, ANY WARRANTIES REGARDING QUALITY, SUITABILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE OF ANY SERVICES OR ANY GOODS PROVIDED INCIDENTAL TO THE SERVICES PROVIDED UNDER THIS AGREEMENT, INCLUDING WITHOUT LIMITATION, ANY SERVICES OR ANY GOODS PROVIDED BY A THIRD PARTY.

**20.3.** IN NO EVENT SHALL EITHER PARTY, OR THEIR AFFILIATES OR ANY OF THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, AGENTS OR SUBCONTRACTORS, BE LIABLE UNDER ANY THEORY OF TORT, CONTRACT, STRICT LIABILITY OR OTHER LEGAL THEORY FOR LOST PROFITS, LOST REVENUES, LOST BUSINESS OPPORTUNITIES, EXEMPLARY, PUNITIVE, SPECIAL, INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES, EACH OF WHICH IS HEREBY EXCLUDED BY AGREEMENT OF THE PARTIES, REGARDLESS OF WHETHER SUCH DAMAGES WERE FORESEEABLE OR WHETHER ANY PARTY OR ANY ENTITY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. CLIENT ACKNOWLEDGES AND AGREES THAT PAYMENT OF ANY EARLY TERMINATION FEE OR LIQUIDATED DAMAGES AS PROVIDED ELSEWHERE IN THIS AGREEMENT SHALL NOT BE PROHIBITED BY THIS PARAGRAPH.

**20.4.** NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY (INCLUDING BUT NOT LIMITED TO SECTIONS 26 or 20.5), OUR CUMULATIVE LIABILITY FOR ALL LOSSES, CLAIMS, SUITS, CONTROVERSIES, BREACHES OR DAMAGES FOR ANY CAUSE WHATSOEVER (INCLUDING, BUT NOT LIMITED TO, THOSE ARISING OUT OF OR RELATED TO THIS AGREEMENT) AND REGARDLESS OF THE FORM OF ACTION OR LEGAL THEORY SHALL NOT EXCEED, (I) $50,000; OR (II) THE AMOUNT OF FEES RECEIVED BY US PURSUANT TO THE AGREEMENT FOR SERVICES PERFORMED IN THE IMMEDIATELY PRECEDING 12 MONTHS, WHICHEVER IS LESS.

**20.5.** NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY (INCLUDING BUT NOT LIMITED TO SECTION 26), OUR LIABILITY TO ANY DELAY IN FUNDING TRANSACTIONS TO YOU FOR ANY REASON WILL BE LIMITED TO INTEREST COMPUTED FROM THE DATE THAT YOU SUBMIT THE TRANSACTION TO THE DATE THAT WE FUND THE TRANSACTION AT THE RATE OF THE FEDERAL FUNDS, AS ESTABLISHED BY THE FEDERAL RESERVE BOARD FROM TIME TO TIME, LESS ONE PERCENT (1%).

### 21. Confidentiality

**21.1.** Unless you obtain consents from us and each applicable Association, Card Issuer and Cardholder, you must not use, disclose, store, sell or disseminate any Cardholder information obtained in connection with a Card transaction (including the names, addresses and Card account numbers of Cardholders) except for purposes of authorizing, completing and settling Card transactions and resolving any Chargebacks, Retrieval Requests or similar issues involving Card transactions, other than pursuant to a court or governmental agency request, subpoena or order. You shall use proper controls for and limit access to, and render unreadable prior to discarding, all records containing Cardholder

account numbers and Card imprints. You may not retain or store Magnetic Stripe data or Card Validation Codes after a transaction has been authorized. If you store any electronically captured signature of a Cardholder, you may not reproduce such signature except upon our specific request.

21.2. You acknowledge that you will not obtain ownership rights in any information relating to and derived from Card transactions.

## 22. Assignments

22.1. Any transfer or assignment of this Agreement by you, without our prior written consent, by operation of law or otherwise, is voidable by us. Furthermore, you shall indemnify and hold us harmless from all liabilities, Chargebacks, expenses, costs, fees and fines arising from such transferee's or assignee's Submission of Card transactions to us for processing. For purposes of this Section 22, any transfer of voting control shall be considered an assignment or transfer of this Agreement.

22.2. The payment services provided by us require access to a single bank account in which we may initiate both credits and debits. You may not enter into any agreement that would require, in any circumstance or event, the transfer of any payments or proceeds from Credit Card transactions covered by this Agreement to the custody or control of any third party. You may not assign any rights, including the right of payment under this Agreement, to any other person. In the event that you make an assignment (or provide a security interest) of receivables covered by this Agreement, then we may, at our option, elect to (a) refuse to acknowledge such assignment unless accompanied by an authorization to both initiate debits or credits to the bank account of the assignee, (b) terminate this Agreement immediately, or (c) charge for any transfers that we are called upon to make manually to fulfill such an assignment at the rate of $100 per transfer.

22.3. Upon notice to you, another Visa and MasterCard member may be substituted for Bank under whose sponsorship this Agreement is performed with respect to Visa and MasterCard transactions. Upon substitution, such other Visa and MasterCard member shall be responsible for all obligations required of Bank for Visa and MasterCard transactions, including without limitation, full responsibility for its bank Card program and such other obligations as may be expressly required by applicable Association Rules.

Subject to Association Rules, we may assign or transfer this Agreement and our rights and obligations hereunder and/or may delegate our duties hereunder, in whole or in part, to any third party, whether in connection with a change in sponsorship, as set forth in the preceding sentence, or otherwise, without notice to you or your consent.

22.4. Except as set forth elsewhere in this Section and as provided in the following sentence, this Agreement shall be binding upon successors and assigns and shall inure to the benefit of the parties and their respective permitted successors and assigns. No assignee for the benefit of creditors, custodian, receiver, trustee in bankruptcy, debtor in possession, or other person charged with taking custody of a party's assets or business, shall have any right to continue, assume or assign this Agreement.

## 23. Term; Events of Default

23.1. This Agreement shall become effective upon the date this Agreement is approved by our Credit Department.

23.2. The initial term of this Agreement shall commence and shall continue in force for three years after it becomes effective. Thereafter, it shall continue until either party terminates the Agreement upon written notice to the other.

23.3. Notwithstanding the above or any other provisions of this Agreement, we may terminate this Agreement at any time and for any reason by providing 30 days' advance notice to you. We may terminate this agreement immediately or with shorter notice upon

event of Default as provided under Section 23.4. You may terminate this Agreement without penalty in the event of a material breach of this Agreement by Servicers. In the event we provide notice to you of an increase in the fees for Services, pursuant to Section 18.6, you may terminate this Agreement without further cause or penalty by providing us written notice of termination. You must terminate within 30 days after we provide notice of the Section 18.6 fee increase. The Section 18.6 fee increase shall not take effect in the event you provide timely notice of termination. However, your continued use of our Services after the effective date of any increase shall be deemed acceptance of the increased fees for Services, throughout the term of this Agreement.

23.4. If any of the following events shall occur (each an "Event of Default"):

23.4.1. a material adverse change in your business, financial condition, business procedures, prospects, products or services; or

23.4.2. any assignment or transfer of voting control of you or your parent; or

23.4.3. a sale of all or a substantial portion of your assets; or

23.4.4. irregular Card sales by you, excessive Chargebacks, noncompliance with any applicable data security standards, as determined by Servicers, of any Card Association, or any other entity, or an actual or suspected data security breach, nonconformance with any applicable data security standards, as determined by Servicers, any Card Association, or any other entity, or an actual or suspected data security breach, or any other circumstances which, in our sole discretion, may increase our exposure for your Chargebacks or otherwise present a financial or security risk to us; or

23.4.5. any of your representations or warranties in this Agreement are breached in any material respect or are incorrect in any material respect when made or deemed to be made; or

23.4.6. you shall default in any material respect in the performance or observance of any term, covenant, condition or agreement contained in this Agreement, including, without limitation, the establishment or maintenance of funds in a Reserve Account, as detailed in Section 24; or

23.4.7. you shall default in any material respect in the performance or observance of any term, covenant or condition contained in any agreement with any of our affiliates; or

23.4.8. you shall default in the payment when due, of any material indebtedness for borrowed money or any material trade payable; or

23.4.9. you shall file a petition or have a petition filed by another party under the Bankruptcy Code or any other laws relating to bankruptcy, insolvency or similar arrangement for adjustment of debts; consent to or fail to contest in a timely and appropriate manner any petition filed against it in an involuntary case under such laws; apply for or consent to, or fail to contest in a timely and appropriate manner, the appointment of, or the taking of possession by, a receiver, custodian, trustee or liquidator of itself or of a substantial part of its property; or make a general assignment for the benefit of creditors; or take any corporate action for the purpose of authorizing any of the foregoing; or

23.4.10. your independent certified accountants shall refuse to deliver an unqualified opinion with respect to your annual financial statements and your consolidated subsidiaries; or

23.4.11. a violation by you of any applicable law or Association Rule or our reasonable belief that termination of this Agreement or suspension of Services is necessary to comply with any law including without limitation the rules and regulations promulgated by the Office of Foreign Assets Control of the US Department of the Treasury or your breach, as determined by Servicers, of Section 34.2 ("Compliance with Laws");

then, upon the occurrence of (1) an Event of Default specified in subsections 23.4.4, 23.4.9 or 23.4.11, we may consider this

Agreement to be terminated immediately, without notice, and all amounts payable hereunder shall be immediately due and payable in full without demand or other notice of any kind, all of which are expressly waived by you, and (2) any other Event of Default, this Agreement may be terminated by us giving not less than 10 days' notice to you, and upon such notice all amounts payable hereunder shall be due and payable on demand.

23.5.   Neither the expiration nor termination of this Agreement shall terminate the obligations and rights of the parties pursuant to provisions of this Agreement which by their terms are intended to survive or be perpetual or irrevocable. Such provisions shall survive the expiration or termination of this Agreement. All obligations by you to pay or reimburse us for any obligations associated with transactions you have submitted to us are intended to survive termination of this Agreement.

23.6.   If any Event of Default shall have occurred and regardless of whether such Event of Default has been cured, we may, in our sole discretion, exercise all of our rights and remedies under applicable law and this Agreement, including, without limitation, exercising our rights under Section 24.

23.7.   In the event you file for protection under the Bankruptcy Code or any other laws relating to bankruptcy, insolvency, assignment for the benefit of creditors or similar laws, and you continue to use our services, it is your responsibility to open new accounts to distinguish pre and post filing obligations. You acknowledge that as long as you utilize the accounts you established prior to such filing, we will not be able to systematically segregate your post-filing transactions or prevent set-off of the pre-existing obligations. In that event, you will be responsible for submitting an accounting supporting any adjustments that you may claim.

23.8.   The Associations often maintain lists of merchants who have had their Merchant Agreements or Card Acceptance rights terminated for cause. If this Agreement is terminated for cause, you acknowledge that we may be required to report your business name and the names and other information regarding its principals to the Associations for inclusion on such list(s). You expressly agree and consent to such reporting if you are terminated as a result of the occurrence of an Event of Default or for any reason specified as cause by Visa, MasterCard or Discover. Furthermore, you agree to waive and hold us harmless from and against any and all claims which you may have as a result of such reporting.

23.9.   After termination of this Agreement for any reason whatsoever, you shall continue to bear total responsibility for all Chargebacks, fees, credits and adjustments resulting from Card transactions processed pursuant to this Agreement and all other amounts then due or which thereafter may become due under this Agreement.

## 24. Reserve Account; Security Interest

24.1.   You expressly authorize us to establish a Reserve Account pursuant to the terms and conditions set forth in this Section 24. The amount of such Reserve Account shall be set by us, in our sole discretion, based upon your processing history and the potential risk of loss to us as we may determine from time to time.

24.2.   The Reserve Account shall be fully funded upon three (3) days' notice to you, or in instances of fraud or suspected fraud an Event of Default reserve account funding may be immediate. Such Reserve Account may be funded by all or any combination of the following:

   (i)   one or more debits to your Settlement Account or any other accounts held by Bank or any of its affiliates; at any financial institution vested in the name of Client, any of its principals, or any of its guarantors, or if any of same are authorized signers on such account;

   (ii)   any payments otherwise due to you, including any amount due from TeleCheck;

   (iii)   your delivery to us of a letter of credit; or

   (iv)   If we so agree, your pledge to us of a freely transferable and negotiable certificate of deposit. Any such letter of credit or certificate of deposit shall be issued or established by a financial institution acceptable to us and shall be in a form satisfactory to us. In the event of termination or expiration of this Agreement by any party, an immediate Reserve Account may be established without notice in the manner provided above. Any Reserve Account will be held by us for the greater of ten (10) months after termination or expiration of this Agreement or for such longer period of time as is consistent with our liability for Card transactions and Chargebacks in accordance with Association Rules. Your funds will be held in an account commingled with reserve funds of our other Clients, without involvement by an independent escrow agent. Unless specifically agreed in writing by us or specifically required by applicable law, funds held by us in a Reserve Account shall not accrue interest.

24.3.   If your funds in the Reserve Account are not sufficient to cover the Chargebacks, adjustments, fees and other charges due from you, or if the funds in the Reserve Account have been released, you agree to promptly pay us such sums upon request.

24.4.1.   To secure your obligations to Servicers and our affiliates under this Agreement and any other agreement for the provision of related equipment or related services (including any obligations for which payments on account of such obligations are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy act, state or federal law, common law or equitable cause), you grant to Servicers a first priority lien and security interest in and to (i) the Reserve Account and (ii) any of your funds pertaining to the Card transactions contemplated by this Agreement now or hereafter in the possession of Servicers, whether now or hereafter due or to become due to you from Servicers. Any such funds, money or amounts now or hereafter in the possession of Servicers may be commingled with other funds of Servicers, or, in the case of any funds held pursuant to the foregoing paragraphs, with any other funds of other customers of Servicers. In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, Servicers are hereby authorized by you at any time and from time to time, without notice or demand to you or to any other person (any such notice and demand being hereby expressly waived), to set off, recoup and to appropriate and to apply any and all such funds against and on account of your obligations to Servicers and their affiliates under this Agreement and any other agreement with Servicers or any of Servicers' affiliates for any related equipment or related services (including any check warranty and check verification services), whether such obligations are liquidated, unliquidated, fixed, contingent, matured or unmatured. You agree to duly execute and deliver to Servicers such instruments and documents as Servicers may reasonably request to perfect and confirm the lien, security interest, right of set off, recoupment and subordination set forth in this Agreement.

24.4.2.   To the extent funds are held in a separate reserve account, the Reserve Account shall be subject to (i) Servicers' security interest pursuant to this subsection 24.4, and (ii) an account control agreement (as defined by the applicable sections of the Uniform Commercial Code, hereinafter referred to as "Control Agreement") among you, the Institution at which the reserve account is held (such institution hereinafter referred to as "Depository") and Servicers (such investment account hereinafter referred to as the "Control Account"). The Control Agreement shall be in form and substance satisfactory to Servicers. The Depository shall be a National Association bank which is mutually acceptable to you and Servicers.

24.4.3.   For sake of clarification and notwithstanding anything in the Agreement to the contrary, in the event Servicers deduct, holdback, suspend, suspend, off set or set off (collectively "Set Off Funds") any settlement monies or amounts otherwise due you pursuant to the terms of this Agreement, you acknowledge that such Set

Off Funds will be held in a commingled reserve account(s) of Servicers (as described in this subsection 24.4) unless such Set Off Funds are wired or deposited by Servicers into any Control Account, pursuant to a Control Agreement in which case Servicers will transfer Set Off Funds from their commingled reserve account(s) to the Control Account as soon as practicable using commercially reasonable efforts.

**24.4.4.** If in replacement of or in addition to the first priority lien and security interest in the Reserve Account, you grant to Servicers a first priority lien and security interest in and to one or more certificates of deposit, the certificates of deposit shall be uncertificated and shall be subject to an Acknowledgement of Pledge of Certificate of Deposit and Control Agreement (the "Certificate of Deposit Control Agreement") by, between and among Customers, Servicers and the financial institution that has established and issued the certificate of deposit. The form of the Certificate of Deposit Control Agreement and the financial institution that will establish and issue the certificate of deposit shall be satisfactory and acceptable to Servicers.

### 25. Financial and Other Information

**25.1.** Upon request, you will provide us quarterly financial statements within 45 days after the end of each fiscal quarter and annual audited financial statements within 90 days after the end of each fiscal year. Such financial statements shall be prepared in accordance with generally accepted accounting principles. You will also provide such other financial statements and other information concerning your business and your compliance with the terms and provisions of this Agreement as we may reasonably request. You authorize us to obtain from third parties financial and credit information relating to you in connection with our determination whether to accept this Agreement and our continuing evaluation of the financial and credit status of you. We may also access and use information which you have provided to Bank for any other reason. Upon request, you shall provide to us or our representatives reasonable access to your facilities and records for the purpose of performing any inspection and/or copying of your books and/or records deemed appropriate.

**25.2.** You will provide us with written notice of any judgment, writ, warrant of attachment, execution or levy against any substantial part (25% or more in value) of your total assets not later than three (3) days after you become aware of same.

### 26. Indemnification

**26.1.** You agree to indemnify and hold us harmless from and against all losses, liabilities, damages and expenses:

  (a) resulting from any breach of any warranty, covenant or agreement or any misrepresentation by you under this Agreement;

  (b) arising out of your or your employees' or your agents' negligence or willful misconduct, in connection with Card transactions or otherwise arising from your provision of goods and services to Cardholders;

  (c) arising out of your use of our Service; or

  (d) arising out of any third party indemnifications we are obligated to make as a result of your actions (including indemnification of any Association or Issuer).

