2013 WL 2181193
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

TRILEGIANT CORPORATION, Plaintiff,
v.
SITEL CORPORATION, Defendant.

No. 09 Civ. 6492(KBF).  |  May 20, 2013.

Opinion

### MEMORANDUM DECISION & ORDER

KATHERINE B. FORREST, District Judge.

*1 This diversity breach of contract action was filed in July 2009, and was presided over by the Honorable Barbara S. Jones, formerly of this Court.[1] After a lengthy period of discovery, on October 15, 2012, cross-motions for summary judgment were filed. (ECF Nos. 106, 112.) On October 29, 2012, defendant Sitel Corporation ("Sitel") also moved to strike the declaration of counsel for Trilegiant Corporation ("Trilegiant"), Kenneth M. Kliebard in Support of Plaintiffs Motion for Summary Judgment. (ECF Nos. 115, 119.) This matter was subsequently transferred to the undersigned. (ECF No. 149.)

For the reasons set forth below, plaintiff's motion for summary judgment is denied in its entirety. Defendant's motion for summary judgment is granted in its entirety, and judgment is entered for defendant in the amount of $1,201,915.39.

### I. BACKGROUND
The facts set forth below are undisputed unless otherwise noted.

#### A. *The Relevant Contracts*
Trilegiant operates membership-based service clubs and programs. Defendant Sitel operates call centers at a number of locations worldwide.

On September 12, 2005, Trilegiant and Sitel, through Sitel's predecessor-in-interest, ClientLogic Operating Corporation ("ClientLogic") entered into a Call Center Services Agreement ("CSA"). The CSA provides that the "Vendor" (ClientLogic, and later Sitel) would provide services as set forth in a Statement of Work ("SOW"). (Decl. of Andrew J. Wells in Support of Sitel's Motion for Summary Judgment ("Wells Decl."), Ex. 4, § 1.1.) The CSA states that "[i]n the event of a conflict between the terms and conditions of this Agreement and the terms and conditions of the Statement of Work, the terms and conditions of this Agreement [the CSA] shall prevail." (*Id.*)

Section 4.6 of the CSA sets forth various provisions limiting liability. This is the sole section of the CSA presented entirely in capital letters. As relevant to this action, it states:

> (b) (i) EXCEPT FOR CLAIMS ARISING OUT OF OR RELATING TO ... (III) THE FRAUDULENT, GROSSLY NEGLIGENT OR WILFULL MISCONDUCT OF VENDOR, VENDOR'S LIABILITY UNDER THIS AGREEMENT OR ANY SCHEDULE, REGARDLESS OF FORM OF THE ACTION, SHALL NOT EXCEED THE GREATER OF (A) THE AMOUNT PAID FOR THE SERVICES FOR THE TWELVE (12) MONTH PERIOD IMMEDIATELY PRECEDING THE MONTH IN WHICH THE EVENT GIVING RISE TO THE LIABILITY OCCURRED OR (II) TEN MILLION DOLLARS.

And

> (ii) EXCEPT FOR CLAIMS ARISING OUT OF OR RELATING TO ... (III) THE FRAUDULENT, GROSSLY NEGLIGENT OR WILFULL MISCONDUCT OF VENDOR, VENDOR SHALL NOT BE LIABLE FOR (A) INDIRECT, SPECIAL, CONSEQUENTIAL, PUNITIVE OR EXEMPLARY DAMAGES, INCLUDING WITHOUT LIMITATION LOST PROFITS, WHETHER BASED IN CONTRACT, TORT, STATUTE OR OTHERWISE, EVEN IF ADVISED

EXHIBIT 3

OF THE POSSIBILITY OF SUCH DAMAGES .... THIS LIMITATION OF LIABILITY IS MADE KNOWINGLY, INTENTIONALLY AND VOLUNTARILY.

(*Id.*, § 4.6(b).)

On September 13, 2005, Trilegiant and ClientLogic entered into the first SOW for ClientLogic's location in Manila, the Philippines. (Declaration of Mickie Baker in Support of Sitel's Motion for Summary Judgment ("Baker Decl."), Ex. 8, at Bates Sitel 000119.)