**26.2.** We agree to indemnify and hold you harmless from and against all losses, liabilities, damages and expenses resulting from any breach of any warranty, covenant or agreement or any misrepresentation by us under this Agreement or arising out of our or our employees' gross negligence or willful misconduct in connection with this Agreement.

### 27. Special Provisions Regarding Non-Bank Cards

**27.1.** You authorize us to share information from your Application with American Express, JCB, or any other Non-Bank Card Association.

**27.2.** You understand that American Express transactions are processed, authorized and funded by American Express. American Express

will provide you with its own agreement that governs those transactions. You understand and agree that we are not responsible and assume absolutely no liability with regard to any such transactions, including but not limited to the funding and settlement of American Express transactions, and that American Express will charge additional fees for the services they provide.

**27.3.** If you accept JCB Cards, you must retain original JCB Sales Drafts and JCB Credit Drafts for a period of at least 120 days from the date of the JCB Card transaction and you must retain microfilm or legible copies of JCB Sales Drafts and JCB Credit Drafts for a period of at least three (3) years following the date of the transaction.

**27.4.** If you accept JCB Cards, you agree to be bound by JCB rules. You also agree to be bound by all other provisions of this Agreement which are applicable to JCB.

### 28. Special Provisions For PIN Debit Card

The special provisions outlined in this Section 28 apply only to those PIN Debit Card transactions that are processed by a Cardholder entering a PIN. These provisions do not apply to Non-PIN Debit Card transactions which do not involve entry of a PIN.

**28.1.** PIN Debit Card Acceptance. Most, but not all, ATM Cards (Debit Cards) can be accepted at the point of sale at participating locations. Examine the back of the PIN Debit Card to determine if the Card participates in a network that you are authorized to accept. The Network mark(s) will usually be printed on the back of the Card. If the PIN Debit Card is valid and issued by a participating network, you must comply with the following general requirements for all participating networks, in addition to any specific requirements of the network.

  · You must honor all valid PIN Debit Cards when presented that bear authorized network marks.

  · You must treat transactions by Cardholders from all Issuers in the same manner.

  · You may not establish a minimum or maximum transaction amount for PIN Debit Card acceptance.

  · You may not require additional information, beside the Personal Identification Number, for the completion of the transaction unless the circumstances appear suspicious. A signature is not required for PIN Debit Card transactions.

  · You shall not disclose transaction related information to any party other than your agent, a network, or issuing institution and then only for the purpose of settlement or error resolution.

  · You may not process a Credit Card transaction in order to provide a refund on a PIN Debit Card transaction.

**28.2.** Transaction Processing. The following general requirements apply to all PIN Debit Card transactions.

  · All debit transactions must be authorized and processed electronically. There is no Voice Authorization or Imprinter procedure for PIN Debit Card transactions.

  · You may not complete a PIN Debit Card transaction that has not been authorized. The Cardholder should be instructed to contact the Issuer to find out why a transaction has been declined. If you cannot obtain an authorization at the time of sale, you should request another form of payment from the customer or process the transaction as a Store and Forward or Resubmission, in which case you assume the risk that the transaction fails to authorize or otherwise declines. The Cardholder should be instructed to contact the Issuing Bank to find out why a transaction has been declined.

  · You may not complete a PIN Debit Card transaction without entry of the Personal Identification Number (PIN) by the Cardholder.

  · The PIN must be entered into the PIN pad only by the Cardholder. You cannot accept the PIN from the Cardholder verbally or in written form.

- The PIN Debit Network used to process your transaction will depend upon, among other things, the availability of the network at the time of the transaction, whether a particular PIN Debit Card is enabled for a particular network and the routing requirements established by the networks and the card issuers. We may, at our sole discretion, utilize any PIN Debit Network available to us for a given transaction.

- You must issue a receipt to the Cardholder upon successful completion of a transaction. The Cardholder account number will be masked so that only the last four digits will appear. The masked digits will appear as a non-numeric character such as an asterisk. This is referred to as PAN Truncation.

- You may not manually enter the account number. The account number must be read electronically from the Magnetic Stripe. If the Magnetic Stripe is unreadable, you must request another form of payment from the customer.

- Any applicable tax must be included in the total transaction amount for which authorization is requested. Tax may not be collected separately in cash.

- YOU ARE RESPONSIBLE TO SECURE YOUR TERMINALS AND TO INSTITUTE APPROPRIATE CONTROLS TO PREVENT EMPLOYEES OR OTHERS FROM SUBMITTING REFUNDS AND VOIDS THAT DO NOT REFLECT BONA FIDE RETURNS OR REIMBURSEMENTS OF PRIOR TRANSACTIONS.

**28.3. Cash Back From Purchase.** You have the option of offering cash back to your customers when they make a PIN Debit Card purchase. You may set a minimum and maximum amount of cash back that you will allow. If you are not now offering this service, your terminal may require additional programming to begin offering cash back.

**28.4. Settlement.** Within one Business Day of the original transaction, you must balance each location to the system for each Business Day that each location is open.

**28.5. Adjustments.** An adjustment is a transaction that is initiated to correct a PIN Debit Card transaction that has been processed in error. You will be responsible for all applicable adjustment fees that may be charged by a Debit Card network. Some networks may have established minimum amounts for adjustments.

There are several reasons for adjustments being initiated:

- The Cardholder was charged an incorrect amount, either too little or too much.

- The Cardholder was charged more than once for the same transaction.

- A processing error may have occurred that caused the Cardholder to be charged even though the transaction did not complete normally at the point of sale.

- All parties involved in processing adjustments are regulated by time frames that are specified in the operating rules of the applicable Debit Card network, The Electronic Funds Transfer Act, Regulation E, and other applicable law.

### 29. Special Provisions Regarding Electronic Benefit Transfer ("EBT")

If you elect to engage in EBT transactions, the terms and conditions of this Section 29 shall apply.

If you have agreed to issue Cash Benefits and will provide cash back or cash only transactions, you agree to maintain adequate cash on hand to issue confirmed Cash Benefits and will issue Cash Benefits to EBT customers in the same manner and to the same extent cash is provided to your other customers.

You may not require that any EBT customers purchase goods or services as a condition to receiving Cash Benefits, unless such condition applies to other customers as well. You may not designate special checkout lanes restricted to use by EBT customers unless you also designate special checkout lanes for Debit or Credit Cards and/or other payment methods.

**29.1. Acceptance of EBT Benefits.** You agree to issue benefits to EBT customers in accordance with the procedures specified in all documentation provided to you by us, as amended from time-to-time and pursuant to all applicable law, rules and regulations. You must provide each EBT customer a receipt for each EBT transaction.

You will issue EBT benefits to EBT customers, in accordance with our then current procedures, in the amount authorized through a point-of-sale terminal, with personal identification number pad and printer. In the event of an equipment failure, you must comply with applicable procedures regarding manual voucher authorization. You must also comply with the procedures set forth in the Quest Operating Rules, as amended from time-to-time, issued by the National Automated Clearing House Association and approved by the Financial Management Service of the U.S. Treasury Department, and any additional rules, regulations and procedures specified by any additional state or federal government or agency regarding lost EBT Cards, forgotten PINs, discrepancies in benefits authorized and similar matters by referring EBT customers to their applicable EBT customer service center.

You may not accept any EBT Card for any purpose other than the acceptance of benefits, including without limitation acceptance of any EBT Card as security for repayment of any customer obligation. In the event of any violation of this provision, you will be obligated to reimburse the applicable state or us for any benefits unlawfully received. Cash should never be dispensed for Food Stamp Benefits.

**29.2. Manual EBT Vouchers.** All manual voucher authorizations must be cleared on your POS terminal for payment of voucher to be made to you. Vouchers must be cleared within 10 business days of voice authorization. Vouchers cannot be cleared by any manner except by your POS terminal therefore you should never mail vouchers requesting payment. If a voucher expires before it has been cleared by your POS for payment, no further action can be taken to obtain payment for the voucher. You must not attempt to voice authorize a manual EBT transaction if the EBT customer is not present to sign the voucher. A copy of the voucher should be given to the EBT customer at the time of authorization and you should retain one copy for your records.

**29.3. Acceptance of EBT Cash Benefits.** If you have agreed to issue Cash Benefits and will provide cash back or cash only transactions, you agree to comply with all applicable laws, rules and regulations and maintain adequate cash on hand to issue confirmed Cash Benefits and will issue Cash Benefits to EBT customers in the same manner and to the same extent cash is provided to your other customers. You may not require that any EBT customers purchase goods or services as a condition to receiving Cash Benefits, unless such condition applies to other customers as well. You may not designate special checkout lanes restricted to use by EBT customers unless you also designate special checkout lanes for debit or Credit Cards and/or other payment methods.

**29.4. Interoperability.** If you issue EBT benefits (Food Stamps and/or Cash Benefits), you must issue EBT benefits from EBT customers from all states.

**29.5. Required Licenses.** If you issue benefits under this Agreement, you represent and warrant to us that you are properly authorized to enter such transactions and are not currently disqualified or withdrawn from redeeming food stamp coupons or otherwise disqualified or withdrawn by any applicable agency. You agree to secure and maintain at your own expense all necessary licenses, permits, franchises, or other authorities required to lawfully effect the issuance and distribution of benefits under this Agreement, including without limitation, any applicable franchise tax certificate and non-governmental contractor's certificate, and covenant that you will not issue benefits at any time during which you are not in compliance with the requirements of any applicable law.

**29.6. Term and Termination.** If you are disqualified or withdrawn from the food stamp program, your authority to issue benefits will be terminated contemporaneously therewith. Such disqualification

or withdrawal will be deemed a breach of this Agreement with respect to your authority to issue Cash Benefits and, in the event of such disqualification; we shall have the right to immediately terminate the provision of service under this Section 29.6 or the Agreement in its entirety. With respect to the issuance of Cash Benefits only, your authority to issue Cash Benefits may be suspended or terminated immediately at the sole discretion of us, the state or its EBT service provider, effective upon delivery of a notice of suspension or termination specifying the reasons for such suspension or termination if there shall be (i) any suspension, injunction, cessation, or termination of the EBT service provider's authority to provide EBT services to the state; (ii) failure by you, upon not less than thirty (30) days prior written notice, to cure any breach by you of the provisions of these terms and conditions, including without limitation, your failure to support the issuance of benefits during your normal business hours consistent with your normal business practices, your failure to comply with issuance procedures, impermissible acceptance of an EBT Card, or your disqualification or withdrawal from the food stamp program; or (iii) based on a state's or its EBT service provider's investigation of the relevant facts, evidence that you or any of your agents or employees are committing, participating in, or have knowledge of fraud or theft in connection with the dispensing of benefits. In the event you fail to cure any breach as set forth above, you may appeal such suspension of termination to the applicable state for determination in its sole discretion.

In the event that your authority to accept benefits is suspended or terminated by a state or its EBT service provider, and you successfully appeal such suspension or termination to the state or its EBT service provider, we shall be under no obligation to reinstate the services previously provided.

The provision of services under this Section 29.6 shall terminate automatically in the event that our Agreement or our service provider's agreement with any applicable state's EBT service provider terminates for any reason.

29.7. **Confidentiality of EBT System Information.** All information related to EBT recipients and/or the issuance of benefits shall be considered confidential information.

Individually identifiable information relating to a benefit recipient or applicant for benefits will be held confidential and will not be disclosed by you or your directors, officers, employees or agents, without prior written approval of the applicable state.

The use of information obtained by you in the performance of your duties under this Section 29.7 will be limited to purposes directly connected with such duties.

29.8. **EBT Service Marks.** You will adequately display any applicable state's service marks or other licensed marks, including the Quest mark, and other materials supplied by us, (collectively the "Protected Marks") in accordance with the standards set by the applicable state. You will use the Protected Marks only to indicate that benefits are issued at your location(s) and will not indicate that we, any state or its EBT service provider or we endorses your goods or services. Your right to use such Protected Marks pursuant to this Agreement will continue only so long as this Agreement remains in effect or until you are notified by us, any state or its EBT service provider to cease their use or display.

29.9. **Miscellaneous.**

29.9.1. **Amendments.** If any of these terms and conditions are found to conflict with federal or state law, regulation or policy of the rules, these terms and conditions are subject to reasonable amendment by a state or its EBT service provider to address such conflict upon thirty (30) days written notice to you provided that you may, upon written notice, terminate your obligation under this Section 29 upon receipt of notice of such amendment.

29.9.2. **State Action.** Nothing contained herein shall preclude a state from commencing appropriate administrative or legal action against you or for making any referral for such action to any appropriate federal, state, or local agency.

### 30. Special Provisions Regarding Wireless Service

If you elect to purchase any Wireless Equipment from us as indicated on the Application, then the following terms and conditions of this Section 30, referred to as the Wireless Services Terms, shall apply. THE WIRELESS SERVICES ARE NOT BEING SOLD TO YOU FOR HOME OR PERSONAL USE. Sale of Wireless Services is made by Processor and not the Bank.

Through our affiliates, we have acquired the right to resell and sublicense certain wireless POS Terminals and accessories (the "Wireless Equipment") and wireless data communication services using radio base stations and switching offered by the various cellular telephone and data networks throughout the country (the "Wireless Networks") in order to allow you to capture and transmit to us certain wireless Credit and Debit Card Authorization transactions or to transmit other communications to our system.

You acknowledge that one or more independent third party vendors ("Wireless Vendor(s)") has developed and provides the Wireless Equipment and Wireless Services to us through our affiliates under separate agreement(s).

In the event you elect to purchase voice and/or data services directly from a third party provider for use with the Wireless Equipment as permitted by Processor, you acknowledge and agree that the Agreement does not address or govern those voice and/or data services or your relationship with that third party provider, and Servicers are in no way responsible for providing, maintaining, servicing or supporting such third party voice and/or data services.

30.1. **Purchase of Wireless Services.** In connection with your purchase of Wireless Equipment, you will purchase the Wireless Networks' Service and obtain sublicenses to use any Wireless Software (as defined in Section 30.2) associated therewith) collectively "Wireless Services". The prices that you will pay for the Wireless Services are set forth on the Service Fee Schedule.

- **Licenses.** You agree to obtain any and all licenses, permits or other authorizations required by the Federal Communications Commission ("FCC") or any other regulatory authority, if any, for the lawful operation of terminal Wireless Equipment used by you in connection with your receipt of Wireless Services. You will promptly provide us with all such information as we may reasonably request with respect to matters relating to the rules and regulations of the FCC.

- **Improvements/General Administration.** We and the Wireless Vendor(s) reserve the right to make changes, from time to time, in the configuration of the Wireless Services, Wireless Network(s), Wireless Equipment, Wireless Software, rules of operation, accessibility periods, identification procedures, type and location of equipment, allocation and quantity of resources utilized, programming languages, administrative and operational algorithms and designation of the control center serving you at the particular address. In addition, we reserve the right to schedule, from time to time, interruptions of service for maintenance activities.

30.2. **Software Licenses.** We hereby grant to you a non-exclusive, nontransferable limited sublicense to use any Wireless Software solely in connection with your purchase and use of the Wireless Services. As used in this Section 30, Wireless "Software" means all software used in, for or in connection with the Wireless Equipment, the Wireless Services or the access thereto in whatever form, including without limitation source code, object code and microcode, including any computer programs and any documentation relating to or describing the software. You acknowledge that the only right you obtain to the Wireless Software is the right to use the Wireless Software in accordance with the terms in this Section.

30.3. **Limitation on Liability.** We shall have no liability for any warranties by any party with respect to uninterrupted Wireless Services, as set forth in Section 30.10, or for any third party's unauthorized access to Client's data transmitted through either the Wireless Equipment or Wireless Services, or Wireless Networks, regardless of the form of action (whether in contract, tort

(including negligence), strict liability or otherwise). The foregoing notwithstanding, for any other liability arising out of or in any way connected with these Wireless Services Terms, including liability resulting solely from loss or damage caused by partial or total failure, delay or nonperformance of the Wireless Services or relating to or arising from your use of or inability to use the Wireless Services, Processor's, Bank's, and Vendor(s)' liability shall be limited to your direct damages, if any, and, in any event, shall not exceed the amount paid by you for the particular Wireless Services during any period of failure, delay, or nonperformance of the Wireless Services. In no event shall Servicers, Wireless Vendor(s) or our respective affiliates be liable for any indirect incidental, special or consequential damages. The remedies available to you under these Wireless Services terms will be your sole and exclusive remedies.

**30.4.** **Indemnification.** In addition to any other Indemnifications as set forth in this Agreement, you will indemnify and hold Servicers, Vendor( s) and us and our respective officers, directors, employees, and affiliates harmless from against any and all losses, claims, liabilities, damages, costs or expenses arising from or related to:

    (a) the purchase, delivery, acceptance, rejection, ownership, possession, use condition, liens against, or return of the Wireless Services;

    (b) your negligent acts or omissions; or

    (c) any breach by you of any of your obligations under this Section 30; or

    (d) any third party's unauthorized access to Client's data and/or unauthorized financial activity occurring on your Merchant Account Number hereunder, except to the extent any losses, liabilities, damages or expenses result from our gross negligence or willful misconduct.