**\*2** On September 28, 2006, ClientLogic and Trilegiant entered into a second SOW for ClientLogic's Manila call center (the "2006 Manila SOW"). That SOW states that in the "event of any express conflict or inconsistency between the provisions of this SOW and the provisions of the Agreement [the CSA], the provisions of this SOW shall control." (Baker Decl., Ex. 2, at Bates Sitel 000079.) Section 3(d) of the 2006 Manila SOW required that ClientLogic, and later Sitel "transfer digital recordings of a portion of the calls to HyperQuality via FTP." (*Id.* at Bates Sitel 000080.) The SOW is signed by Julie Casteel as Chief Sales & Marketing Officer for ClientLogic. (*Id.* at Bates Sitel 000083.)

The requirements for call recording, transfer of such recordings and retention are set forth in a document attached as Exhibit D to the 2006 Manila SOW entitled "Information Technology Statement of Work" [the "IT SOW"]. (*Id.* at Bates Sitel 000088) That document is prefaced with a single page which states, "Both parties have agreed that the attached Application Scope of Work fully displays the requirements from Trilegiant." (*Id.*) The IT SOW states:

> *Agent Application*
>
> A contact center application will provide the agent with scripting information and will capture call and transaction data related to the Transfer Plus business. The application will be constructed based on several documents received from the client and conference call discovery sessions to be conducted.

(*Id.* at Bates Sitel 019685.)

The document also states:

> *HyperQuality Process*
>
> Call recording will occur in the Philippines. These recordings, along with data captured by the agent application, will be periodically extract[ed] and submitted to ... HyperQuality for quality review.

(*Id.*) It further states that "[d]uring the course of the sale, customer information will be collected for transmitting via the DE3 (Add) file." (*Id.* at Bates Sitel 019691.) And; "ClientLogic will be responsible for producing the [DE3 file] for the client as per the specifications provided by the client and agreed to over conference call meetings ...." (*Id.* at Bates Sitel 019695.) Finally, in a section headed "Call Tracking" it states that, "to handle all reporting needs, the following information will be recorded on each call: ... For each sale made, all information for the DE3 and TMV files will be saved." (*Id.* at Bates Sitel 019692.)

The IT SOW contains a schematic which sets forth the process of call intake through call recording. The schematic shows a call coming into the customer service center and eventually being routed into the DE3 (Add) File and into the FTP server. (*Id.* at Bates Sitel 019697.) Under a "Voice Solution" section, the document states that "[b]oth the voice and data files will be encrypted, zipped and placed at the FTP site for delivery to HyperQuality." (*Id.* at Bates Sitel 019698.) Finally, the document has a section entitled "Constraints/Assumptions" which states that "FTP Server Voice file Storage retention period is *90 days.*" (*Id.* (emphasis added).)

**\*3** The 2006 Manila SOW also states that "Vendor [ClientLogic, and later Sitel] will fully comply with Trilegiant's Vendor Standards Manual ["VSR"] which Vendor is in receipt of." (*Id.* at Bates Sitel 000079.) No document called a "Vendor Service Manual" is attached to the CSA, the original SOW, or the 2006 Manila SOW. With the exception of the 2009 version of the SOW (as to which there is no evidence in the record before the Court that Sitel ever received), none of the VSRs have a cover page or title page that denominates it specifically as a "VSR." With that said, in a declaration, Sitel's senior vice president for operations, Mickie Baker states that the documents included in Exhibit 5 of his declaration are "VSRs" received by Sitel. (Baker Decl. ¶ 15.) Trilegiant's submissions on these motions also attach various versions of the VSRs.

The relevant issues before the Court relate to provisions of the versions of the VSRs demonstrated to have been in Sitel's possession. Each of these versions contains a page for the recipient to have various responsible members of

the call center sign, acknowledging receipt and review. (*See e.g.,* Baker Decl. Ex. 5, at Bates Sitel 000243.) There is no signed page for any version of the VSR in the record; Baker's declaration states that "none of these documents is specifically entitled "Vendor Services Manual" and none are signed. And none were attached to the Manila Inbound Transfer Program SOW" [the 2006 Manila SOW, discussed *supra*]. (Baker Decl. ¶ 14.)