**30.5.** **Confidentiality.** All information or materials which could reasonably be considered confidential or competitively sensitive that you access from or relate to either vendors or us related to the subject matter of this Wireless Services Agreement will be considered confidential information. You will safeguard our confidential information with at least the same degree of care and security that you use for your confidential information, but not less than reasonable care.

**30.6.** **Termination.** In addition to any other provision in this Agreement, the Wireless Services being provided under this Section 30:

    (a) Immediately upon termination of the agreement between us (or our affiliates) and Vendor(s), provided that we will notify you promptly upon our notice or knowledge of termination of such agreement, provided further that if Vendor(s) loses its authority to operate less than all of the Wireless Services or if the suspension of any authority or non-renewal of any license relates to less than all of the Wireless Services, then these Wireless Services Terms will terminate only as to the portion of the Wireless Services affected by such loss of authority, suspension or non-renewal; or

    (b) Immediately if either we or our affiliates or Vendor(s) are prevented from providing the Wireless Services by any law, regulation, requirement, ruling or notice issued in any form whatsoever by judicial or governmental authority (including without limitation the FCC).

**30.7.** **Effect of Termination.** Upon termination of these Wireless Services Terms for any reason, you will immediately pay to us all fees due and owing to us hereunder. If these Wireless Services Terms terminate due to a termination of the agreement between us or our affiliates and Vendor(s), then we may, in our sole discretion, continue to provide the Wireless Services through Vendor(s) to you for a period of time to be determined as long as you continue to make timely payment of fees due under these Wireless Services Terms.

**30.8.** **Third Party Beneficiaries.** Our affiliates and Vendor(s) are third party beneficiaries of these Wireless Services Terms and may enforce its provisions as if a party hereto.

**30.9.** **Other Applicable Provisions.** You also agree to be bound by all other terms and conditions of this Agreement.

**30.10.** **Disclaimer.** Wireless Services use radio transmissions, so Wireless Services can't be provided unless your Wireless Equipment is in the range of one of the available Wireless Networks' transmission sites and there is sufficient network capacity available at that moment. There are places, particularly in remote areas, with no service at all. Weather, topography, buildings, your Wireless Equipment, and other conditions that we do not control may also cause failed transmissions or other problems. PROCESSOR, BANK, AND VENDOR(S) DISCLAIM ALL REPRESENTATIONS AND WARRANTIES RELATING TO WIRELESS SERVICES. WE CANNOT PROMISE UNINTERRUPTED OR ERROR FREE WIRELESS SERVICE AND DO NOT AUTHORIZE ANYONE TO MAKE ANY WARRANTIES ON OUR BEHALF.

## 31. Terms of Equipment Purchase or Rental

This Section 31 governs any equipment that is rented to you on a month to month basis or that is sold to you by us. If your Application or other documents reflect that your equipment is leased, then the provisions of your lease are governed by Section 32 in the Equipment Lease Agreement. Equipment rented to or purchased by you under this Section 31 is referred to in this section as the "Equipment." THE EQUIPMENT IS NOT BEING SOLD OR RENTED TO YOU FOR HOME OR PERSONAL USE. Sales and rentals of equipment are made by Processor, and for purposes of this section the words "we," "our," and "us" refer only to Processor and not to Bank. The agreement between Processor and you as set forth in this section is referred to as the "Equipment Agreement," and the full Agreement of which the Equipment Agreement is a part is referred to as the "Merchant Agreement."

YOU ACKNOWLEDGE THAT THE EQUIPMENT AND/OR SOFTWARE YOU PURCHASED OR RENT FROM US MAY NOT BE COMPATIBLE WITH ANOTHER PROCESSOR'S SYSTEMS. WE DO NOT HAVE ANY OBLIGATION TO MAKE SUCH SOFTWARE AND/OR EQUIPMENT COMPATIBLE WITH ANY OTHER PROCESSING SYSTEMS. IN THE EVENT THAT YOU ELECT TO USE ANOTHER PROCESSING SERVICE PROVIDER UPON THE TERMINATION OF THIS AGREEMENT, YOU ACKNOWLEDGE THAT YOU MAY NOT BE ABLE TO USE THE EQUIPMENT AND/OR SOFTWARE RENTED OR PURCHASED UNDER THIS AGREEMENT.

**31.1.** **Purchased Equipment; Supplies.** We will sell to you, and you will buy from us the Equipment identified in the Merchant Agreement as being purchased by you (the "Purchased Equipment"), free and clear of all liens and encumbrances (subject to Section 31.7), except that any "Software" (as defined in Section 31.8) will not be sold to you outright but instead will be provided to you pursuant to, and subject to the conditions of Section 31.8 of this Agreement. You shall pay the purchase price specified for the Purchased Equipment and the related software license(s), including all applicable tax, prior to the effective date of the Equipment Agreement or at our option, such amounts will be collected by us by debits or deductions pursuant to Section 31.5. We will provide you supplies as requested by you from time to time. You shall pay the purchase price for such supplies, plus shipping and handling charges, including all applicable tax, prior to delivery of the supplies or upon invoice, as specified by us, or at our option, such amounts will be collected by us by debits or deductions pursuant to Section 31.5. (Maintenance and repair of merchant-owned equipment is your responsibility. Should your terminal become inoperable, we can provide you with equipment at a monthly rental fee. There will also be a nominal shipping and handling fee. For such rental equipment contact the POS Help Desk.

**31.2.** **Rental Equipment.** We agree to rent to you and you agree to accept and rent from us the Equipment identified in the Merchant Agreement as being rented to you (the "Rental Equipment"), according to the terms and conditions of this Section 31. In addition, any rental equipment ordered by you during the term of the Merchant Agreement shall also be governed by the terms of this Equipment Agreement.

**31.3.** **Effective Date and Term of Equipment Agreement.** This Equipment Agreement shall become effective on the first date

you receive any piece of Equipment covered by this Equipment Agreement. This Equipment Agreement will remain in effect until all of your obligations and all of our obligations under this Equipment Agreement have been satisfied. We will deliver the Equipment to the site designated by you. You shall be deemed to have accepted each piece of Equipment at the earlier of: (a) your actual acceptance after installation, (b) delivery to you if your site is not prepared and ready for installation, or (c) for Equipment that we have not agreed to install for you, seven (7) days after shipment of each such piece of Equipment. The rental period with respect to each piece of Rental Equipment shall commence on the date such Equipment is deemed accepted and shall terminate at the scheduled termination date (but not upon any early termination) of your Merchant Agreement and/or any other agreement then in effect with us for Card services. The provisions of this Equipment Agreement shall survive the termination or expiration of the Merchant Agreement and continue until all equipment rented from us is returned or paid for.

**31.4.** **Site Preparation. Installation & Maintenance.** You will prepare the installation site(s) for the Equipment, including but not limited to the power supply circuits and phone lines, in conformance with the manufacturer's and our specifications and will make the site(s) available to us by the confirmed shipping date.

- Upon request, you must allow us (or our agents) reasonable access to the premises where authorization terminals or other communications equipment (e.g., printers) are or will be located.

- Any alterations required for installation of authorization terminal(s) or other communications equipment will be done at your expense.

- Only we or our agents can alter or modify authorization terminal(s) or other communications Equipment owned by us.

- If a terminal or printer appears to be defective, you must immediately call the POS Help Desk.

- You are responsible for safeguarding authorization terminals or other Equipment from loss, damage, unauthorized use, misuse or theft. We should be notified immediately regarding any damage to or loss of communications equipment.

- If necessary, we will assist you in obtaining replacement Equipment. If you fail to return any defective Equipment, you may be responsible for its replacement value and for any legal and/or collection costs incurred by the Equipment owner in connection with recovering Equipment.

- You are responsible for keeping all communication Equipment free of any claims, liens and legal processes initiated by creditors.

- Equipment may not be subleased at any time. The cost of comparable new Equipment, as well as any associated legal and/or collection costs incurred by us or the owner of the Equipment, will be assessed to you for each piece of equipment not returned upon termination of the Agreement by either party, or upon request for the return of the Equipment for any reason.

- You may not relocate, remove, disconnect, modify or in any way alter any Equipment used in connection with the services we are providing to you without first obtaining our permission.

- You must provide us with thirty (30) days prior written notice to request the relocation of any Equipment.

- Should you require additional Equipment, you must contact Relationship Management or Customer Service (there may be additional costs or fees charged to you in connection with any new Equipment ordered, including download fees).

**31.5.** **Payment of Amounts Due.**

(a) The monthly rental charge specified in the Merchant Agreement shall be due and payable on the first day of each month of the rental period for each piece of Rental Equipment, except that the first payment of the monthly rental charge for

each piece of Rental Equipment shall be due and payable upon acceptance of such Equipment by you at the location designated in the Merchant Agreement or, upon delivery if the site is not prepared for installation (as provided in Section 31.3). The monthly rental charge for fractions of a calendar month shall be prorated based on a thirty (30) day month.

(b) You hereby authorize us to collect all amounts due from you under this Equipment Agreement by initiating debit entries for such amounts to your account designated pursuant to the Merchant Agreement to be debited and credited for amounts due from and to you under the Merchant Agreement (the "Settlement Account") or by deducting such amounts from amounts due to you from TeleCheck or Servicers. All authorizations and other provisions in your Merchant Agreement regarding the debiting and crediting of your Settlement Account apply with equal force with respect to amounts due to or from you under this Equipment Agreement. This authority will remain in full force and effect until we have given written notice to your bank where your Settlement Account is maintained that all monies due from you under this Equipment Agreement have been paid in full.

(c) In addition to the purchase price or monthly rental charge due hereunder, you shall pay, or reimburse us for, amounts equal to any taxes, levies, duties or assessments, however designated, levied or based on such charges, or on this Equipment Agreement or the Equipment and related supplies or any services, use or activities hereunder, including without limitation, state and local sales, use, property, privilege and excise taxes, exclusive, however, of taxes based on our net income.

(d) As indicated in the Merchant Agreement, separate charges will apply for supplies; they are not included in monthly rental charges.

**31.6.** **Use and Return of Equipment; Insurance.**

(a) You shall cause the Equipment to be operated by competent and qualified personnel in accordance with any operating instructions furnished by us or the manufacturer and in connection with the services provided under your Merchant Agreement. You shall not use the Equipment, or permit the Equipment to be used, in any manner or for any purpose for which the Equipment is not designed or reasonably suited.

(b) You shall not permit any physical alteration or modification of the Equipment without our prior written consent.

(c) You shall not change the installation site of the Equipment without our prior written consent, which consent we will not unreasonably withhold.

(d) You shall not assign your rights or obligations under this Equipment Agreement, or pledge, lend, create a security interest in, directly or indirectly create, incur, assume or allow to exist any other consensually or judicially imposed liens or encumbrances on, or part with possession of, or sublease the Equipment to any other person, firm or organization without our prior written consent. Any such assignment, delegation, sublease, pledge, security interest or lien in the absence of such consent shall be void.

(e) You shall comply with all governmental laws, rules and regulations relating to the use of the Equipment. You are also responsible for obtaining all legally required permits for the Equipment.

(f) We or our representatives may, at any time, enter your premises for purposes of inspecting, examining or repairing the Equipment.

(g) Promptly upon termination of all applicable rental periods or promptly following any action by us pursuant to Section 31.11(b), you shall deliver possession of the Rental Equipment (including all attachments and parts) to us at your cost in the same operating order, repair, condition and appearance that the Rental Equipment had at the time of its delivery to you, reasonable wear and tear excepted.

(h) For each item of Rental Equipment that you fail to return to us at your cost in the same operating order, repair, condition and appearance that it had at the time of delivery to you, reasonable wear and tear excepted, by the 10th Business Day after (i) termination of the applicable rental period, or (ii) any action by us pursuant to Section 31.11(b), you agree to pay us the greater of $250 or the fair market value of such item of Equipment if it were in the condition described above, as determined by us. We may collect such amounts in the manner provided in Section 31.5 and to the extent we are unable to do so, you agree to pay us the amounts owed promptly.

(i) Except for Purchased Equipment that has been paid for in full, the Equipment shall remain our personal property and shall not under any circumstances be considered to be a fixture affixed to your real estate. You shall permit us to affix suitable labels or stencils to the Equipment indicating our ownership.

(j) You shall keep the Equipment adequately insured against loss by fire, theft and all other hazards (comprehensive coverage). The loss, destruction, theft of or damage to the Equipment shall not relieve you from your obligation to pay the full purchase price or rent payable hereunder.

(k) Except for Purchased Equipment that has been paid for in full, the Equipment shall be kept at the address indicated in the Merchant Agreement and shall not be removed from there without our prior written consent (except where normal use of the Equipment requires temporary removal).

(l) In order to return equipment, you should:
- Call Customer Service for the address of the location to send the equipment.
- The following information must be included within the shipping box:
  1. Company name, complete address and phone number.
  2. Name of person to contact if there are any questions.
  3. Your Merchant Account Number.
  4. Serial number of the terminal (found on the underside of the terminal).
- Please maintain proof of delivery documents for your records, and the serial number from the bottom of the terminal.
- Rental fees may be continued until equipment is returned.

**31.7. Security Interest; Financing Statements.** You hereby grant to us a security interest in (a) all Purchased Equipment and the related Software to secure payment of the purchase price, and (b) all Rental Equipment and the related Software to secure payment of the monthly payments therefore and authorize us to file financing statements with respect to the Equipment and the Software in accordance with the Uniform Commercial Code, signed only by us or signed by us as your attorney-in-fact.

**31.8. Software License.** Anything in this Equipment Agreement to the contrary notwithstanding, we retain all ownership and copyright interest in and to all software, computer programs, related documentation, technology, know-how and processes embodied in or provided in connection with the Equipment (collectively "Software"), and you shall have only a nonexclusive license to use the Software in your operation of the Equipment. You shall not reverse engineer, disassemble or decompile the Software. You shall not give any third party access to the Software without our prior written consent. Your obligations under this Section 31.8 shall survive the termination of this Equipment Agreement.

**31.9. Limitation on Liability.** Our liability arising out of or in any way connected with the Equipment shall not exceed the purchase price or prior twelve month's rent, as applicable, paid to us for the particular Equipment involved. In no event shall we be liable for any indirect, incidental, special or consequential damages. The remedies available to you under this Equipment Agreement will be your sole and exclusive remedies.

**31.10. Indemnification.** You shall indemnify and hold us harmless from and against any and all losses, liabilities, damages and expenses, resulting from (a) the purchase, delivery, installation, acceptance, rejection, ownership, leasing, possession, use, operation, condition, liens against, or return of the Equipment, or (b) any breach by you of any of your obligations hereunder, except to the extent any losses, liabilities, damages or expenses result from our gross negligence or willful misconduct.

**31.11. Default; Remedies.**

(a) If any debit of your Settlement Account initiated by us for rent and/or other charges due hereunder is rejected when due, or if you otherwise fail to pay us any amounts due hereunder when due, or if you default in any material respect in the performance or observance of any obligation or provision in this Equipment Agreement, or if any other default occurs under the Merchant Agreement, any such event shall be a default hereunder.

(b) Upon the occurrence of any default, we may at our option, effective immediately without notice, either: (i) terminate the period of rental and our future obligations under this Equipment Agreement, repossess the Equipment and proceed in any lawful manner against you for collection of all charges that have accrued and are due and payable, in which case this Equipment Agreement shall terminate as soon as your obligations to us are satisfied, or (ii) accelerate and declare immediately due and payable all monthly rental charges for the remainder of the applicable rental period and proceed in any lawful manner to obtain satisfaction of the same.

**31.12. Assignment.** Subject to the following provisions, this Equipment Agreement shall be binding upon successors and assigns and shall inure to the benefit of the parties and their respective permitted successors and assigns. You may not assign or transfer this Equipment Agreement, by operation of law or otherwise, without our prior written consent. For purposes of this Equipment Agreement, any transfer of voting control of you or your parent shall be considered an assignment or transfer hereof. We may assign or transfer this Equipment Agreement and our rights and obligations hereunder, in whole or in part, to any third party without the necessity of obtaining your consent. No assignee for the benefit of creditors, custodian, receiver, trustee in bankruptcy, debtor in possession, sheriff or any other officer of a court, or other person charged with taking custody of a party's assets or business, shall have any right to continue or to assume or to assign this Equipment Agreement.

## 32. Equipment Lease Agreement

This Section 32 governs any equipment that is leased to you by us. If your Application or other documents reflect that your equipment is purchased or rented, then the provisions of purchase or rental are governed by the Equipment Agreement set forth in Section 31.

The agreement between us and you as set forth in this section is referred to as the "Lease Agreement" and for purposes of this Section 32, the full Agreement of which this Lease Agreement is a part is referred to as the "Merchant Agreement". For purposes of this section, the words "we," "our" and "us" refer to Wells Fargo Merchant Services, L.L.C. and its successors and assigns and the words "you" and "your" refer to the Lessee identified in the signature panel of this Merchant Agreement and its permitted successors and assigns.

Lessee hereby authorizes us or our designees, successors or assigns (hereinafter "Lessor") to withdraw any amounts including any and all sales taxes now due or hereinafter imposed, owed by Lessee in conjunction with this Lease Agreement by initiating debit entries to the bank account designated by Lessee on the MPA (the Settlement Account). In the event of default of Lessee's obligations hereunder, Lessee authorizes debit of its account for the full amount due under this Lease Agreement. Further, Lessee authorizes its financial institution to accept and to charge any debit entries initiated by Lessor to Lessee's account. In the event that Lessor withdraws funds erroneously from Lessee's account, Lessee

authorizes Lessor to credit Lessee's account for an amount not to exceed the original amount of the debit. This authorization is to remain in full force and effect until Lessor has received written notice from Lessee of its termination in such time and in such manner as to afford Lessor a reasonable opportunity to act. Lessee also authorizes Lessor from time to time to obtain investigative credit reports from a credit bureau or a credit agency concerning Lessee.