Each of the four (or, as explained *infra* possibly five) versions of the VSR—for which the record contains evidence of Sitel's possession—contains the following statement: "This Vendor Manual is intended as a supplement to individual Vendor agreements. Any conflicts or ambiguity between this Manual and any relevant Vendor agreement shall be construed in favor of the Vendor agreement." (*See e.g.,* Baker Decl. Ex. 5 at Bates Sitel 000245, Sitel 002160, Sitel 019435.)[2]

Each of the versions of the VSR that were in Sitel's possession has pages with dates from 2004. The first version bears the notation at the bottom "2004 OB Standards Manual, Revised 1/12/04". (*See id.* at Bates Sitel 000245.) Under a provision for "Record Keeping Standards," the VSR requires that oral verifications of enrollment should be maintained for thirty-six months. (*Id.* at Bates Sitel 000247.) It also states that "[t]hese record-keeping requirements may be split between Trilegiant and each Vendor in accordance with the Vendor Agreement." (*Id.*) This version also contains a separate provision later in the document entitled "Verification Standards" which provides that "Trilegiant Corporation requires **all Vendors to conduct 100% taped confirmation of sales** .... Vendors **must maintain verification voice tapes/ CD's for a minimum of 48 months** .... Failure to produce proof of enrollment recording will result in a $250.00 fine per incident." (*Id.* at Bates Sitel 000269 (emphasis in original).)

*4 The second version of the VSR is included as an attachment to an email titled "Trilegiant 2005 Standards Manual rev 5.11.05.doc" (the email is dated in May 2006). (*Id.* at Bates Sitel 002150.) The email states: "Attached are the files that the [sic] are needed for the Manila transfer plus program. We can go over these next week." (*Id.*) Despite the attachment being dated in 2005, at the bottom of each page on the document is the notation "2004 OB Standards Manual Revised 1/12/04." (*See id.* at Bates Sitel 002150–Bates Sitel 002207.) This version includes the same language as the first version referred to above.

The third VSR version maintained in Sitel's files shows track changes and appears to be a draft—at the back of the document the date of September 6, 2006, is associated with the track changes. (*Id.* at Bates Sitel 019485.) At the bottom of each page on the document is the notation "2004Standards Manual Revised 1/12/04." (*See id.* at Bates Sitel 019426–Bates Sitel 19484.) This version includes the same language as the prior two versions with respect to record keeping and that ambiguities should be resolved in favor of the "Vendor agreement"; and that the "requirements may be split between Trilegiant and each Vendor in accordance with the Vendor agreement;" and that failure to retain tapes would result in a $250.00–per–incident fine; but that retention of tapes should be for thirty-six months (instead of forty-eight months). (*See id.* at Bates Sitel 019435, Bates Sitel 019437, Bates Sitel 019460.)

The fourth and/or fifth versions of the VSR manual contain Bates numbers the scans of which are cut off—they begin with "Sitel 01936 ..."—and accordingly the Court here refers to them by their page numbers, which read as "1of59," "2of59," etc, through page seventeen, and afterwards are noted only with page numbers "18," "19," etc. The document is prefaced with an email dated August 25, 2006, with the subject line "VENDOR STANDARDS" and an attachment titled "Standards Manual 2004 rev 5 11 05.doc". This/these version(s) contains the same language as the prior versions regarding record keeping; however, in the "Verification Standards" section, the retention period is stated as forty-eight months again. (*Id.* at 35.) The bottom of each page from "1of59" through "17of59" bears the notation "2004Standards Manual Revised 1/12/04"; at the bottom of each of the following pages are the notations "2004 Standards Manual Revised 1/12/04." That is, starting on page eighteen, there is a space between "2004" and "Standards"; in addition, the placing of the notation "Revised 1/12/04" is different after page eighteen.

It is undisputed, and is undisputable, that each of the VSRs state: "Any conflicts or ambiguity between this Manual and any relevant Vendor agreement shall be construed in favor of the Vendor agreement." (*See e.g.,* Baker Decl. Ex. 5 at Bates Sitel 000245, Sitel 002160, Sitel 019435; *see also supra,* note 2.) Moreover, it is undisputed, and is undisputable, that the CSA required Sitel to "provide the services described in the Statement of Work." (Wells Decl. Ex. 4 § 1.1.) Finally, it is undisputed, and is undisputable, that the "requirements from Trilegiant" under the 2006 Manila SOW, and the IT SOW attached thereto, required retention of recordings for ninety

days. (*See* Baker Decl. Ex. 2 at Bates Sitel 000088, Bates Sitel 019698.)