**32.1. Leased Equipment.** We agree to lease to you and you agree to lease from us the equipment identified on the Merchant Agreement or such other comparable equipment that we provide to you (the "Equipment"), according to the terms and conditions of this Lease Agreement. We are providing the Leased Equipment to you "as is" and make no representations or warranties of any kind as to the suitability of the Leased Equipment for any particular purpose. The term of Equipment includes the Equipment initially deployed under this Lease Agreement and/or any additions, replacements, substitutions, or additions thereto.

**32.2. Effective Date: Term and Interim Rent.**

(a) This Lease Agreement becomes effective on the earlier of the date we deliver any piece of Equipment to you (the "Delivery Date"), or acceptance by us. This Lease Agreement remains in effect until all of your obligations and all of our obligations under it have been satisfied. We will deliver the Leased Equipment to the site designated by you.

(b) The term of this Lease Agreement begins on a date designated by us after receipt of all required documentation and acceptance by us (the "Commencement Date"), and continues for the number of months indicated on the MPA. THIS IS A NON-CANCELABLE LEASE FOR THE TERM INDICATED ON THE MPA.

(c) You agree to pay an Interim Lease Payment in the amount of one-thirtieth (1/30th) of the monthly lease charge for each day from and including the Delivery Date until the date preceding the Commencement Date.

(d) YOU ACKNOWLEDGE THAT THE LEASED EQUIPMENT AND/OR SOFTWARE YOU LEASE UNDER THIS LEASE AGREEMENT MAY NOT BE COMPATIBLE WITH ANOTHER PROCESSOR'S SYSTEMS AND THAT WE DO NOT HAVE ANY OBLIGATION TO MAKE SUCH SOFTWARE AND/OR LEASED EQUIPMENT COMPATIBLE IN THE EVENT THAT YOU ELECT TO USE ANOTHER SERVICE PROVIDER. UPON TERMINATION OF THE MERCHANT PROCESSING AGREEMENT YOU ACKNOWLEDGE THAT YOU MAY NOT BE ABLE TO USE THE LEASED EQUIPMENT AND/OR SOFTWARE LEASED UNDER THIS LEASE AGREEMENT WITH SAID SERVICE PROVIDER.

**32.3. Site Preparation.** You will prepare the installation site(s) for the Leased Equipment, including but not limited to the power supply circuits and phone lines, in conformance with the manufacturer's and our specifications and will make the site(s) available to us by the confirmed shipping date.

**32.4. Payment of Amounts Due.**

(a) The monthly lease charge is due and payable monthly, in advance you agree to pay all assessed costs for delivery and installation of Leased Equipment.

(b) In addition to the monthly lease charge, you shall pay, or reimburse us for, amounts equal to any taxes, assessments on or arising out of this Lease Agreement or the Leased Equipment, and related supplies or any services, use or activities hereunder, including without limitation, state and local sales, use, property, privilege and excise tax, tax preparation, compliance expenses, but exclusive of taxes based on our net income. Property taxes are calculated and charged based on the average of the estimated annual property taxes over the course of the term of the lease. You will also be charged an annual Tax Handling Fee, as set forth on the MPA and/or applicable Fee Schedule.

(c) Your lease payments will be due despite dissatisfaction with the Leased Equipment for any reason.

(d) Whenever any payment is not made by you in full when due, you shall pay us as a late charge, an amount equal to ten percent of the amount due but no less than $10.00 for each month during which it remains unpaid (prorated for any partial month), but in no event more than the maximum amount permitted by law. You shall also pay to us an administrative charge of $25.00 for any debit we attempt to make against your Settlement Account that is rejected.

(e) In the event your account is placed into collections for past due lease amounts, you agree that we can recover a collection expense charge of $25.00 for each aggregate payment requiring a collection effort.

**32.5. Use and Return of Leased Equipment; Insurance.**

(a) You shall cause the Leased Equipment to be operated by competent and qualified personnel in accordance with any operating instructions furnished by us or the manufacturer. You shall maintain the Leased Equipment in good operating condition and protect it from deterioration, normal wear and tear excepted.

(b) You shall not permit any physical alteration or modification of the Leased Equipment, or change the installation site of the Leased Equipment, without our prior written consent.

(c) You shall not create, incur, assume or allow to exist any consensually or judicially imposed liens or encumbrances on, or part with possession of, or sublease the Leased Equipment without our prior written consent.

(d) You shall comply with all governmental laws, rules and regulations relating to the use of the Leased Equipment. You are also responsible for obtaining all permits required to operate the Leased Equipment at your facility.

(e) We or our representatives may, at any time, enter your premises for purposes of inspecting, examining or repairing the Leased Equipment.

(f) The Leased Equipment shall remain our personal property and shall not under any circumstances be considered to be a fixture affixed to your real estate. You shall permit us to affix suitable labels or stencils to the Leased Equipment evidencing our ownership.

(g) You shall keep the Leased Equipment adequately insured against loss by fire, theft, and all other hazards.

(h) You shall provide proof of insurance. The loss, destruction, theft or damage of or to the Leased Equipment shall not relieve you from your obligation to pay the full purchase price or total monthly lease charges hereunder.

**32.6. Title to Leased Equipment.** We at all times retain title to the Leased Equipment unless we agree otherwise in writing. You agree to execute and deliver to us any statement or instrument that we may request to confirm or evidence our ownership of the Leased Equipment, and you irrevocably appoint us as your attorney-in-fact to execute and file the same in your name and on your behalf. If a court determines that the leasing transaction contemplated by this Lease Agreement does not constitute a financing and is not a lease of the Leased Equipment, then we shall be deemed to have a first lien security interest on the Leased Equipment as of the date of this Lease Agreement, and you will execute such documentation as we may request to evidence such security interest. If this Lease Agreement is deemed a loan despite the intention of the parties, then in no contingency or event whatsoever shall interest deemed charged hereunder, however such interest may be characterized or computed, exceed the highest rate permissible under any law which a court of competent jurisdiction shall, in a final determination, deem applicable hereto.

**32.7. Return or Purchase of Leased Equipment at End of Lease Period.** Upon the completion of your lease term or any extension, you will have the option to (a) return the Leased

Equipment to us, or (b) purchase the Leased Equipment from us for the lesser of fair market value at the time (as determined in good faith by us) or an amount equal to ten-percent (10%) of the total lease payments under this Lease Agreement with respect to each item of Leased Equipment. If you wish to purchase the Equipment from us, you must give notice to us in writing prior to the end of the lease term in order to ascertain the purchase price. In the absence of an affirmative election by you to return or purchase the Leased Equipment, this lease will continue on a month-to-month basis at the existing monthly lease payment. If we terminate this Lease Agreement pursuant to Section 32.12 (b) due to a default by you, then you shall immediately return the Leased Equipment to us no later than the tenth Business Day after termination, or remit to us the fair market value of the Leased Equipment as determined in good faith by us. We may collect any amounts due to us under this Section 32.7 by debiting your Settlement Account, and to the extent we are unable to obtain full satisfaction in this manner, you agree to pay the amounts owed to us promptly upon our request.

**32.8. Software License.** We retain all ownership and copyright interest in and to all computer software, related documentation, technology, know-how and processes embodied in or provided in connection with the Leased Equipment other than those owned or licensed by the manufacturer of the Leased Equipment (collectively "Software"), and you shall have only a nonexclusive license to use the Software in your operation of the Leased Equipment.

**32.9. Limitation on Liability.** We are not liable for any loss, damage or expense of any kind or nature caused directly or indirectly by the Leased Equipment, including any damage or injury to persons or property caused by the Leased Equipment. We are not liable for the use or maintenance of the Leased Equipment, its failure to operate, any repairs or service to it, or by any interruption of service or loss of use of the Leased Equipment or resulting loss of business. Our liability arising out of or in any way connected with this Lease Agreement shall not exceed the aggregate lease amount paid to us for the particular Leased Equipment involved. In no event shall we be liable for any indirect, incidental, special or consequential damages. The remedies available to you under this Lease Agreement are your sole and exclusive remedies.

**32.10. Warranties.**

(a) All warranties, express or implied, made to you or any other person are hereby disclaimed, including without limitation, any warranties regarding quality, suitability, merchantability, fitness for a particular purpose, quiet enjoyment, or infringement.

(b) You warrant that you will only use the Leased Equipment for commercial purposes and will not use the Leased Equipment for any household or personal purposes.

**32.11. Indemnification.** You shall indemnify and hold us harmless from and against any and all losses, liabilities, damages and expenses resulting from (a) the operation, use, condition, liens against, or return of the Leased Equipment or (b) any breach by you of any of your obligations hereunder, except to the extent any losses, liabilities, damages or expenses result from our gross negligence or willful misconduct.

**32.12. Default; Remedies.**

(a) If any debit of your Settlement Account initiated by us is rejected when due, or if you otherwise fail to pay us any amounts due hereunder when due, or if you default in any material respect in the performance or observance of any obligation or provision of this Lease Agreement or any agreement with any of our affiliates or joint ventures, any such event shall be a default hereunder. Without limiting the foregoing, any default by you under a processing agreement with us or with an affiliate or joint venture to which we are a party will be treated as a default under this Lease Agreement.

Such a default would include a default resulting from early termination of the Merchant Agreement.

(b) Upon the occurrence of any default, we may at our option, effective immediately without notice, either (i) terminate this lease and our future obligations under this Lease Agreement, repossess the Leased Equipment and proceed in any lawful manner against you for collection of all charges that have accrued and are due and payable, or (ii) accelerate and declare immediately due and payable all monthly lease charges for the remainder of the applicable lease period together with the fair market value of the Leased Equipment (as determined by us), not as a penalty but as liquidated damages for our loss of the bargain. Upon any such termination for default, we may proceed in any lawful manner to obtain satisfaction of the amounts owed to us and, if applicable, our recovery of the Leased Equipment, including entering onto your premises to recover the Leased Equipment. In any case, you shall also be responsible for our costs of collection, court costs as well as applicable shipping, repair and refurbishing costs of recovered Leased Equipment. You agree that we shall be entitled to recover any amounts due to us under this Lease Agreement by charging your Settlement Account or any other funds of yours that come into our possession or control, or within the possession or control of our affiliates or joint ventures, or by setting off amounts that you owe to us against any amounts we may owe to you, in any case without notifying you prior to doing so. Without limiting the foregoing, you agree that we are entitled to recover amounts owed to us under this Lease Agreement by obtaining directly from an affiliate or joint venture to which we are a party and with which you have entered into an Merchant Agreement any funds held or available as security for payment under the terms of the Merchant Agreement, including funds available under the "Reserve Account; Security Interest" section of the Merchant Agreement, if applicable.

**32.13. Assignment.** You may not assign or transfer this Lease Agreement, by operation of law or otherwise, without our prior written consent. For purposes of this Lease Agreement, any transfer of voting control of you or your parent shall be considered an assignment or transfer of this Lease Agreement. We may assign or transfer this Lease Agreement and our rights and obligations hereunder, in whole or in part, to any third party without the necessity of obtaining your consent. We intend to assign this Lease Agreement shortly after its execution to First Data Merchant Services Corporation.

**32.14. Lease Guaranty.** No guarantor shall have any right of subrogation to any of our rights in the Leased Equipment or this Lease Agreement or against you, and any such right of subrogation is hereby waived and released. All indebtedness that exists now or arises after the execution of this Lease Agreement between you and any guarantor is hereby subordinated to all of your present and future obligations, and those of your guarantor, to us, and no payment shall be made or accepted on such indebtedness due to you from a guarantor until the obligations due to us are paid and satisfied in full.

**32.15. Notices.** All notices must be in writing, and shall be given (a) if sent by mail, when received, and (b) if sent by courier, when delivered; if to you at the address appearing on the Merchant Agreement, and if to us at 4000 Coral Ridge Drive, Coral Springs, Florida 33065. Attn: Lease Department. Customer Service toll free number 1-877-257-2094.

**32.16.** Should your terminal become inoperable due to manufacturer's defect in our reasonable determination, we will provide you with a replacement unit at no cost for the term of your lease so long as you are actively processing with us. If the leased equipment is obsolete or defective due to operator error, you can upgrade to a new unit by entering into a new lease contract. For such replacements contact the POS Help Desk.

## 33. Choice of Law; Venue; Waiver of Jury Trial

**33.1.** **Choice of Law.** Our Agreement shall be governed by and construed in accordance with the laws of the State of New York (without regard to its choice of law provisions).

**33.2.** **Venue.** We have substantial facilities in the State of New York and many of the services provided under this Agreement are provided from these facilities. The exclusive venue for any actions or claims arising under or related to this Agreement shall be in the appropriate state or federal court located in Suffolk County, New York.

**33.3.** **Waiver of Jury Trial.** ALL PARTIES IRREVOCABLY WAIVE ANY AND ALL RIGHTS THEY MAY HAVE TO A TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING ANY CLAIM RELATING TO OR ARISING UNDER THIS AGREEMENT.

## 34. Other Terms

**34.1.** **Force Majeure.** No party shall be liable for any default or delay in the performance of its obligations under this Agreement if and to the extent such default or delay is caused, directly or indirectly, by (i) fire, flood, earthquake, elements of nature or other acts of God; (ii) any terrorist attacks or outbreak or escalation of hostilities, war, riots or civil disorders in any country; (iii) any act or omission of the other party or any government authority; (iv) any labor disputes (whether or not employees' demands are reasonable or within the party's power to satisfy); or (v) the nonperformance by a third party for any similar cause beyond the reasonable control of such party, including without limitation, failures or fluctuations in telecommunications or other equipment. In any such event, the non-performing party shall be excused from any further performance and observance of the obligations so affected only for as long as such circumstances prevail and such party continues to use commercially reasonable efforts to recommence performance or observance as soon as practicable. Notwithstanding anything to the contrary in this paragraph, your failure to receive payment of funds or from a third party shall not excuse the performance of your obligations to us under this Agreement.

**34.2.** **Compliance with Laws.** In performing its obligations under this Agreement, each party agrees to comply with all laws and regulations applicable to it. You further agree to cooperate and provide information requested by Servicers, as Servicers determine necessary, to facilitate Servicers compliance with any applicable law including without limitation the rules and regulations promulgated by the Office of Foreign Assets Control of the US Department of the Treasury.

**34.3.** **Notices.** Except as otherwise specifically provided, all notices and other communications required or permitted hereunder (other than those involving normal operational matters relating to the processing of Card transactions) shall be in writing, shall be sent by mail, courier or facsimile (facsimile notices shall be confirmed in writing by courier), if to you at your address appearing in the Application, and if to us at our address appearing on the Additional Important Information page, with a copy to Attention: General Counsel's Office, 3975 N.W. 120th Avenue, Coral Springs, FL 33065, and shall be deemed to have been given (i) if sent by mail or courier, when received, and (ii) if sent by facsimile machine, when the courier confirmation copy is actually received. Notice given in any other manner shall be effective when actually received.

**34.4.** **Headings.** The headings contained in this Agreement are for convenience of reference only and shall not in any way affect the meaning or construction of any provision of this Agreement.

**34.5.** **Severability.** The parties intend every provision of this Agreement to be severable. If any part of this Agreement is not enforceable, the remaining provisions shall remain valid and enforceable.

**34.6.** **Entire Agreement; Waiver.** This Agreement constitutes the entire agreement between the parties with respect to the subject matter thereof and supersedes any previous agreements and

understandings. A party's waiver of a breach of any term or condition of this Agreement shall not be deemed a waiver of any subsequent breach of the same or another term or condition.

**34.7.** **Amendment.** We may modify any provision of this Agreement by providing written notice to you. You may choose not to accept the requirements of any such change by terminating the Agreement within thirty (30) days of receiving notice. If you choose to do so, notify us that you are terminating for this reason so that we may waive any early termination fee that might otherwise apply. For purposes of this section, an electronic or "click-wrap" notice intended to modify or amend this Agreement and which you check "I Accept" or "I Agree" or otherwise accept through an electronic process, shall constitute a writing as required herein.

**34.8.** **No Third Party Beneficiaries.** Nothing in this Agreement is intended to confer upon any person or entity other than the parties any rights or remedies, and the parties do not intend for any third parties to be third-party beneficiaries of this Agreement.

**34.9.** **Association Rules.** The parties acknowledge that the Visa, MasterCard and Discover Association Rules give Visa, MasterCard and Discover, certain rights to require termination or modification of this Agreement with respect to transactions involving Visa, MasterCard and Discover Cards and the Visa, MasterCard and Discover Card systems and to investigate you. The parties also acknowledge that issuers of other Cards, for which we perform services on your behalf, may have similar rights under their applicable Association Rules with respect to this Agreement's applicability to transactions involving such other Cards.

## 35. Glossary

As used in this Program Guide, the following terms mean as follows:

**Acquirer:** In the case of MasterCard and Visa transactions or network acquirers in the case of Discover transactions that acquire Card sale transactions from merchants such as yourself.