### B. *The Conduct at Issue*

**\*5** On November 30, 2007, one Andrea Whitney of Sitel emailed several individuals at Trilegiant that because Sitel had been using "the previous Affinion Loyalty Verint system and rules, all calls are purged from the system after 90 days." (Baker Decl. Ex. 3 at Bates Sitel 014722.) Whitney further stated that Sitel had "put in place today the archiving process and will keep all recordings for 36 months." (*Id.*)

On January 3, 2008, on behalf of Trilegiant, one Vilma Viola wrote ClientLogic's "General Counsel–North America" that "[p]ursuant to the tape retention requirements set forth in the Vendor Standards Manual, which is incorporated by reference in the SOW, Trilegiant is hereby requesting Vendor to provide all proof of enrollment recordings commencing on the SOW Date and concluding on September 1, 2007." (Baker Decl. Ex. 4 at Bates Sitel 019365.) ClientLogic/Sitel was unable to comply with this request in light of their previously stated retention arrangement.

In this action, Trilegiant seeks damages pursuant to the "fine" provision contained in the VSRs in an amount in excess of $33 million, for Sitel's failure to maintain the recordings for forty-eight months, as opposed to ninety days. Trilegiant, in other words, alleges that Sitel's failure to retain the recordings for more than ninety days was a breach of contract. Sitel has counterclaimed for call center work it alleges it performed pursuant to the SOWs in the amount of $1,201,815.39 for which it has invoiced Trilegiant and not been paid. (*See* Baker Decl. ¶¶ 32–33.)

The parties do not dispute that prior to November 30, 2007, ClientLogic/Sitel did not retain enrollment verification recordings for a period longer than ninety days. On July 30, 2008, Trilegiant notified Sitel that it was terminating the CSA.

### II. LEGAL STANDARD ON SUMMARY JUDGMENT

Summary judgment may not be granted unless the movant shows, based on admissible evidence in the record before the Court, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). In making a determination on summary judgment, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." *Dickerson v. Napolitano,* 604 F.3d 732, 740 (2d Cir.2010).

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must set out specific facts showing a genuine issue of material fact for trial. *Price v. Cushman & Wakefield, Inc.,* 808 F.Supp.2d 670, 685 (S.D.N.Y.2011); *see also Wright v. Goord,* 554 F.3d 255, 266 (2d Cir.2009). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines,* 593 F.3d 159, 166 (2d Cir.2010) (citations omitted); *see also Price,* 808 F.Supp.2d at 685 ("In seeking to show that there is a genuine issue of material fact for trial, the non-moving party cannot rely on mere allegations, denials, conjectures or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial."). In addition, self-serving affidavits, standing alone, are insufficient to create a triable issue of fact and defeat a motion for summary judgment. *See BellSouth Telecommc'ns, Inc. v. W.R. Grace & Co.-Conn.,* 77 F.3d 603, 615 (2d Cir.1996). Only disputes relating to material facts—*i.e.,* "facts that might affect the outcome of the suit under the governing law"—will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (stating that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").

### III. RELEVANT PRINCIPLES OF CONTRACT LAW

#### A. *Contracts Construed According to Plain Language*

**\*6** It is well accepted that courts should construe contracts according to the parties' intent as derived from the contracts' unambiguous terms. The parties' intent is derived "from the plain meaning of the language employed in the agreements," *Crane Co. v. Coltec Indus., Inc.,* 171 F.3d 733, 737 (2d Cir.1999) (quotation marks omitted), when the agreements are "read as a whole." *W.W.W. Assocs., Inc. v. Giancontieri,* 565 N.Y.S.2d 440, 443 (N.Y.1990). Divining the parties' intent requires a court to "give full meaning and effect to all of [the contract's] provisions ." *Katel Ltd. Liab. Co. v. AT & T Corp.,* 607 F.3d 60, 64 (2d Cir.2010) (quotation marks