**Address Verification:** A service provided through which the merchant verifies the Cardholder's address, in whole or in part. Primarily used by Mail/Telephone/Internet order merchants. Address verification is intended to deter fraudulent transactions. However, it is not a guarantee that a transaction is valid.

**Agreement:** The agreements among Client, Processor and Bank contained in the Application, the Program Guide and the Schedules thereto and documents incorporated therein, each as amended from time to time, which collectively constitute the Agreement among the parties.

**Application:** See Merchant Processing Application.

**Association:** Any entity formed to administer and promote Cards, including without limitation MasterCard International, Incorporated ("MasterCard"), Visa U.S.A., Inc. and Visa International ("Visa"), Discover Financial Services LLC ("Discover") and any applicable debit networks.

**Association Rules:** The rules, regulations, releases, interpretations and other requirements (whether contractual or otherwise) imposed or adopted by any Association.

**Authorization:** Approval by, or on behalf of, the Card Issuer to validate a transaction for a merchant or another affiliate bank. An authorization indicates only the availability of the Cardholder's credit limit at the time the authorization is requested.

**Authorization Approval Code:** A number issued to a participating merchant by the Authorization Center which confirms the authorization for a sale or service.

**Authorization Center:** A department that electronically communicates a merchant's request for authorization on Credit Card transactions to the Cardholder's bank and transmits such authorization to the merchant via electronic equipment or by voice authorization.

**Authorization/EDC Fees:** A fee that applies to all Visa, MasterCard and Discover Network Card approvals (pre-authorizations and authorizations), denials, batch inquiries, and batch entry transactions and includes any transaction fees and capture fees.

**Bank:** The bank identified on the application signed by you.

**Bankruptcy Code:** Title 11 of the United States Code, as amended from time to time.

**Batch:** A single Submission to us of a group of transactions (sales and credits) for settlement. A Batch usually represents a day's worth of transactions.

**Business Day:** A day (other than Saturday or Sunday) on which Bank is open for business.

**Card:** See either Credit Card or Debit Card.

**Cardholder:** Means the individual whose name is embossed on a Card (or Debit Card, as applicable) and any authorized user of such Card.

**Card Issuer:** The bank or Association that issues a Card to an individual.

**Card Not Present Sale/transaction:** A transaction that occurs when the Card in not present at the point-of-sale, including Internet, mail-order and telephone-order Card sales.

**Card Verification Value (CVV)/Card Validation Code 2 (CVC2):** A unique value encoded on the Magnetic Stripe of a Card used to validate Card information during the Authorization process.

**Card Validation Codes:** A three-digit value printed in the signature panel of most Cards and a four-digit value printed in the front of an American Express Card. Visa's Card Validation Code is known as CVV2; MasterCard's Card Validation Code is known as CVC2; Discover's Card Validation Code is known as a CID. Card Validation Codes are used to deter fraudulent use of an account number in a non-face-to-face environment, (e.g., mail orders, telephone orders and Internet orders).

**Cash Benefits:** An EBT account maintained by an Issuer that represents pre-funded or day-of-draw benefits, or both, administered by one or more Government entities, and for which the Issuer has agreed to provide access under the EBT program. Multiple benefits may be combined in a single cash benefit account.

**Cash Over Transaction:** Dispensing of cash by a merchant in connection with a Card sale, other than a PIN Debit Card transaction, for the purchase of goods or services.

**Chargeback:** The procedure by which a Sales Draft or other indicia of a Card transaction (or disputed portion) is returned to Bank, the Acquirer or the Issuer. Client is responsible for reimbursing us for all Chargebacks.

**Check Warranty:** A service provided through a merchant's POS equipment which guarantees payment up to a defined limit, provided the merchant follows proper steps in accepting the check.

**Check Verification:** A service provided in which a merchant accesses a national negative file database through its terminal/register to verify or authorize that a person has no outstanding bad check complaints at any of the member merchants. This is not a guarantee of payment to the merchant.

**Client:** The party identified as "Client" on the Application. The words "you," "your," "Customer" and "Merchant" also refer to Client.

**Credit:** A refund or price adjustment given for a previous purchase transaction.

**Credit Card:** A valid Card bearing the service mark of Visa, MasterCard or Discover and, to the extent the Schedules so provide, a valid Card issued by any other Associations specified on such Schedules.

**Credit Draft:** A document evidencing the return of merchandise by a Cardholder to a Client, or other refund made by the Client to the Cardholder.

**Credit Limit:** The credit line set by the Card Issuer for the Cardholder's account.

**Customer Activated Terminal (CAT):** A magnetic stripe terminal or chip-reading device (such as an automatic dispensing machine, Limited Amount Terminal, or Self-Service) that is not an ATM.

**Debit Card:** See either PIN Debit Card or Non-PIN Debit Card.

**Dial-Up Terminal:** An Authorization device which, like a telephone, dials an Authorization Center for validation of transactions.

**Discount Rate:** An amount charged a merchant for processing its qualifying daily Credit Card transactions. Transactions that fail to meet applicable interchange requirements will be charged additional amounts as set forth in Section 18.1.

**Electronic Benefit Transfer (EBT):** An electronic system that allows a government benefit recipient to authorize the transfer of their benefits from a Federal, State or local government account to a merchant account to pay for products and services received.

**Electronic Draft Capture (EDC):** A process which allows a merchant's Dial-Up Terminal to receive authorization and capture transactions, and electronically transmit them to a Card processor. This eliminates the need to submit paper for processing.

**Factoring:** The submission of authorization requests and/or Sales Drafts by a merchant for Card sales or Cash Advances transacted by another business.

**General Terms:** Section of the Program Guide, including any amendments or modifications.

**Gross:** When referred to in connection with transaction amounts or fees, refers to the total amount of Card sales, without set-off for any refunds or credits.

**Imprinter:** A manual or electric machine used to physically imprint the merchant's name and ID number as well as the Cardholder's name and Card number on Sales Drafts.

**Issuer:** The bank or Association which has issued a Card to an individual. MasterCard and Visa only issue Cards through banks ("Issuing Banks") while Discover may issue Cards directly or issue Cards through an Issuing Bank.

**Limited Amount Terminal:** A customer Activated Terminal that has data capture only capability, and accepts payment for items such as parking garage fees, road tolls, motion picture theater entrance, or magnetic stripe telephones.

**Magnetic Stripe:** A stripe of magnetic information affixed to the back of a plastic credit or debit Card. The Magnetic Stripe contains essential Cardholder and account information.

**Media:** The documentation of monetary transactions (i.e., Sales Drafts, Credit Drafts, computer printouts, etc.)

**Merchant Identification Card:** A plastic embossed Card supplied to each merchant to be used for imprinting information to be submitted with each batch of paper Sales Drafts. Embossed data includes Merchant Account Number, name and sometimes merchant ID code and terminal number.

**Merchant Account Number (Merchant Number):** A number that numerically identifies each merchant, outlet, or line of business to the Processor for accounting and billing purposes.

**Merchant Processing Application:** The application executed by Client, Processor and Bank, which is one of the documents comprising the Agreement.

**Non-PIN Debit Card:** A Debit Card with either a Visa, MasterCard or Discover mark that is tied to a Cardholder's bank account or a prepaid account and which is processed without the use of a PIN.

**Non-Qualified Interchange Fee:** The difference between the interchange fee associated with the Anticipated Interchange Level and the interchange fee associated with the more costly interchange level at which the transaction actually was processed.

**Non-Qualified Surcharge:** A surcharge applied to any transaction that fails to qualify for the Anticipated Interchange Level and is therefore downgraded to a more costly interchange level. The Non-Qualified Surcharge (the amount of which is set forth on the Service Fee Schedule) is in addition to the Non-Qualified Interchange Fee, which is also your responsibility (see above and Section 18.1).

**Operating Procedures:** The then-current manual prepared by Processor, containing operational procedures, instructions and other directives relating to Card transactions. The current Operating Procedures are set forth in the Program Guide.

**PAN Truncation:** A procedure by which a Cardholder's copy of a Sales or Credit Draft will only reflect the last four digits of the Card.

**PIN:** A Personal Identification Number entered by the Cardholder to submit an PIN Debit Card transaction.

**PIN Debit Card:** A debit Card used at a merchant location by means of a Cardholder-entered PIN in the merchant PIN Pad. PIN Debit Cards bear the marks of ATM networks (such as NYCE, Star).

**Point of Sale (POS) Terminal:** A device placed in a merchant location which is connected to the Processor's system via telephone lines and is designed to authorize, record and transmit settlement data by electronic means for all sales transactions with Processor.

**Processor:** The entity identified on this application (other than the Bank) which provides certain services under this Agreement.

**Program Guide:** The booklet which contains Operating Procedures, General Terms, Third Party Agreements, and Confirmation Page, which, together with the Merchant Processing Application and the Schedules thereto and documents incorporated therein, constitute your Agreement with Processor and Bank.

**Recurring Payment Indicator:** A value used to identify transactions for which a consumer provides permission to a merchant to bill the consumer's Card account at either a predetermined interval or as agreed by the Cardholder for recurring goods or services.

**Referral:** This message received from an Issuer when an attempt for authorization requires a call to the Voice Authorization Center or Voice Response Unit (VRU).

**Reserve Account:** A fund established and managed by us to protect against actual or contingent liability arising from Chargebacks, adjustments, fees and other charges due to or incurred by us.

**Resubmission:** A transaction that the merchant originally processed as a Store and Forward transaction but received a soft denial from the respective debit network or Association. The resubmission transaction allows the merchant to attempt to obtain an approval for the soft denial, in which case you assume the risk that the transaction fails.

**Retrieval Request/Transaction Documentation Request:** A request for documentation related to a Card transaction such as a copy of a Sales Draft or other transaction source documents.

**Sales Draft:** Evidence of a purchase of goods or Services by a Cardholder from Client using a Card, regardless of whether the form of such evidence is in paper or electronic form or otherwise, all of which must conform to Association Rules.

**Sales/Credit Summary:** The identifying form used by a paper Submission merchant to indicate a Batch of Sales Drafts and Credit Drafts (usually one day's work). Not a Batch header, which is used by electronic merchants.

**Schedules:** The attachments, addenda and other documents, including revisions thereto, which may be incorporated into and made part of this Agreement.

**Self Service Terminals:** A Customer Activated Terminal that accepts payment of goods or services such as prepaid cards or video rental, has electronic capability, and does not accept PIN's.

**Services:** The activities undertaken by Processor and Bank to authorize, process and settle all United States Dollar denominated Visa, MasterCard and Discover Card transactions undertaken by Cardholders at Client's location(s) in the United States, and all other activities necessary for Processor and Bank to perform the functions required by this Agreement for all other Cards covered by this Agreement.

**Servicers:** Bank and Processor collectively. The words "us" and "we" refer to Servicers.

**Settlement Account:** An account at a financial institution designated by Client as the account to be debited and credited by Processor or Bank for Card transactions, fees, chargebacks and other amounts due under the Agreement or in connection with the Agreement.

**Split Dial:** A process which allows the authorization terminal to dial directly to different Card processors (e.g., Amex) for authorization. In this instance, the merchant cannot be both EDC and Split Dial. Split Dial is also utilized for Check Guarantee companies.

**Split Dial/Capture:** Process which allows the authorization terminal to dial directly to different Card processors (e.g., Amex) for authorization and Electronic Draft Capture.

**Store and Forward:** A transaction that has been authorized by a merchant when the merchant cannot obtain an authorization while the customer is present, typically due to a communications failure. The merchant will store the transaction electronically in their host system and retransmit the transaction when communications have been restored.

**Submission:** The process of sending Batch deposits to Processor for processing. This may be done electronically or by mail.

**Summary Adjustment:** An adjustment to your Submission and/or Settlement Accounts in order to correct errors. (See Sections 10.3 and 10.4.)

**Telecommunication Card Sales:** Individual local or long distance telephone calls, for which the telephone service provider is paid directly by use of a Card. These do not include, however, calls paid for with pre-paid telephone service cards. Telecommunication Card Sales are considered Card Not Present sales.

**Transaction Fees:** Service costs charged to a merchant on a per transaction basis.

**Us, We:** See Servicers.

**You, Your:** See Client.

# Third Party Agreements

The following Agreements are Third Party Agreements entered into between Client and the Third Parties identified in the Third Party Agreements.

If Client desires to receive the products and/or services offered under a Third Party Agreement, Client must check the appropriate box or otherwise indicate such desire in the Merchant Processing Application, in which case the terms and conditions of the

Third Party Agreement shall be binding upon Client. The Signature page in the Merchant Processing Application or any Schedule thereto shall also serve as a signature page to the Third Party Agreements.

Client acknowledges that the Third Parties are relying upon the information contained on the Merchant Processing Application and the Schedules thereto, all of which are incorporated by reference into the Third Party Agreements.

## 36. TeleCheck Services Agreement

This TeleCheck Services Agreement (the "Agreement") is entered by and between TeleCheck Services, Inc. and Client as indicated on the Merchant Processing Application ("Client"). TeleCheck will provide the Electronic Check Acceptance® ("ECA") Warranty Services ("ECA Warranty Services") or Paper Warranty Services, selected in the Merchant Processing Application. Upon processing Client's first check through the TeleCheck® service or from the date Client is entered into the TeleCheck system as a subscriber, whichever is earlier (the "Effective Date"), the terms and conditions of this Agreement, including payment and the Minimum Monthly Fee, shall apply from that point forward. Any of the TeleCheck services including, without limitation, funds settlement, billing and customer service, may be performed by one or more of TeleCheck's affiliates.

**36.1. Term, Termination and Amendment.** This Agreement shall be effective for an initial term of 12 or 24 months from the Effective Date (as specified on the Merchant Processing Application); provided, however, that Client may terminate this Agreement if Client gives and TeleCheck receives written notice of termination within the first 30 days of the Agreement. Thereafter, this Agreement shall automatically renew for successive 12 month terms until terminated as provided for herein. Client may terminate this Agreement at the end of the initial term or any renewal term upon at least 30 days' prior written notice to TeleCheck. TeleCheck reserves the right to amend, at its discretion, this Agreement, including, without limitation, any addenda and the TeleCheck Operational Procedures, by providing Client notice and such amendments shall be effective 30 days from the date notice is mailed to Client. In the event TeleCheck changes the rates, fees or warranty limits hereunder, Client may terminate this Agreement upon written notice received by TeleCheck within such 30 day period. TeleCheck may terminate this Agreement at any time upon notice to Client. Client may terminate this Agreement at anytime upon written notice if TeleCheck has failed to cure a material breach of this Agreement within 30 days following written notice of that breach given by Client.

**36.2. Definitions.** As used in this Agreement, the following definitions apply: **"ACH Network"** means the Automated Clearing House Network, a processing and delivery system that provides for the distribution and settlement of electronic credits and debits. **"Authorization Receipt"** means the written authorization receipt, in the form approved by TeleCheck, signed by Consumer for each ECA Warranty Transaction. **"Batch"** means a collection of saved transactions transmitted to TeleCheck for settlement processing. **"Claim"** means any claim, demand, directive, suit or other proceeding, notice, damage, expense (including reasonable attorney's fees), assessment, fine or liability of any kind. **"Consumer"** means a person or entity that authorizes an Item. **"ECA Warranty Transaction"** means a transaction processed by TeleCheck as an electronic funds transfer, a remotely created check or a paper check by TeleCheck for the contemporaneous purchase of goods or services by a Consumer. **"Item"** means an outstanding financial obligation pursuant to a paper check, electronic funds transfer or remotely created check processed under this Agreement. **"NACHA Rules"** means the National Automated Clearing House Association Operating Rules and Guidelines, as amended from time to time, that govern the ACH Network. **"Paper Warranty Transaction"** means a transaction for the contemporaneous purchase of goods or services pursuant to TeleCheck's Paper Warranty Services program. **"Return Item Fee"** means any fee or exemplary damages allowed by law that may be assessed on a Return Item. **"Return Items"** mean any Items that are dishonored, returned, reversed, charged back or otherwise unpaid by a Consumer's financial institution upon presentment for payment, regardless of the reason or timing. **"Returned Payment"** means any financial obligation pursuant to this Agreement not paid by Client's financial institution. **"Client's Account"** means Client's financial institution account. **"TeleCheck Approval Code"** means that TeleCheck has authorized an Item for warranty coverage under this Agreement. **"TeleCheck Operational Procedures"** means TeleCheck's published policies and procedures contained in various documents provided to Client concerning the services provided pursuant to this Agreement. **"TeleCheck Parties"** means TeleCheck and its affiliates and their respective officers, directors, employees, shareholders, agents and attorneys. **"Warranty Maximum"** (a) for an Item processed as an ECA Warranty

Transaction means the lower of (i) the face amount of the Item; (ii) the amount set forth on the Merchant Processing Application; or (iii) $25,000.00; and (b) for an Item processed as a Paper Warranty Transaction means the lower of (i) the face amount of the Item; (ii) the amount set forth on the Merchant Processing Application; or (iii) $99,999.99.

### TERMS APPLICABLE ONLY TO
### TELECHECK ECA WARRANTY SERVICES

**36.3. ECA Warranty Services.**

**36.3.1. Description.** The TeleCheck ECA Warranty Services provide Client with: (a) coded information to assist Client in deciding whether or not to accept an Item; (b) processing services; and (c) warranty services for ECA Warranty Transactions that comply with the warranty requirements of Section 36.3.3, all in accordance with this Agreement.