omitted). Courts must avoid "interpretations that render contract provisions meaningless or superfluous."*Manley v. AmBase Corp.,* 337 F.3d 237, 250 (2d Cir.2003). When the parties' intent is clear—*i.e.,* unambiguous—the contract "must be enforced according to the plain meaning of its terms." *Lockheed Martin Corp. v. Retail Holdings, N.V.,* 639 F.3d 63, 69 (2d Cir.2011) (citing *South Rd. Assocs., LLC v. IBM,* 826 N.E.2d 806, 809 (N.Y.2005)). A contract is unambiguous where the contract's terms have "a definite and precise meaning, as to which there is no reasonable basis for a difference of opinion." *Id.* (citing *White v. Cont'l Cas. Co.,* 878 N.E.2d 1019, 1021 (N.Y.2007)).

If reasonable minds could differ about the meaning of contractual language, however, such language is ambiguous. *See Lockheed Martin Corp.,* 639 F.3d at 69 (contractual language is ambiguous when it "is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement"). The court must then turn to extrinsic evidence to determine the parties' intent. *State of New York v. Home Indem. Co.,* 486 N.E.2d 827, 829 (N.Y.1985) (per curium). While extrinsic evidence generally may not vary or contradict the terms of a fully integrated document, it may be used to interpret facially ambiguous language in the contract. *Topps Co., Inc. v. Cadbury Stani S.A.I.C.,* 526 F.3d 63, 69 (2d Cir.2008).

Contract disputes are generally resolvable on summary judgment only when the contractual language in question is wholly unambiguous. *Id.* at 68. However, the court may grant summary judgment if ambiguities exist and if those ambiguities "may be resolved through extrinsic evidence that is itself capable of only one interpretation ." *Id.* In addition, the court may interpret ambiguous term and grant summary judgment "if the non-moving party fails to point to any relevant extrinsic evidence supporting that party's interpretation of the [ambiguous] language." *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.,* 232 F.3d 153, 158 (2d Cir.2000).

The Second Circuit has reminded us of the common-law rule that a court should construe ambiguous language of a contract against the drafter so as to protect the non-drafter from an unintended or unfair result. *See Paine Webber, Inc. v. Bybyk,* 81 F.3d 1193, 1199 (2d Cir.1996).

*7 Under New York law, penalty provisions masquerading as liquidated damages are unenforceable as a matter of law. However, courts will enforce liquidated damages provisions where actual damages are difficult to ascertain or the sum stipulated is not proportionate to the loss. *See U.S. Fidelity and Guar. Co. v. Braspetro Oil Svcs. Co.,* 369 F.3d 34, 70 (2d Cir.2004) (citing *United Merchants & Mfrs. v. Equitable Life Assurance Soc'y,* 674 F.2d 134, 142 (2d Cir.1982).

A sustainable liquidated damages provision is one negotiated between the parties in which they anticipate a reasonable amount payable for actual loss in the event of a breach. *Id.* at 71 (citations omitted). Courts will not uphold such provisions if the specified amount is not a reasonable measure of the anticipated harm. *Id.* (citing *BDO Seidman v. Hirshberg,* 93 N.Y.2d 382. 396 (1999)). If a purported liquidated damages provision is plainly disproportionate to the contemplated injury, the amount will be disallowed. *Id.; see also Fingerlakes Aquaculture. LLC v. Progas Welding Supply, Inc.,* 825 N.Y.S.2d 559, 560 (3d Dep't 2006) ($400 per day "fine" for non-delivery of a tank constituted an unenforceable penalty, where the non-delivery would result in an insignificant financial loss and the imposition of the fine "would constitute a windfall well above the actual harm sustained"). Similarly, a "liquidated damages" provision that is intended to compel contractual performance rather than to compensate for loss in the event of a breach is unenforceable as a penalty provision. *See Rattigan v. Commodore International,* 739 F.Supp. 167, 169 (S.D.N.Y.1990).