**36.3.2. Processing Services.** For each ECA Warranty Transaction that TeleCheck issues a TeleCheck Approval Code that is processed by TeleCheck as an electronic funds transfer or remotely created check, TeleCheck shall, via an electronic funds transfer, effect a credit to Client's Account for the amount of such transaction as part of a batch credit. Such credit shall typically occur within 2 banking days following Client's regular close-out of the point of sale terminal and transmission of the saved ECA Warranty Transactions to TeleCheck for settlement processing, provided that the Batch is closed and received by TeleCheck by 9:00 p.m. Central Time. TeleCheck may reduce such credit, or initiate a debit, by the amount of any necessary adjustments for ECA Warranty Transactions, including, without limitation, chargebacks or partial adjustments, to Client's Account. TeleCheck reserves the right to decline to process any transaction as an ECA Warranty Transaction.

TeleCheck shall not be liable for any delays in receipt of funds or errors in debit and credit entries caused by third parties, including, without limitation, any ACH Network participant or Client's financial institution. Notwithstanding anything contained herein to the contrary, TeleCheck shall be entitled without notice to place a hold on or suspend payment of any amounts now due or hereafter to become due should an excessive amount of Return Items or other questionable activity occur as determined by TeleCheck in its discretion, or as otherwise required by law. In addition to any other remedies available to TeleCheck under this Agreement, Client agrees that, if Client breaches or fails to comply with this Agreement, TeleCheck may, with notice to be provided within 3 business days following such action, change processing or payment terms, suspend settlement or other payments of any amounts now due, or hereafter to become due, until TeleCheck has had reasonable opportunity to investigate such event. Continuance of service and payment processing during any period of delinquency shall not constitute a waiver of TeleCheck's rights of suspension or termination. In the event TeleCheck makes a partial adjustment to an Item or a credit to a Consumer's account at the request of Client or as a result of a Client error, and the Item becomes a Return Item, TeleCheck may recover all such amounts from Client. TeleCheck may also recover from Client the amount of any fees paid by a Consumer to Consumer's financial institution which resulted from a Client error.

**36.3.3. Warranty Requirements.** TeleCheck warrants the accuracy of its information provided that all requirements set forth in this Section are strictly met. TeleCheck agrees to purchase from Client one Item per ECA Warranty Transaction for which a TeleCheck Approval Code was inaccurate; provided, however, that

TeleCheck's liability shall be limited by the Warranty Maximum and warranty requirements, and shall not exceed the amount of the Item. Client's sole and exclusive remedy for breach of warranty shall be the right to require TeleCheck to purchase such Item subject to the terms and conditions contained in this Agreement. Client represents and warrants with respect to each ECA Warranty Transaction submitted to TeleCheck for processing under this Agreement that:

(a) The check is a first party check drawn on Consumer's account at a United States financial institution and made payable to Client. The name of the Consumer is imprinted or typed on the check by the check manufacturer;

(b) Client made an inquiry to TeleCheck in strict accordance with TeleCheck Operational Procedures and obtained a single TeleCheck Approval Code. The transaction was not performed in an attempt to avoid the warranty requirements or Warranty Maximum (as more fully described in Section 36.3.6(f)), including through split sales;

(c) The transaction represents an obligation of Consumer at the point of sale (no phone, mail or internet orders) for goods sold or rented or services rendered for the price of such goods or services, and the transaction is not for credit, cash or payment on an account, debt or check already due Client;

(d) The signature of Consumer on the Authorization Receipt is not substantially different from the name imprinted on the check;

(e) The date of the check and the ECA Warranty Transaction accurately coincides within 1 calendar day of (i) the date of the inquiry call to TeleCheck, and (ii) the date the transaction actually occurred. (Checks may not pre-date or post-date by more than 1 calendar day the date of the inquiry call and the transaction date);

(f) Client has no reason to question or have notice of any fact, circumstance or defense which would impair the validity or collectibility of Consumer's obligation or relieve Consumer from liability;

(g) The transaction is not subject to any stop payment, dispute or set-off;

(h) Client complied with all applicable laws, rules, regulations, and NACHA Rules;

(i) Consumer authorized the debiting of Consumer's account and the debit entry in an amount agreed to by Consumer. Client received a separate signed and completed Authorization Receipt from Consumer for each ECA Warranty Transaction;

(j) The paper check to which the ECA Warranty Transaction relates: (i) has not been used in for any other transaction, (ii) is voided on the front by Consumer or Client, and (iii) is returned to Consumer;

(k) The amount entered into the TeleCheck system and on the Authorization Receipt match exactly and does not exceed the Warranty Maximum; and

(l) If the ECA Warranty Transaction is approved as a paper check not eligible for processing as an electronic funds transfer, each representation and warranty set forth Section 36.4.2 shall be applicable to such ECA Warranty Transaction.

**36.3.4. Authorization Receipts.** Client shall (a) maintain the signed Authorization Receipt for a minimum period of 2 years from the date of the transaction or for the period specified by the NACHA Rules, whichever is longer, (b) physically deliver either the original or a legible copy of the signed Authorization Receipt to TeleCheck within 7 days of TeleCheck's request, and (c) permit TeleCheck to audit Client (upon reasonable notice and during normal business hours) for compliance with this requirement.

**36.3.5. Assignment of ECA Warranty Transactions.** By electing to subscribe to the TeleCheck ECA Warranty Services, Client ASSIGNS, TRANSFERS AND CONVEYS to TeleCheck all of Client's rights, title and interest in any ECA Warranty Transaction submitted

by Client to TeleCheck under this Agreement. Client shall, at TeleCheck's request, endorse such check and take any action reasonably deemed necessary by TeleCheck to aid in the enforcement of TeleCheck's rights hereunder.

**36.3.6. Chargeback and Reassignment.** TeleCheck may chargeback to Client any ECA Warranty Transaction processed by TeleCheck, or reassign to Client any ECA Warranty Transaction which has been approved as a paper check and purchased by TeleCheck, in any of the following circumstances:

(a) The goods or services, in whole or in part, for which the ECA Warranty Transaction was submitted, have been returned to Client, have not been delivered by Client or are claimed by Consumer to have been unsatisfactory or are subject to any stop payment, dispute or set-off;

(b) Client has received full or partial payment or security in any form to secure payment of the Item, or the goods or services for which the Item was issued or authorized were initially delivered on credit or under a lease;

(c) The transaction is for any reason illegal, void or invalid; or purchase by or transfer to TeleCheck of the Item is not permitted by applicable law; or a court of law determines that the Item is, in whole or in part, not due and payable by Consumer, unless such determination results from Consumer's bankruptcy proceeding;

(d) Any of the representations made by Client as set forth in Section 36.3 are or become false or inaccurate;

(e) Client failed to comply with this Agreement;

(f) Client, or any of Client's owners, agents or employees (i) materially altered either the check or the Authorization Receipt; or (ii) processed the transaction with reason to know that the Item was likely to be dishonored (including failure to receive a TeleCheck Approval Code) or that the identification used was forged, altered or did not belong to Consumer; or (iii) processed the transaction in a manner which was an attempt to avoid the warranty requirements or Warranty Maximum. "Knowledge" shall be presumed in the presence of facts or circumstances which, if known, would cause a non-subscribing merchant, using commercially reasonable judgment, to independently refuse to accept a check. "Knowledge" is also presumed where there is evidence of Client's attempt to avoid warranty limitations through manipulation of transactions, including, but not limited to the splitting of a single transaction into smaller components or resubmission of a previously denied transaction;

(g) The Authorization Receipt was incomplete or unsigned, or a legible copy of the Authorization Receipt was not received by TeleCheck within 7 days of a request by TeleCheck;

(h) A duplicate ECA Warranty Transaction relating to the same transaction was received and processed, or the original paper check was deposited, thereby creating a duplicate entry against Consumer's financial institution account;

(i) Consumer disputes authorizing the ECA Warranty Transaction or the validity or accuracy of the transaction;

(j) Client received notice that Consumer filed bankruptcy and Client failed to notify TeleCheck of the bankruptcy within 3 business days of Client's receipt of such notice; or

(k) The closeout of the Batch and transmission of the ECA Warranty Transaction to TeleCheck for settlement processing did not occur within 7 days from the date the TeleCheck Approval Code was issued for the transaction

Client shall immediately notify TeleCheck upon the happening of any of the above circumstances. If the Item is charged back or reassigned as provided herein, (a) TeleCheck may debit Client's Account in the amount paid by TeleCheck for the Item, (b) deduct or offset such Item against any amounts to be paid to Client for ECA Warranty Transactions, or (c) upon request, Client shall remit

the amount of the Item to TeleCheck. TeleCheck may also chargeback to Client any amount over the Warranty Maximum on any ECA Warranty Transaction where TeleCheck has not received payment for such transaction within 60 days of the date of the ECA Warranty Transaction. Upon charging back or reassigning an Item, TeleCheck shall have no further liability to Client on such Item. Following termination of this Agreement, Client shall continue to bear total responsibility for any reassignments, chargebacks and adjustments made under this Section.

**36.3.7. Account Reconciliation.** Payments processed by TeleCheck will be reflected on settlement reports made available to Client by TeleCheck. Client agrees to notify TeleCheck promptly of any discrepancy between Client's records and the information provided in the reports, or of any funding failures or errors. In the event any ECA Warranty Transaction is not funded or otherwise paid by TeleCheck in accordance with Section 36.3.2, Client is required to notify TeleCheck in writing within 30 days from the date of such transaction. If Client fails to notify TeleCheck within such 30 day period of the discrepancy, funding failure or error, TeleCheck shall have no liability and Client is precluded from asserting any claims, damages or losses arising from such discrepancy, funding failure or error.

**36.3.8. "Goodwill" of a Non-Compliance Item.** TeleCheck, in its sole discretion, may voluntarily elect not to chargeback or reassign to Client a specific non-compliance Item which fails to comply with the warranty requirements set forth in Section 36.3.3. Such discretionary election by TeleCheck shall not (a) constitute a course of dealing or a waiver of TeleCheck's right to chargeback or reassign any other Return Item, or (b) relate to any other past or subsequent Return Item, or (c) act as a waiver of TeleCheck's right to decline to pay any other Return Item.

**36.3.9. Reserve Account Establishment and Funding.** Client expressly authorizes TeleCheck to establish a reserve account for ECA Warranty Transactions. The amount of the reserve account shall be set by TeleCheck, in its sole discretion, based upon Client's processing history and the anticipated risk of loss to TeleCheck. The reserve account shall be fully funded upon 3 days' notice to Client or in instances of fraud or breach of this Agreement, the reserve account may be funded immediately at TeleCheck's election. The reserve account may be funded by all or any combination of the following: (a) one or more debits to Client's Account (and TeleCheck is hereby authorized to make such debits); (b) one or more deductions or offsets to any payments otherwise due to Client from TeleCheck or any of its affiliates; or (c) Client's delivery to TeleCheck of a letter of credit issued or established by a financial institution acceptable to, and in a form satisfactory to, TeleCheck. In the event of termination of this Agreement by either TeleCheck or Client, an immediate reserve account may be established without notice in the manner provided above. Any reserve account will be held by TeleCheck for 10 months after termination of this Agreement. Client's funds may be held in a commingled reserve account for the reserve funds of TeleCheck's subscribers without involvement by an independent escrow agent, and shall not accrue interest. If Client's funds in the reserve account are not sufficient to cover the delinquent fees, chargebacks or rejected and reassigned warranty Items, or any other fees and charges due from Client to TeleCheck or its affiliates, or if the funds in the reserve account have been released, Client shall immediately pay TeleCheck such sums upon request. In the event of a failure by Client to fund the reserve account, TeleCheck may fund such reserve account in the manner set forth above.

**36.3.10. Fees and Rates.** Client shall pay TeleCheck the fees and rates set forth on the Merchant Processing Application and addenda, if any, or in this Agreement, as changed from time to time by TeleCheck, plus all applicable taxes. The "Inquiry Rate" is the percentage rate which shall apply to the face amount of each Item (up to the Warranty Maximum), for which an authorization inquiry is made to TeleCheck by telephone, electronically or otherwise. The "Transaction Fee" is the additional per transaction charge for each ECA Warranty Transaction. The "Monthly Minimum

Fee" is the minimum aggregate amount of Inquiry Rate fees that Client shall pay on a monthly basis. If the total Inquiry Rate fees for Client's inquiries for any month are less than the Monthly Minimum Fee, then the Monthly Minimum Fee shall apply. The "Customer Requested Operator Call/Voice Authorization Fee" is an additional fee per operator-assisted call not requested by TeleCheck. "December Risk Surcharge" is an additional percentage charge for each transaction in December. The "Monthly Statement/Processing Fee" is a monthly fee for handling Client's account. The "Set Up Fees" are fees related to the establishment and set up of the first and subsequent locations on the TeleCheck Services.

The following additional fees may be also be charged by TeleCheck: The "ECA Conversion Fee" is the fee charged to convert an existing subscriber to the ECA services. The "Non-Imaging Surcharge" is a per transaction charge for every ECA Warranty Transaction that is not processed using a TeleCheck approved imaging device. The "Funding Report Fee" is an additional fee to receive daily or weekly ECA funding reports. The "POS Support Fee" is a monthly fee for point of sale support services. The "Chargeback Fee" is a $5.00 handling fee for each chargeback of an ECA Warranty Transaction. The "Correction Fee" is a $5.00 fee payable on each Item that must be corrected due to Client's error or at Client's request. The "Recovery Processing Fee" is a $5.00 fee for each Item that fails to meet warranty requirements for which TeleCheck elects, in its discretion, to reimburse Client as a "Goodwill Item" for a specific Return Item. A "Warranty Research Fee" of $7.50 may be charged each time Client requests substantiation of a warranty payment/non-payment. A "Terminal Application Update Fee" of $25.00 per terminal shall be charged for each occasion that a terminal application update is made available for additional features, different information or regulatory compliance. These above fees are in addition to any fees charged by TeleCheck to Client under any other agreement.

## TERMS APPLICABLE ONLY TO TELECHECK PAPER WARRANTY SERVICES

**36.4. Paper Warranty Services.**

**36.4.1. Description.** The TeleCheck Paper Warranty services provide Client with: (a) coded information to assist Client in deciding whether or not to accept a check; and (b) warranty services for checks that meet the warranty requirements of Section 36.4.2, all in accordance with this Agreement.

**36.4.2. Warranty Requirements.** TeleCheck warrants the accuracy of its information provided that all requirements set forth in the warranty requirements set forth in this Section are strictly met. TeleCheck agrees to purchase from Client one check per Paper Warranty Transaction for which a TeleCheck Approval Code was inaccurate; provided, however, that TeleCheck's liability shall be limited by the Warranty Maximum and warranty requirements, and shall not exceed the amount of the check. Client's sole and exclusive remedy for breach of warranty shall be the right to require TeleCheck to purchase such check subject to the terms and conditions contained in this Agreement. Client represents and warrants with respect to each Paper Warranty Transaction submitted to TeleCheck for processing under this Agreement that:

(a) The check is a first party check drawn on Consumer's account at a United States or Canadian financial institution, completely and properly filled out, and made payable to Client. The name of the Consumer is imprinted or typed on the check by the check manufacturer. If a P.O. Box is used or an address is not imprinted by the check manufacturer, a physical address description is written on the check according to TeleCheck Operational Procedures;

(b) Client made an inquiry to TeleCheck in strict accordance with TeleCheck Operational Procedures and obtained a single TeleCheck Approval Code. The transaction was not performed in an attempt to avoid the warranty requirements or Warranty Maximum (as more fully described in Section 36.4.4(f), including through split sales;

(c) The transaction represents an obligation of Consumer at the point of sale (no phone, mail or internet orders) for goods sold or rented or services rendered for the price of such goods or services, and the transaction is not for credit, cash or payment on an account, debt or check already due Client;

(d) The signature in the signature block on the check is not substantially different from the name imprinted on the check;

(e) The date of the check accurately coincides within 1 calendar day of (i) the date of the inquiry call to TeleCheck, and (ii) the date the transaction actually occurred. (Checks may not pre-date or post-date by more than 1 calendar day the date of the inquiry call and the transaction date);

(f) Client has no reason to question or have notice of any fact, circumstance or defense which would impair the validity or collectibility of Consumer's obligation or relieve Consumer from liability;

(g) The TeleCheck Client Number, Consumer's telephone number (including area code), identification type and number and TeleCheck Approval Code are printed or written on the check;

(h) The amount shown in words and figures on the check is (i) less than or equal to the amount entered into the TeleCheck system; or (ii) no more than $1.00 over the amount entered into the TeleCheck system;

(i) The check is deposited in Client's Account and received by TeleCheck for purchase within 30 days of the date of the check. Such check has been sent directly from Client's financial institution after being presented for payment only once (no representments shall be allowed, whether paper or electronic); and

(j) The transaction is not subject to any stop payment, dispute or set-off.

**36.4.3. Assignment of Checks.** By electing to subscribe to the Paper Warranty Services, Client ASSIGNS, TRANSFERS AND CONVEYS to TeleCheck all of Client's rights, title and interest in any check submitted to TeleCheck for coverage under this Agreement. Client shall, at TeleCheck's request endorse such check and take any action reasonably deemed necessary by TeleCheck to aid in the enforcement of TeleCheck's rights hereunder.