Determining whether a provision constitutes true liquidated damages or is, in fact and effect, a penalty, is a question of law. *Braspetro,* 369 F.3d at 71. "Under no circumstances, however, will liquidated damages be allowed where the contractual language and attendant circumstances show that the contract provides for the full recovery of actual damages, because liquidated damages and actual damages are mutually exclusive remedies under New York law." *Id.*

Determining whether a contractual provision is in the nature of liquidated damages—or is a penalty—requires that the Court look to the anticipated loss discernible at the time of the contracting and not actual loss incurred. *See Vernitron Corp. v. CF 48 Assocs.,* 104 A.D.2d 409, 409 (2d Dep't 1984). Courts should seek to determine whether a liquidated damages provision is reasonable—and whether in the absence of such a provision, damages are difficult to calculate. *Id.*

**B.** *Liquidated Damages versus Fines*

### IV. STANDARD FOR GROSS NEGLIGENCE

Under New York law, gross negligence is conduct that "evinces a reckless disregard for the rights of others or 'smacks' of intentional wrongdoing." *Colnaghi, U.S.A., Ltd., v. Jewlers Protection Services,* 81 N.Y.2d 821, 823–24 (N.Y.1993). Ordinary mistakes in performance do not constitute "gross negligence." *See Industrial Risk Insurers v. Port Authority of New York and New Jersey,* 387 F.Supp.2d 299, 307 (S.D.N.Y.2005).

### V. DISCUSSION

#### A. *Which Retention Period Governs?*

**\*8** Every version of the VSR which the record evidence demonstrates was in Sitel's possession contains a clear contractual provision providing that in the event of any conflict, the "Vendor agreement" governs. (*See e.g.,* Baker Decl. Ex. 5 at Bates Sitel 000245, Sitel 002160, Sitel 019435; *see also supra,* note 2 .) The relevant "Vendor agreement"—the CSA—refers, in turn, to the SOW between the parties. The 2006 Manila SOW states that in the "event of any express conflict or inconsistency between the provisions of this SOW and the provisions of the Agreement [the CSA], the provisions of this SOW shall control." (Baker Decl. Ex. 2 at A–3.) And the 2006 Manila SOW's attached IT SOW provides for a ninety-day retention period. (*See* Baker Decl. Ex. 2 at Bates Sitel 000088, Bates Sitel 019698.)

Section 3(d) of the 2006 Manila SOW states that "Vendor will transfer digital recordings of a portion of the calls to HyperQuality via FTP." (*Id.,* at B–2.) That statement is contained in the text of the SOW, and nothing about that statement suggests that it is a temporary obligation. ClientLogic/Sitel's recording and retention obligations are fully set forth in the IT SOW, attached to the 2006 Manila SOW-indeed, that document is prefaced with a single page which states: "Both parties have agreed that the attached Application Scope of Work fully displays the requirements from Trilegiant." (*Id.* at Bates Sitel 000088.) This language—in contrast to that in the VSRs—indicates that the parties have agreed to its terms and "fully displays the requirements from Trilegiant." As stated *supra,* that "requirement[s] from Trilegiant" was to retain recordings for ninety days. (*Id.* at Bates Sitel 019698.)

Thus the plain and unambiguous language of the CSA, the 2006 Manila SOW, and the IT SOW required that Sitel retain call recordings on the FTP for ninety days. There is simply no other reading of these documents providing for a longer retention period requirement. Accordingly, Sitel did not breach the CSA or any of its incorporated documents when it failed to retain recordings for longer than ninety days —that was the only period for which it was required to do so.

In addition, the Court notes that the VSRs were not negotiated between the parties, nor were they ever signed by Sitel, ClientLogic, or Trilegiant. (*See e.g.,* Baker Decl. Ex. 5 at Bates Sitel 000243.) They were also inconsistent in terms of retention—internally, and with the CSA and the SOWs. On the one hand, each version provided for "Record Keeping Standards" that required that oral verifications of enrollment should be maintained for thirty-six months. (*See e.g., id.* at Bates Sitel 000247.) But they also stated that "[t]hese record-keeping requirements may be split between Trilegiant and each Vendor in accordance with the Vendor Agreement." (*Id.*) Moreover, they contained a later provision regarding "Verification Standards" providing for retention of recordings for a minimum of thirty-six or forty-eight months (depending on the VSR). (*See e.g., id.* at Bates Sitel 000269.)