**36.4.4. Reassignment.** TeleCheck may reassign to Client any check purchased by TeleCheck pursuant to the Paper Warranty Services provisions of this Agreement, in any of the following circumstances:

(a) The goods or services, in whole or in part, for which the check was issued have been returned to Client, have not been delivered by Client or are claimed by Consumer to have been unsatisfactory or are subject to any stop payment, dispute or set-off;

(b) Client has received full or partial payment or security in any form to secure payment of the check, or the goods or services for which the check was issued were initially delivered on credit or under a lease;

(c) The transaction is for any reason illegal, void or invalid; or purchase by or transfer to TeleCheck of the check is not permitted by applicable law; or a court of law determines that the check is, in whole or in part, not due and payable by Consumer, unless such determination results from Consumer's bankruptcy proceeding;

(d) Any of the representations made by Client as set forth in Section 36.4.2 are or become false or inaccurate;

(e) Client failed to comply with this Agreement;

(f) Client, or any of Client's owners, agents or employees: (i) materially altered the check; or (ii) accepted the check with reason to know that it was likely to be dishonored (including failure to receive a TeleCheck Approval Code) or that the identification used was forged, altered or did not belong to

Consumer; or (iii) processed the transaction in a manner which was an attempt to avoid the warranty requirements or Warranty Maximum. "Knowledge" shall be presumed in the presence of facts or circumstances which, if known, would cause a non-subscribing merchant, using commercially reasonable judgment, to independently refuse to accept a check. "Knowledge" is also presumed where there is evidence of Client's attempt to avoid warranty limitations through manipulation of transactions, including, but not limited to the splitting of a single transaction into smaller components or resubmission of a previously denied transaction; or

(g) Client received notice that Consumer filed bankruptcy and Client failed to notify TeleCheck of the bankruptcy within 3 business days of Client's receipt of such notice.

Client shall immediately notify TeleCheck upon the happening of any of the above circumstances. If the check is reassigned as provided herein, TeleCheck may debit Client's Account in the amount paid by TeleCheck for the check, or upon request, Client shall remit the amount of the check to TeleCheck. Upon reassignment of a check, TeleCheck shall have no further liability to Client on such check. Following termination of this Agreement, Client shall continue to bear total responsibility for any reassignments, chargebacks and adjustments made under this Section.

**36.4.5. "Goodwill" of a Non-Compliance Item.** TeleCheck, in its sole discretion, may voluntarily elect not to reassign to Client a specific non-compliance item which fails to comply with the warranty requirements set forth in Section 36.4.2. Such discretionary election by TeleCheck shall not (a) constitute a course of dealing or a waiver of TeleCheck's right to reassign any other Return Item, or (b) relate to any other past or subsequent Return Item, or (c) act as a waiver of TeleCheck's right to decline to pay any other Return Item.

**36.4.6. Fees and Rates.** Client shall pay TeleCheck the fees and rates set forth on the Merchant Processing Application and addenda, if any, or in this Agreement, as changed from time to time by TeleCheck, plus all applicable taxes. The "Inquiry Rate" is the percentage rate which shall apply to the face amount of each Item (up to the Warranty Maximum), for which an authorization inquiry is made to TeleCheck by telephone, electronically or otherwise. The "Transaction Fee" is the additional per transaction charge for each Paper Warranty Transaction. The "Monthly Minimum Fee" is the minimum aggregate amount of Inquiry Rate fees that Client shall pay on a monthly basis. If the total Inquiry Rate fees for Client's inquiries for any month are less than the Monthly Minimum Fee, then the Monthly Minimum Fee shall apply. The "Customer Requested Operator Call/Voice Authorization Fee" is an additional fee per operator-assisted call not requested by TeleCheck. "December Risk Surcharge" is an additional percentage charge for each transaction in December. The "Monthly Statement/ Processing Fee" is a monthly fee for handling Client's account. The "Set Up Fees" are fees related to the establishment and set up of the first and subsequent locations on the TeleCheck Services.

The following additional fees may be also be charged by TeleCheck: The "POS Support Fee" is a monthly fee for point of sale support services. The "Recovery Processing Fee" is a $5.00 fee for each item that fails to meet warranty requirements for which TeleCheck elects, in its discretion, to reimburse Client as a "Goodwill Item" for a specific Return. A "Warranty Research Fee" of $7.50 may be charged each time Client requests substantiation of a warranty payment/non-payment. A "Terminal Application Update Fee" of $25.00 per terminal shall be charged for each occasion that a terminal application update is made available for additional features, different information or regulatory compliance. These above fees are in addition to any fees charged by TeleCheck to Client under any other agreement.

**GENERAL TERMS APPLICABLE TO ALL TELECHECK SERVICES**

**36.5. Payment.** All fees and charges are due upon receipt of invoice. Client authorizes TeleCheck to debit from Client's Account, all

payments and other amounts owed (including, without limitation, all Return Items, Return Payments, chargebacks, adjustments, fees and charges, and delinquency charges) under this Agreement or any other agreement between Client and TeleCheck or its affiliates, and to credit all amounts owing to Client under this Agreement to Client's Account. If there are insufficient funds in Client's Account to pay amounts owed to TeleCheck or its affiliates, or if debits to Client's account are rejected due to ACH debit blocks, or if there are any amounts otherwise not paid by Client when due, including, without limitation, delinquency charges, chargebacks or rejected and reassigned warranty Items, Client shall immediately reimburse TeleCheck or its affiliates upon demand, or at TeleCheck's option, TeleCheck may offset or recoup such amounts against any amounts due Client under this Agreement or any other agreement between Client and TeleCheck or its affiliates. A delinquency charge of 1-1/2% per month or the highest amount permitted by law, whichever is lower, shall be added to the outstanding balance of any account over 15 days delinquent. TeleCheck shall have the right to suspend all services and obligations to Client, including the payment of all warranties due and all transactions previously authorized, during any period in which Client's account is delinquent. Client agrees to pay to TeleCheck a fee of $25.00 or the highest amount permitted by law, whichever is lower, for any Return Payment. Client shall also be responsible for paying for all of the point of sale supplies related to the TeleCheck services (i.e., paper and ink for terminals, rubber stamps, if applicable).

**36.6. Security Interest.** To secure Client's obligations to TeleCheck and its affiliates under this Agreement and any other agreement (including any check or credit card processing services), Client grants to TeleCheck a lien and security interest in and to any of Client's funds pertaining to the transactions contemplated by this Agreement now or hereafter in the possession of TeleCheck or its affiliates, whether now or hereafter due or to become due to Client from TeleCheck. Any such funds may be commingled with other funds of TeleCheck, or, in the case of any funds held in a reserve account, with any other funds of other subscribers of TeleCheck. In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, TeleCheck is hereby authorized by Client at any time and from time to time, without notice or demand to Client or to any other person (any such notice and demand being hereby expressly waived), to set off, recoup and to appropriate and to apply any and all such funds against and on account of Client's obligations to TeleCheck and its affiliates under this Agreement and any other agreement, including, without limitation, fees for any other services (including any check or credit card processing services), whether such obligations are liquidated, unliquidated, fixed, contingent, matured or unmatured. Client agrees to duly execute and deliver to TeleCheck such instruments and documents as TeleCheck may reasonably request to perfect and confirm the lien, security interest, right of set off, recoupment and subordination set forth in this Agreement.

**36.7. Point of Sale Notices; Return Item Fees.** Client agrees to follow procedures and post and provide at TeleCheck's direction any notices (including any updates to such notices) which in TeleCheck's opinion may be required for TeleCheck to process the Item and/or the Return Item Fee, as an electronic funds transfer, draft or otherwise. Client also agrees to assess a Return Item Fee on all Return Items, and that TeleCheck shall be entitled to collect and retain the Return Item Fee from Consumer.

**36.8. TeleCheck Approval Code.** Client acknowledges that TeleCheck will use its internal and proprietary risk management systems to evaluate the risk associated with any particular Item and to assist in its decision whether or not to issue a TeleCheck Approval Code. The decision to issue a TeleCheck Approval Code shall be within the discretion of TeleCheck.

**36.9. Credit Law Compliance.** Client certifies that (a) Client has a legitimate business need, in connection with a business transaction initiated by Consumer, for the information provided by

TeleCheck under this Agreement regarding such Consumer; and (b) the information provided by TeleCheck shall only be used for permissible purposes as defined in the Fair Credit Reporting Act, and applicable state and federal laws, with the exception that the information shall not be used for employment purposes, and shall not be used by Client for any purpose other than a single business transaction between Consumer and Client occurring on the date of the inquiry call to TeleCheck. Neither Client, nor Client's agents or employees, shall disclose the results of any inquiry made to TeleCheck except to Consumer about whom such inquiry is made and in no case to any other person outside Client's organization. If Client decides to reject any transaction, in whole or in part, because of information obtained from TeleCheck, Client agrees to provide Consumer with all information required by law and TeleCheck.

**36.10. Use of TeleCheck Materials and Marks.** Pursuant to authorization granted to TeleCheck by TeleCheck International, Inc., the owner of the trademarks referenced in this Section, TeleCheck grants to Client, and Client accepts, a nonexclusive, nonassignable and non-transferable limited license, uncoupled with any right or interest, to use the **TELECHECK** and the **TELECHECK logo** service marks, and for those Clients who are receiving ECA Warranty Services or ECA Verification Services, the **TELECHECK ELECTRONIC CHECK ACCEPTANCE** and **ECA** service marks (collectively, the "TeleCheck Marks") as follows. Client may use and display decals, identification data and other materials provided by TeleCheck during the term of this Agreement at Client's location solely in connection with the offering of TeleCheck services as authorized under this Agreement. Client shall not permit any persons other than its own officers or employees at Client's locations to use the TeleCheck Client number assigned by TeleCheck. Client agrees that upon termination of this Agreement it will, at its own expense, either return or destroy all TeleCheck materials (including the prompt removal of any TeleCheck decals, electronic files, logos or other materials or references to TeleCheck that are displayed to the public, including those affixed to equipment, doors or windows). The monthly fees payable by Client will apply for all months or fractions of a month that any materials or TeleCheck-owned equipment remain in use. Client shall not create any print, electronic or Internet-based materials including but not limited to any advertising or promotional materials using any TeleCheck Marks without the prior written consent of TeleCheck. Client acknowledges TeleCheck International, Inc's ownership of the TeleCheck Marks and will not contest the validity of the marks or the ownership thereof. Client further agrees to refrain from performing any acts that might discredit, disparage, dilute, infringe or negatively affect the value of the TeleCheck Marks or constitute unfair competition to TeleCheck or TeleCheck International, Inc. Client agrees promptly to bring to TeleCheck's attention any unauthorized use of the TeleCheck Marks by third parties of which Client becomes aware. Client shall use the TeleCheck Marks pursuant to any guidelines provided by TeleCheck, as may be amended from time to time. The following shall appear at least once on every piece of advertising or promotional material created by Client which uses the TeleCheck Marks and has received prior written approval from TeleCheck: "The ("Applicable Mark") trademark is owned by TeleCheck International, Inc. and is licensed for use by ("Client Name")".

**36.11. Use of Information.** Client agrees that: (a) any data and other information relating to an Item or Consumer obtained by TeleCheck in connection with any service provided hereunder (including any electronic or other image of all or any portion of any check or driver's license or other identification) shall be owned by TeleCheck, with all right, title, and interest thereto; (b) TeleCheck may use any credit information provided to a TeleCheck affiliate for TeleCheck's credit review; and (c) TeleCheck may provide or receive any experiential information regarding Client or Client's customers to or from any TeleCheck affiliate.

**36.12. TeleCheck Operational Procedures.** Client shall strictly follow all TeleCheck Operational Procedures provided to Client, as may be amended from time to time by TeleCheck, in its discretion.

**36.13. Limitation of Liability.** In no event shall either TeleCheck or Client be liable to the other party, or to any other person or entity, under this Agreement, or otherwise, for any punitive, exemplary, special, incidental, indirect or consequential damages, including, without limitation, any loss or injury to earnings, profits or goodwill, regardless of whether such damages were foreseeable or whether such party has been advised of the possibility of such damages. Notwithstanding anything to the contrary contained in this Agreement, in no event shall TeleCheck's liability under this Agreement for all Claims arising under, or related to, this Agreement exceed, in the aggregate (inclusive of any and all Claims made by Client against TeleCheck, whether related or unrelated), the lesser of: (a) the total amount of fees paid to TeleCheck by Client pursuant to this Agreement during the 12 month period immediately preceding the date the event giving rise to such Claims occurred; or (b) $75,000.00.

**36.14. DISCLAIMER. EXCEPT AS EXPRESSLY SET FORTH HEREIN, TELECHECK MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AND NO IMPLIED AT LAW WARRANTY SHALL ARISE FROM THIS AGREEMENT OR FROM PERFORMANCE BY TELECHECK, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR USE, ALL OF WHICH ARE EXPRESSLY WAIVED BY SUBSCRIBER.** All decisions to reject any Item, driver's license or other form of identification or payment for Client's products or services are solely Client's responsibility.

**36.15. Changes in Law or NACHA Rules.** Notwithstanding anything to the contrary in this Agreement, if the continued performance of all or any portion of the obligations of TeleCheck becomes impossible or illegal due to changes in applicable federal, state or local laws or regulations, or by NACHA Rules, as determined by TeleCheck in its reasonable discretion, TeleCheck may, upon 30 days written notice to Client, request to modify or discontinue TeleCheck's performance of its obligations to the extent necessary to avoid a violation of law or NACHA Rules or, if TeleCheck chooses in its sole discretion to incur additional expenses to comply, request to increase its fees to cover the additional cost of compliance. Additionally, if any fees or charges to TeleCheck increase for processing transactions through the ACH Network, TeleCheck may request to increase its fees to cover such increases. If TeleCheck makes such request and the parties are unable to agree upon corresponding changes to the terms and conditions of this Agreement within 30 days of such request, TeleCheck may terminate this Agreement upon 30 days written notice.

**36.16. Updating Information.** With regard to any Return Items submitted to TeleCheck, Client shall promptly notify TeleCheck if: (a)a Consumer makes any payment to Client; (b) there is a return of goods or services, in whole or in part; or (c) there is a dispute of any amount, notice of bankruptcy or any other matter.

**36.17. Confidentiality.** Client shall maintain the confidentiality of this Agreement and any information provided to Client by TeleCheck, including, without limitation, TeleCheck Operational Procedures, pricing or other proprietary business information, whether or not such information is marked confidential. Such information shall not be used except as required in connection with the performance of this Agreement or disclosed to third parties.

**36.18. No Resale, Assignment of Agreement.** This Agreement is solely between TeleCheck and Client. Client shall not provide or resell directly or indirectly, the services provided by TeleCheck to any other third party. This Agreement may be assigned by Client only with the prior written consent of TeleCheck. TeleCheck may freely assign this Agreement, its rights, benefits or duties hereunder. Subject to the foregoing, this Agreement shall inure to the benefit of and be binding upon the successors and assigns of TeleCheck and Client's heirs, executors, administrators, successors and assigns.

**36.19. Indemnification.** In the event Client (a) fails to strictly comply, in whole or in part, with any: (i) terms and conditions of this Agreement and any addenda hereto or TeleCheck Operational

Procedures; or (ii) applicable law, rules, regulations and NACHA Rules, or (b) makes any false or inaccurate representation, Client shall indemnify, defend and hold harmless the TeleCheck Parties from and against any and all Claims arising therefrom, including payment of all costs and reasonable attorneys' fees for actions taken by TeleCheck, whether by suit or otherwise, to defend the TeleCheck Parties from any Claim related thereto or to preserve or enforce TeleCheck's rights under this Agreement. In the event of any legal action with third parties or regulatory agencies concerning any transaction or event arising under this Agreement, Client shall: (a) promptly notify TeleCheck of the Claims or legal action; (b) reasonably cooperate with TeleCheck in the making of any Claims or defenses; and (c) provide information, assist in the resolution of the Claims and make available at least one employee or agent who can testify regarding such Claims or defenses. Upon written notice from TeleCheck to Client, Client shall immediately undertake the defense of such Claim by representatives of its own choosing, subject to TeleCheck's reasonable approval; provided, however, that TeleCheck shall have the right to control and undertake such defense by representatives of its own choosing, but at Client's cost and expense, if the Claim arises out of patent, trademark, or other intellectual property rights or laws.

**36.20. Notices.** Any notice or other communication required or permitted to be given hereunder shall be delivered by facsimile transmission, overnight courier or certified or registered mail (postage prepaid return receipt requested) addressed or transmitted to the party to be notified at such party's address or number as provided on the Merchant Processing Application or at such party's last known address or number. Any notice delivered hereunder shall be deemed to have been properly given (a) upon receipt if by facsimile transmission, as evidenced by the date of transmission indicated on the transmitted material, (b) upon receipt if deposited on a prepaid basis with a nationally recognized overnight courier for next business day delivery, and (c) on the date of delivery indicated on the return receipt, if mailed by certified or registered mail. TeleCheck shall also be permitted to provide notices by regular mail and such notice shall be deemed effective 10 days after mailing. The parties' addresses may be changed by written notice to the other party as provided herein.

**36.21. Force Majeure.** TeleCheck shall not be held responsible for any delays in or failure or suspension of service caused by mechanical or power failure, computer malfunctions (including, without limitation, software, hardware and firmware malfunctions), transmission link failures, communication failures, failure, delay or error in clearing or processing a transaction through the ACH Network or Federal Reserve system, failure, delay or error by any third party or any other third party system, strikes, labor difficulties, fire, inability to operate or obtain service for its equipment, unusual delays in transportation, act of God or other causes reasonably beyond the control of TeleCheck.