**\*9** The laws of contract construction require that the Court credit the provision of the VSRs which sends the reader back to the CSA, and from thence to the 2006 Manila SOW and the incorporated IT SOW. To the extent there is a difference in retention period between the IT SOW and the VSRs, the IT SOW must govern according to the path established by the contractual documents themselves.

#### B. *Gross Negligence*

The Court has determined that the ninety day retention period applies in this matter, and that therefore Sitel was not in breach of any agreement by failing to retain recordings for any longer period of time. However, even if the Court were to have found that the thirty-six or forty-eight month retention periods set forth in the VSRs were applicable, any recovery would nevertheless be limited by the limitations on liability provision of the CSA. Section 4.6 of the CSA limits liability to $10 million—except in instances of gross negligence. There is simply no triable issue of fact as to whether defendant acted with gross negligence. As discussed above, the legal standard for gross negligence requires conduct that evinces intentional wrongdoing or a reckless disregard for the rights of others. There is no evidence in the record of any such conduct.

#### C. *Is the Fine Provision Applicable or Enforceable?*

Having found that the CSA's section 4.6 limitation on liability applies does not entirely dispose of the question of whether damages would nonetheless be payable under the "fine" provision in the VSR if the Court had found Sitel in breach (and the Court has not so found). There remains an argument —which the Court finds to lack merit—that even if the CSA limitation of liability applies (and even if Sitel were in breach), Sitel should nonetheless pay up to $10 million of the "fine" amount.

The "fine" provision purporting to require $250 per "incident" of non-retention and/or non-recording is an unenforceable penalty under New York law. Indeed, it is specifically denominated a "fine"—and the Court gives the terms in a contract their plain and ordinary meaning. There is no ambiguity about the word "fine"—a fine is a penalty, not reasonable damages negotiated to compensate for compensable loss. Penalty provisions are not enforceable. *See Vernitron,* 478 N.Y.S.2d at 934.

Moreover, there is no evidence in the record that the "fine" was subject to any negotiation. Nor is there any evidence that any of the justifications for the amount of $250 "per incident" bear any relationship to any estimate of reasonable loss with regard to any purported failure of ClientLogic/Sitel to maintain recordings for thirty-six or forty-eight months. Much of the evidence put forward to support the $250 amount post dates the 2004 and/or 2005 dates of the VSRs in Sitel's files. In other words, the VSR language was in place before the 2006 Manila SOW here at issue was negotiated between the parties. There can also be no serious dispute that the provision relating to the "fine" was in the VSR one to two years before any VSR was even sent to Sitel. Thus, Trilegiant's arguments regarding calculation of potential loss in "2006" (*see e.g.,* Trilegiant's Memorandum in Opposition to Sitel['s] Motion for Summary Judgment, at 17) are irrelevant.[3]

**\*10** Trilegiant does submit a declaration from Kerry Gay, Vice President of Operations of Trilegiant on this issue. (*See* Declaration of Jayesh–Hines Shah in Support of Plaintiff['s] Motion for Summary Judgment, Ex. 1.) Gay concedes that "some time before 2006, I was responsible for setting the amount of liquidated damages at $250." (*Id.* ¶ 15.) This concession itself indicates that the provision was not negotiated in connection with the Trilegiant/ClientLogic 2006 Manila SOW. The explanation that Gay further provides indicates that she considered the importance of maintaining call recordings. (*Id.* ¶ 17.) The only reasonable inference the Court can draw from this statement is that the "fine" was designed to coerce performance—and hence act as a penalty for non-performance—not to arrive at some reasonable estimate of loss. *See Rattigan,* 739 F.Supp. at 169.[4] While Gay refers to using a "loss" amount of a two year revenue stream, she in no way ties actual failure to record calls to total loss of *all* calls. (*Id.* ¶ 19.) Put another way, the "fine" assumes that *all* calls which a vendor has failed to record result in a loss of two years of revenue. There is no basis proffered for such an assumption. Gay, for instance, does not refer to data suggesting that a certain percentage of non-recorded calls in fact result in lost revenue; and there is no reasonable basis to assume that all such non-recorded calls result in loss.