**36.22. Compliance with Laws, Governing Law and Integration.** Client shall comply with all applicable laws, regulations and rules, including NACHA Rules, relating to the services provided hereunder. Client certifies that it has not been suspended by NACHA or any credit card association, or cancelled by an ODFI or Third Party Sender (as defined in the NACHA Rules). This Agreement, plus any addenda attached hereto, constitutes the entire Agreement between the parties concerning subject matter hereof and supersedes all prior and contemporaneous understandings, representations and agreements in relation to its subject matter. **THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, WITHOUT REGARD TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.**

**36.23. Severability and Interpretation.** If any provision, in whole or in part, of this Agreement is held invalid or unenforceable for any reason, the invalidity shall not affect the validity of the remaining provisions of this Agreement, and the parties shall substitute for the invalid provision a valid provision which most closely

approximates the intent and economic effect of the invalid provision. Neither this Agreement, nor any addenda or TeleCheck Operational Procedures, shall be interpreted in favor or against any party because such party or its counsel drafted such document. No course of dealing, usage, custom of trade or communication between the parties shall modify or alter any of the rights or obligations of the parties under this Agreement. This Agreement is solely for the benefit of TeleCheck (and its affiliates) and Client and no other person or entity shall have any right, interest or claim under this Agreement.

**36.24. Amendment and Waiver.** No modification, amendment or waiver of any of the terms and conditions of this Agreement shall be binding upon TeleCheck unless made in writing and approved and signed by TeleCheck. No waiver of any rights hereunder shall be deemed effective unless in writing executed by the waiving party. No waiver by any party of a breach or any provision of this Agreement shall constitute a waiver of any prior or subsequent breach of the same or any other provision of this Agreement. The parties agree that no failure or delay in exercising any right hereunder shall operate as a waiver of any such right. All of TeleCheck's rights are cumulative, and no single or partial exercise of any right hereunder shall preclude further exercise of such right or any other right.

**36.25. Damages.** Upon Client's breach of this Agreement, including any unauthorized termination, TeleCheck shall be entitled to recover from Client liquidated damages in an amount equal to ninety percent (90%) of the aggregate Monthly Minimum Fees and Statement/Processing Fees payable for the unexpired portion of the then current term of this Agreement. TeleCheck and Client hereby acknowledge and agree that, after giving due consideration to the costs TeleCheck may incur by reason of Client's breach of this Agreement, to the possibility that TeleCheck will not be able to mitigate its damages, and to the expense savings that TeleCheck may obtain by not having to provide services or maintenance, the liquidated damages specified herein constitute a realistic pre-estimate of the loss to TeleCheck in the event of such breach and shall not be construed as a penalty.

**36.26. Survivability.** All representations, warranties, indemnities, limitations of liability and covenants made herein shall survive the termination of this Agreement and shall remain enforceable after such termination.

## 37. ADDITIONAL IMPORTANT INFORMATION PERTAINING TO THIS ENTIRE AGREEMENT

### 37.1. Electronic Funding Authorization

All payments to Client shall be through the Automated Clearing House ("ACH") and shall normally be electronically transmitted directly to the Demand Deposit Account ("DDA") you have designated or any successor account designated to receive provisional funding of Client's Card sales pursuant to the Agreement. Client agrees that any DDA designated pursuant to the preceding sentence will be an account primarily used for business purposes. Neither Wells Fargo Bank, N.A. ("Wells Fargo Bank") nor Wells Fargo Merchant Services, L.L.C. can guarantee the timeframe in which payment may be credited to Client's depository institution (DEPOSITORY).

Client hereby authorizes Wells Fargo Bank and its authorized representative, including Wells Fargo Merchant Services, L.L.C., to access information from the DDA and to initiate credit and/or debit entries by bankwire or ACH transfer and to authorize DEPOSITORY to block or to initiate, if necessary, reversing entries and adjustments for any original entries made to the DDA and to authorize DEPOSITORY to provide such access and to credit and/or debit or to block the same to such account. This authorization is without respect to the source of any funds in the DDA, is irrevocable and coupled with an interest. This authority extends to any equipment rental or purchase agreements which may exist with Client as well as to any fees and assessments and Chargeback amounts of whatever kind or nature due to Wells Fargo Merchant Services, L.L.C. or Wells Fargo Bank under terms of this Agreement whether arising during or after termination of the Agreement. This authority is to remain in full force and effect at all times unless and until Wells Fargo Merchant Services, L.L.C. and Wells Fargo Bank have consented to its termination at such time and in such a manner as to afford them a reasonable opportunity to act on it. In addition, Client shall be charged ten dollars ($10.00) for each ACH which cannot be processed, and all subsequent funding may be suspended until Client either (i) notifies Wells Fargo Merchant Services, L.L.C. that ACH's can be processed or (ii) a new electronic funding agreement is signed by Client. Client's Depository must be able to process or accept electronic transfers via ACH.

### 37.2. Funding Acknowledgement

Automated Clearing House (ACH). I acknowledge that the funds for MasterCard,Visa and Discover transactions will be processed and transferred to my depository within two (2) Business Days from the time a Batch is closed (by 12:00 a.m. PT) and within one (1) Business Day from the time the Batch is closed (by 12:00 a.m. PT) if such account is a Wells Fargo Direct Deposit Account.

### 37.3. Additional Fees and Early Termination

The Fees for Services as shown on your pricing disclosure are based on the assumption that your Credit Card and Non-PIN Debit transactions will qualify at the Anticipated Interchange Levels associated with your account.

If a transaction fails to qualify for your Anticipated Interchange Levels, you will be billed a Non-Qualified Interchange Fee, plus a Non-Qualified Surcharge for each such non-qualifying transaction (see Section 18.1 and Glossary).

Your initial fees for Services are stated on your Application and may be adjusted from time to time to reflect:

a.   Any increases or decreases in the interchange and/or assessment portion of the fees,

b.   The appropriate interchange level as is consistent with the qualifying criteria of each transaction submitted by Client, and

c.   Increases in any applicable sales or telecommunications charges or taxes levied by any state, federal or local authority related to the delivery of the services provided by Wells Fargo Merchant Services, L.L.C. when such costs are included in the Service or other fixed fees.

In addition to the Debit Card transaction fees set forth on the Application, Client shall be responsible for the amount of any fees imposed upon a transaction by the applicable debit network.

A Monthly Minimum Processing Fee will be calculated beginning thirty (30) days after the date Client's Application is approved. (Refer to your pricing disclosures.)

Authorization Fees are charges that apply each time you communicate directly with Processor. Authorization/EDC Fee applies to all Visa, MasterCard and Discover Network Card approvals (pre-authorizations and authorizations), denials, batch inquiries, and batch entry transactions and includes any transaction fees and capture fees.

An equipment rental fee will be charged each month for each piece of equipment rented, plus tax as applicable. Client will be charged for actual shipping fees for equipment and cost of supplies.

The parties further agree and acknowledge that, in addition to any remedies contained herein or otherwise available under applicable law and, if (a) CLIENT breaches this Agreement by improperly terminating it prior to the expiration of the applicable term of the Agreement, or (b) this Agreement is terminated prior to the expiration of the applicable term of the Agreement due to an Event of Default, then SERVICERS will suffer a substantial injury that is difficult or impossible to accurately estimate. Accordingly, in an effort to liquidate in advance the sum that should represent such damages, the parties have agreed that the amount calculated in the manner specified below is a reasonable pre-estimate of SERVICERS' probable loss. Such amount shall be paid to SERVICERS within 15 days after CLIENT's receipt of SERVICERS' calculation of the amount due.

If Client has twelve (12) or more months in Net Credit Card and Non-PIN Debit (MasterCard/Visa) volume ("Sales Volume") and terminates the Agreement prior to the end of the initial term of the Agreement, Client shall pay an early termination fee equivalent to one of the following:

(i)   If the Client's total Sales Volume for the past 12 months is less than $3,000,000, the early termination fee is $500 per location; or

(ii)   If the Client's total Sales Volume for the past 12 months is greater than or equal to $3,000,000, the early termination fee is 0.06% multiplied by the total Sales Volume for the past 12 months

For purposes of calculating the early termination fee above, where Client has twelve or more months of Sales Volume, the total Sales Volume is calculated by summing the monthly Sales Volume for the past 12 months.

If Client has less than twelve (12) months in Sales Volume and terminates the Agreement prior to the end of the initial term of the Agreement, Client shall pay an early termination fee equivalent to one of the following:

(i)   If the Client's annualized Sales Volume for the past 12 months is less than $3,000,000, the early termination fee is $500 per location; or

(ii)   If the Client's annualized Sales Volume for the past 12 months is greater than or equal to $3,000,000, the early termination fee is 0.06% multiplied by the annualized Sales Volume

For purposes of calculating the early termination fee above, where Client has less than twelve months of Sales Volume, the annualized Sales Volume is calculated by summing the monthly Sales Volume since the account was initially active, for months with a Sales Volume of $50 or greater for that month, divided by the number of months since active, and multiplied by 12.

Client's obligation with respect to any Monthly Minimum Processing Fee will end when SERVICERS receive the aforementioned liquidated damages. If Client terminates this agreement via facsimile, Client must keep a copy of the facsimile confirmation record. This facsimile confirmation record will be required to substantiate refund of fees that Client deems were incorrectly assessed after the termination of the Agreement.

**American Express Definitions:**
EDC – Wells Auth/Wells Capture
Split Dial – Amex Auth/Wells Capture
Reverse – Amex Auth/Amex Capture

### 37.4. Addresses for Notices

**Wells Fargo Merchant Services, L.L.C.:**
1307 Walt Whitman Road
Melville, NY 11747
Attn: Sales Department

**Wells Fargo Bank:**
1200 Montego Way
Walnut Creek, CA 94598
Attn: Merchant Services

**Important Phone Numbers:**
(see also Sections 3.3 and 5.3)
Customer Service
1-800-451-5817 press 1
**MasterCard/Visa/Discover Authorization Center**
1-800-626-4480
**POS Help Desk**
1-800-622-0842

If this application for business credit is denied you may obtain a written statement of the specific reasons for the denial. To obtain the statement, please contact Credit Initiation, 1307 Walt Whitman Road, Melville, NY 11747, 1-800-767-2484 ext. 32900, within sixty (60) days from the date you are notified of our decision. We will send you a written statement of reasons for the denial within thirty (30) days of receiving your request.

WFB1007

## DUPLICATE CONFIRMATION PAGE

Please read the foregoing merchant processing Program Guide in its entirety. It describes the terms under which we will provide merchant processing services to you.

From time to time you may have questions regarding the contents of your Agreement (which includes your Merchant Processing Application, the foregoing Program Guide, and the schedules thereto and documents incorporated herein) with us. The following information summarizes portions of your Agreement in order to assist you in answering some of the questions we are most commonly asked.

1. Your discount rates are assessed on transactions that qualify for certain reduced interchange rates imposed by MasterCard, Visa and Discover. Any transactions that fail to qualify for these reduced rates will be charged an additional fee (see Section 18).

2. We may debit your bank account from time to time for amounts owed to us under the Agreement.

3. There are many reasons why a Chargeback may occur. When they occur we will debit your settlement funds or settlement account. For a more detailed discussion regarding Chargebacks, see Section 10.

4. If you dispute any charge or funding, you must notify us within 45 days of the date of the statement where the charge or funding appears or should have appeared.

5. The Agreement limits our liability to you. For a detailed description of the limitation of liability, see Section 20.

6. We have assumed certain risks by agreeing to provide you with Card processing. Accordingly, we may take certain actions to mitigate our risk, including termination of the Agreement, and/or hold monies otherwise payable to you (see Section 23, Term; Events of Default and Section 24, Reserve Account; Security Interest), under certain circumstances.

7. By executing this Agreement with us you are authorizing us to obtain financial and credit information regarding your business and the signer and guarantor of the Agreement until all your obligations to us are satisfied.

8. The Agreement contains a provision that in the event you terminate the Agreement early, you may be responsible for the payment of an early termination fee as set forth in Section 37.3 under "Additional Important Information."

9. If you lease equipment from Processor, it is important that you review Section 32. This lease is a non-cancelable lease for the full term indicated.

---

### 10. Association Disclosure

**Member Bank Information: Wells Fargo Bank**

The Bank's mailing address is Wells Fargo Bank, 1200 Montego Way, Walnut Creek, CA 94598 and its phone number is 1-800-451-5817.

**Important Member Bank Responsibilities:**

(a) The Bank is the only entity approved to extend acceptance of Association products directly to a Merchant.

(b) The Bank must be a principal (signer) to the Merchant Agreement.

(c) The Bank is responsible for educating Merchants on pertinent Visa and MasterCard Rules with which Merchants must comply, but this information may be provided to you by Processor.

(d) The Bank is responsible for and must provide settlement funds to the Merchant;

(e) The Bank is responsible for all funds held in reserve that are derived from settlement.

**Important Merchant Responsibilities:**

(a) Ensure compliance with cardholder data security and storage requirements.

(b) Maintain fraud and chargebacks below Association thresholds.

(c) Review and understand the terms of the Merchant Agreement.

(d) Comply with Visa and MasterCard rules.

**Print Client's Business Legal Name:** _____

By its signature below, Client acknowledges that it received (either in person, by facsimile, or by electronic transmission) and read the complete Program Guide (Version WFB1007) consisting of 42 pages (including this confirmation), which is incorporated into its Agreement, and agrees to comply with all terms set forth therein. Upon receipt of a signed original of this Confirmation Page by us, your Application for merchant processing services will be reviewed. Client understands that its Application is subject to approval by us. Client understands that a copy of the Program Guide is also available for downloading from the internet at:

www.wellsfargo.com/downloads/pdf/biz/merchant/program_guide.pdf

**CLIENT'S BUSINESS PRINCIPAL:**
Signature (Please sign below):

X _____     Title _____     Date _____

Please Print Name of Signer _____

**WFB1007**                    **CONFIRMATION PAGE**

**Please read the foregoing merchant processing Program Guide in its entirety. It describes the terms under which we will provide merchant processing services to you.**

From time to time you may have questions regarding the contents of your Agreement (which includes your Merchant Processing Application, the foregoing Program Guide, and the schedules thereto and documents incorporated herein) with us. The following information summarizes portions of your Agreement in order to assist you in answering some of the questions we are most commonly asked.

1. Your discount rates are assessed on transactions that qualify for certain reduced interchange rates imposed by MasterCard, Visa and Discover. Any transactions that fail to qualify for these reduced rates will be charged an additional fee (see Section 18).

2. We may debit your bank account from time to time for amounts owed to us under the Agreement.

3. There are many reasons why a Chargeback may occur. When they occur we will debit your settlement funds or settlement account. For a more detailed discussion regarding Chargebacks, see Section 10.

4. If you dispute any charge or funding, you must notify us within 45 days of the date of the statement where the charge or funding appears or should have appeared.

5. The Agreement limits our liability to you. For a detailed description of the limitation of liability, see Section 20.

6. We have assumed certain risks by agreeing to provide you with Card processing. Accordingly, we may take certain actions to mitigate our risk, including termination of the Agreement, and/or hold monies otherwise payable to you (see Section 23, Term; Events of Default and Section 24, Reserve Account; Security Interest), under certain circumstances.

7. By executing this Agreement with us you are authorizing us to obtain financial and credit information regarding your business and the signer and guarantor of the Agreement until all your obligations to us are satisfied.

8. The Agreement contains a provision that in the event you terminate the Agreement early, you may be responsible for the payment of an early termination fee as set forth in Section 37.3 under "Additional Important Information."

9. If you lease equipment from Processor, it is important that you review Section 32. This lease is a non-cancelable lease for the full term indicated.

**10. Association Disclosure**

**Member Bank Information: Wells Fargo Bank**

The Bank's mailing address is Wells Fargo Bank, 1200 Montego Way, Walnut Creek, CA 94598 and its phone number is 1-800-451-5817.

**Important Member Bank Responsibilities:**

(a) The Bank is the only entity approved to extend acceptance of Association products directly to a Merchant.

(b) The Bank must be a principal (signer) to the Merchant Agreement.

(c) The Bank is responsible for educating Merchants on pertinent Visa and MasterCard Rules with which Merchants must comply; but this information may be provided to you by Processor.

(d) The Bank is responsible for and must provide settlement funds to the Merchant;

(e) The Bank is responsible for all funds held in reserve that are derived from settlement.

**Important Merchant Responsibilities:**

(a) Ensure compliance with cardholder data security and storage requirements.

(b) Maintain fraud and chargebacks below Association thresholds.

(c) Review and understand the terms of the Merchant Agreement.

(d) Comply with Visa and MasterCard rules.

**Print Client's Business Legal Name:** _____

**By its signature below, Client acknowledges that it received (either in person, by facsimile, or by electronic transmission) and read the complete Program Guide (Version WFB1007) consisting of 42 pages (including this confirmation), which is incorporated into its Agreement, and agrees to comply with all terms set forth therein. Upon receipt of a signed original of this Confirmation Page by us, your Application for merchant processing services will be reviewed. Client understands that its Application is subject to approval by us. Client understands that a copy of the Program Guide is also available for downloading from the internet at:**

**www.wellsfargo.com/downloads/pdf/biz/merchant/program_guide.pdf**

**CLIENT'S BUSINESS PRINCIPAL:**
Signature (Please sign below):

X _____        _____        _____
                                                  Title                            Date

_____
Please Print Name of Signer