Trilegiant states that the *SOW* was negotiated; however, there is no evidence in the record before the Court that the *VSR* was ever negotiated. That is, apart from the fact that the VSR is referred to in the SOW (but "which" VSR is unclear) there is no evidence that this provision was freely contracted into. This further undercuts the argument that the "fine" is in fact liquidated damages. *Cf. Rattigan,* 739 F.Supp. at 170. As set forth above, courts will enforce liquidated damages when they are negotiated between parties and bear some reasonable relationship to actual loss. *See U.S. Fidelity and Guar. Co.,* 369 F.3d at 70. This is not the case here.

Finally, the Court is persuaded that in all events, in doubtful cases (and this is hardly that), Courts have tended to favor the construction that makes the sum payable a penalty rather than liquidated damages. *Rattigan,* 739 F.Supp. at 170.[5]

## VI. SITEL'S REQUEST FOR PAYMENT

Having disposed of plaintiff's claim, the Court turns to defendant Sitel's counterclaim for amounts invoiced but remaining unpaid. Trilegiant argues that it need not pay amounts invoiced because Sitel had materially breached the contract. (*See* Trilegiant Corp.'s Mem. in Opp'n to Sitel Operating Corp.'s Mot. for Summ. J. (ECF No. 132) at 24–25.) The Court has found that argument to be without merit—Sitel did not breach any contract with Trilegiant. In fact, Sitel was performing according to the agreements of the parties, properly construed.

**\*11** Trilegiant does not proffer evidence disputing the amount invoiced or the work otherwise performed. Accordingly, since Trilegiant had agreed to pay Sitel for work performed, and since work was performed, Trilegiant must now pay amounts owed.

The Court grants Sitel's motion for summary judgment in the amount requested, $1,201,815.39. Judgment is entered in that amount.

## VII. CONCLUSION

For the reasons set forth above, plaintiff's motion for summary judgment is DENIED and defendant's is GRANTED in its entirety. Trilegiant's claims are dismissed.

Moreover, it is ORDERED, ADJUDGED, AND DECREED that judgment be entered for Sitel in the amount of $1,201,815.39, as the Court has granted Sitel summary judgment on its counterclaim for that amount. Sitel is directed to submit a proposed form of judgment within five business days.

The Clerk of Court is directed to close the motions at ECF Nos. 106, 112, and 119.

SO ORDERED.

Footnotes

1   Just prior to the close of discovery, defendant served an amended answer and counterclaim (asserting claims for breach of contract and unjust enrichment) on September 12, 2012. (ECF No. 103 .)
2   There is an additional VSR in Exhibit 5 to the Baker Declaration with the same language, although the Bates number is cut off in the scan submitted to the Court. The Bates number begins: "Sitel 0193 …" The language is contained on page "10*of*59" in the document.
3   Having found that there is no breach of contract, the Court finds it unnecessary to address the question of plaintiffs actual damages.
4   The declaration of Vilma Viola, also submitted by plaintiff, is similar. (*See* Shah Decl. Ex. 2.) In a section of the declaration entitled "Amount of Liquidated Damages", Viola states that "[b]anking and financial institution marketing partners rely on Trilegiant's maintenance of sales call recordings." (*Id.* ¶ 19.) She follows this statement by suggesting that "if" Trilegiant was unable to produce a recording, the partner "may ask" Trilegiant to stop billing the customer, resulting in the loss of revenue. (*Id.*) As an initial matter, the only reasonable inference from this statement is that the "fine" provision is intended to compel performance and penalize non-performance; it is also entirely hypothetical and speculative.
5   Defendant has also moved to strike the declaration of Kenneth M. Kliebard, submitted in support of plaintiff's motion. Defendant argues that Kliebard, who is counsel of record to plaintiff in this matter, is proffering this declaration as an undisclosed expert or fact witness—and that he cannot function in those capacities and also be counsel of record. Much of the "litigation" to which Kliebard refers occurred long after 2004 (the Court notes that ¶ 8 of the declaration refers to consent decrees dating back to the "early 2000s" and "in place at the time Trilegiant's contract with Sitel was negotiated", but Kliebard does not tie those decrees to specific intent of the parties with respect to the actual fine language in the VSR. Therefore, the Court finds that the declaration is irrelevant to the issue of the intent of the parties in this lawsuit. The motion to strike is therefore DENIED as moot.

End of Document                                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.