**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| AZMIE MADANAT, individually and on behalf of all others similarly situated,<br><br>            Plaintiff,<br><br>    v.<br><br>FIRST DATA CORPORATION; FIRST DATA MERCHANT SERVICES CORPORATION; and DOES 1-25, INCLUSIVE,<br><br>            Defendants. | Case No. 1:11-cv-00364-LDW-ARL |

# DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

**PERKINS COIE** LLP
Four Embarcadero Center
Suite 2400
San Francisco, California 94111
(415) 344-7000

*Attorneys for Defendants First Data Corporation and First Data Merchant Services Corporation*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ............................................................................................................... 2

    A.    The First Data Leasing Program. ................................................................ 2

            1.    Lease Acquisition And Start Up Costs To First Data. ................... 3

            2.    The Default Clause. ....................................................................... 3

    B.    The Narrow Issue That Remains To Be Resolved In This Case. .......................... 5

    C.    Madanat's Mischaracterization of the Facts ............................................... 5

    D.    The Actual Facts Surrounding Madanat's Lease ................................... 6

ARGUMENT ..................................................................................................................... 7

    I.    MADANAT LACKS STANDING TO BRING HIS CLAIMS AND
        ASKS THIS COURT TO RENDER AN ADVISORY OPINION ...................... 7

    II.    EVEN IF MADANAT DID HAVE STANDING, HIS CLAIMS FAIL AS
        A MATTER OF LAW AND FACT. .................................................... 9

        A.    "Optional" Liquidated Damages Clauses Are Valid And
            Enforceable Under The UCC, *Which Controls Here*, And The
            Default Clause Does Not Give First Data The Option To Seek
            Actual Damages In Any Event. ................................................. 9

            1.    The UCC Controls And Permits A Choice Between Actual
                And Liquidated Damages. .......................................................... 9

            2.    The Default Clause Does Not Give First Data The
                Alternative Choice Of Pursuing Actual Damages In The
                First Place. .................................................................................. 10

        B.    Madanat's Argument That the Default Clause Is Punitive And
            Provides For A Disproportionate Recovery Is Also Wrong. .................. 13

            1.    The UCC Does Not Require That Damages Be Difficult To
                Ascertain. .................................................................................... 13

            2.    Actual Damages Are Difficult To Ascertain, Nonetheless. ......... 14

            3.    The Liquidated Amount Is Not Unreasonable In Relation
                To Actual Damages. .................................................................... 14

CONCLUSION .................................................................................................................. 17

# TABLE OF AUTHORITIES

**Cases**

*Ames Linen Service v. Katz,*
    779 N.Y.S.2d 600, 601 (N.Y. App. Div. 2004) ............................................................... 14

*Atel Financial Corp. v. Quaker Coal Co.,*
    132 F.Supp.2d 1233, 1241 (N.D. Cal. 2001) ................................................................... 17

*Boyce v. Soundview Tech. Group., Inc.,*
    464 F.3d 376, 384 (2d Cir. 2006) ..................................................................................... 11

*CIT Group/Commercial Servs., Inc. v. Holladay-Tyler Printing Corp.,*
    1995 WL 702343 (S.D.N.Y. Nov. 29, 1995) ................................................................... 10

*Coastal Leasing Corp. v. T-Bar S. Corp.,*
    128 N.C. App. 379, 383 (N.C. Ct. App. 1998) ......................................................... 13, 16

*Covey v. Simonton,*
    481 F.Supp.2d 224 (E.D.N.Y. 2007) ............................................................................... 17

*Dalston Constr. Corp. v. Wallace,*
    214 N.Y.S.2d 191 (N.Y. Sup. Ct. 1960) ................................................................... 10, 12

*DAR & Associates, Inc. v. Uniforce Services, Inc.,*
    37 F.Supp.2d 192, 203 (E.D.N.Y. 1999) ......................................................................... 16

*General Electric Capital Corp. v. National Tractor Trailer School Inc.,*
    667 N.Y.S.2d 614, 618 (N.Y. Sup. Ct. 1997) ................................................................. 10

*Grossinger Motorcorp, Inc. v. Am. Nat'l Bank & Trust Co.,*
    607 N.E.2d 1337 (Ill. App. Ct. 1993) ........................................................................ 10, 12

*Hollingsworth v. Perry,*
    133 S. Ct. 2652, 2663 (2013) ............................................................................................. 8

*In re Food Management Group, LLC,*
    2007 WL 4352225, *2 (S.D.N.Y. Dec. 10, 2007) .......................................................... 11

*Inchaustegui v. 666 5th Ave. Ltd. P'ship,*
    706 N.Y.S.2d 396, 399 (N.Y. App. Div. 2000) ............................................................... 12

*Jarro Bldg. Indus. Corp. v. Schwartz,*
    281 N.Y.S.2d 420 (N.Y. App. Term 1967)................................................................ 10, 12

*King v. Crossland Sav. Bank,*
    111 F.3d 251 (2d Cir. 1997)............................................................................................. 16

*Koylum, Inc. v. Peksen Realty Corp.*,
2004 WL 5599307, *5 (E.D.N.Y. Dec. 2, 2004) .......................................... 15

*Leasing Serv. Corp. v. Justice*,
673 F.2d 70, 74 (2d Cir. 1982) ....................................................................... 14

*Lujan v. Defenders of Wildlife*,
504 U.S. 555, 560 (1992) ............................................................................ 7, 8

*Mollins v. Nissan Motor Co., Ltd.*,
2007 WL 315352, *2 (N.Y. Sup. Ct. Jan. 31, 2007) ...................................... 9

*PacifiCorp Capital, Inc. v. Tano, Inc.*,
877 F. Supp. 180, 184 (S.D.N.Y. 1995) ........................................................ 14

*Penn Intermodal Leasing, Inc. v. Shipping Corp. of India*,
1997 WL 431087, *7 (S.D.N.Y. July 30, 1997) ............................................. 14

*Port Washington Teachers' Ass'n v. Bd. of Educ. of Port Washington Union free Sch. Dist.*,
478 F.3d 494, 500 (2d Cir. 2007) .................................................................... 8

*Rajamin v. Deutsch Bank Nat. Trust Co.*,
2014 WL 2922317 *5 (2d. Cir. June 30, 2014) ........................................... 7, 8

*Southern Walk at Broadlands Homeowner's Ass'n, Inc. v. Openband At Broadlands, LLC*,
713 F.3d 175, 182-83 (4th Cir. 2013) .............................................................. 8

*Stock Shop, Inc. v. Bozell &Jacobs, Inc.*,
481 N.Y.S.2d 269 (N.Y. Sup. Ct. 1984) .................................................. 10, 12

*Trilegiant Corp. v. Sitel Corp.*,
2013 WL 2181193 (S.D.N.Y. May 20, 2013) ................................................ 10

*U.S. Fid. &Guar. Co. v. Braspetro Oil Servs. Co.*,
369 F.3d 34 (2d Cir. 2004) ..................................................................... 10, 12

*Wells Fargo Bank Northwest, N.A. v. Taca International Airlines, S.A.*,
315 F.Supp.2d 347, 350 (S.D.N.Y. 2003) ................................................. 9, 10

*Western Intermodal Services, Ltd. v. Singamas Container. Indus. Co., Ltd.*,
2000 WL 343780, *2 n.1 (S.D.N.Y. Mar. 31, 2000) ....................................... 9

**Statutes**

N.Y. U.C.C § 2-A-501 Official Cmt. 4 (1994) ............................................................ 9

N.Y. U.C.C § 2-A-504 (1994) ...................................................................................... 13

UCC §2–A–102. ...................................................................................................................... 9

UCC Article 2-A .............................................................................................................. 9, 10

**INTRODUCTION**

All that is left to be decided in this case is a narrow and discreet question: is the default clause in First Data's[1] leases—which describes what action First Data may take when a lessee defaults (hereafter, the "Default Clause")—enforceable? It is. Having lost on all of his other fanciful and far reaching claims,[2] the plaintiff (hereafter, "Madanat") bends over backwards in his Motion trying to find a reason that the Default Clause might be unenforceable. Each of his arguments fails for numerous reasons. The Motion should be denied.

*First*, the Motion can, and should, be denied in its entirety because Madanat suffered no injury as a result of the Default Clause. Indeed, it was never even enforced against him. As a result, he lacks standing. *See* part I., *infra*.

*Second*, Madanat argues that the Default Clause is an "optional liquidated damages clause." That is, the clause supposedly gives First Data the choice of suing for actual damages *or* liquidated damages. According to Madanat, that choice makes the clause unenforceable as a matter of law. That is wrong for two reasons. First, the UCC controls here, and the UCC *does allow* for so-called "optional liquidated damages clauses." *See* part II.A.1., *infra*. Second, Madanat is wrong as a matter of fact. The Default Clause here does not actually provide for an option between actual and liquidated damages. The provision that Madanat contends allows for actual damages simply gives First Data the ability to collect past due lease payments. That's something completely different—and much less—than actual damages for a breached lease. *See* part II.A.2., *infra*. Thus, Madanat's argument fails even if the UCC was not controlling.

*Third*, Madanat contends that liquidated damages are not enforceable here because actual damages for a breach are easy to predict and calculate. But here again, he ignores controlling UCC law. Under the UCC, difficulty in ascertaining damages is not a prerequisite for liquidated damages clauses in leases. *See* part II.B.1., *infra*. And, here again, he is factually wrong in any

---

[1] Defendants First Data Corporation and First Data Merchant Services are collectively referred to herein as "First Data."

[2] The Court denied class certification on Madanat's other claims on July 16, 2012. *See* Memorandum and Order (Dkt. 74); Report and Recommendation (Dkt. 71).

case.  Actual damages would include all kinds of lost revenue, consequential, and incidental damages that are hard to calculate and predict.  *See* part II.B.2., *infra*.

*Fourth*, Madanat contends that the liquidated damages allow First Data to recover more than its actual harm.  They allow a "triple recovery," according to him, that include all remaining lease payments, the fair market value of the terminal, and a future stream of rental payments from re-leasing the terminal.  All wrong.  The provision that he attacks on this ground *does not* call for First Data to retake possession of the terminal or to re-lease the terminal if a particular merchant happens to send it back, anyway.  *See* part II.B.3., *infra*.  That leaves Madanat with a *hypothetical possibility* (unsupported by any evidence) that a merchant might return a terminal—even though he does not need to—and that First Data might then be able to re-lease it.  The record shows that rarely, if ever, happens.  *See* part II.B.3., *infra*.  More to the point, though, a theoretical recovery that is greater than actual damages is not enough to invalidate an otherwise reasonable liquidated damages provision.  That is true even if the theoretical result occasionally comes true.  *See* part II.B.3., *infra*.  What actually matters is the reasonable expected harm from breach, as determined at the time of contracting.  Here the reasonable expected harm is exactly what the subject provision calls for—lost lease payments and the lost residual value of the terminal.  *See* part II.B.3., *infra*.

## BACKGROUND

### A.  The First Data Leasing Program.

First Data is a nationwide provider of credit card processing equipment and services for businesses.  As relevant to this case First Data supplies the equipment used by businesses to process credit cards and provides the "back end" banking-related services that ultimately result in money from a credit card transaction being deposited into the business owner's bank account.  The equipment is known as a "POS Terminal."  The "back end" services are referred to as processing.  Declaration of Ed Quaranta (Dkt. 60) ("Quaranta Decl.") ¶4.

First Data's leasing program is the subject of this lawsuit.  Through this program, merchants are able to lease a POS Terminal for a period of months rather than buying the

terminal outright.  *Id*. ¶5.  Merchants may choose to lease instead of buy for a number of reasons, but there are several key benefits.  A lease enables new businesses to accept credit card payments without having to spend the capital to buy the equipment and necessary software outright.  *Id*.  That capital can be used instead for advertising, employees, and other things often critical to the success of a new small business.

### 1.      Lease Acquisition And Start Up Costs To First Data.

All of the leases at issue in this case were signed up by an entity known as Wells Fargo Merchant Services ("WFMS").  WFMS then sold the leases—at considerable expense—to First Data, when then assumed the role of lessor.  Quaranta Decl. ¶6.

First Data requires leases to be for a fixed period of months because of the significant up-front costs that it expends to acquire each lease.  The largest of these up-front costs is the purchase price it pays WFMS for the lease.  *Id*. ¶6.  There are also significant "start-up" costs to get the terminal up and running.  These include configuring the terminal with software, setting it up for the merchant, training the merchant how to use it, and troubleshooting if there are initial problems using it.  *Id*. ¶7. Given all of these up-front costs, the leasing program could not operate if merchants were able to cancel the lease at any time.  This is not unlike other commercial leasing programs for items such as automobiles and office equipment.

### 2.      The Default Clause.

The lease gives First Data two options upon a merchant's default.  First, it can terminate the lease and its obligations thereunder, repossess the POS Terminal, and take action to collect all outstanding amounts due.  This option is typically used by First Data when it needs to terminate a lease due to a lessee's conduct-related breach.[3]  Declaration of Bryan Brouillard in

---

[3] A common example is excessive chargebacks.  Second Brouillard Decl. ¶5.  A "chargeback" is when a card purchase needs to be refunded because the card owner claims that the purchase was not his or hers.  *Id.*  If this happens unusually frequently with a particular merchant, then First Data will often terminate the relationship completely, including the lease component.  *Id.*  Subsection (b)(i) of the Default Clause allows First Data to do that.  *Id.*  And since the termination of the lease is at First Data's volition, First Data will simply collect any past due payments and collect the terminal.  *Id.* That is why subsection (b)(i)  authorizes First Data to terminate the lease, collect whatever payments are due as of that termination, and collect the leased terminal.  *Id.* Under certain circumstances, based on where the merchant is in the lease

Support of Opposition to Motion for Summary Judgment ("Second Brouillard Decl." ¶5. Second, First Data can declare immediately due and payable all of the monthly lease payments for the remainder of the lease period together with the fair market value of the terminal. Merchants are not required to return, and First Data takes no action to repossess, the leased equipment when this second option is enforced. If a merchant does happen to return the terminal, however, First Data does not charge for its fair market value. *Id.* ¶7. This second option is typically relied upon when a lessee breaches by failing to pay the monthly lease payments that are due. *Id.* ¶5-7. Both options are authorized by section 32.12(b) of the lease and are referred to collectively herein as the "Default Clause." *See* Pl. Mot. Ex. 1 (Dkt. 93-2) at §32.12(b).

There is no single way in which the Default Clause is "enforced," however. To begin with, there are myriad circumstances under which the clause even becomes applicable. A default may occur for any number of reasons. *See Id.* at §32.12(a). First Data's response will, in turn, depend on the circumstances. By way of example, some merchants will pay the full remainder due under the lease, others will pay a negotiated amount less than that, and still others will become current on their accounts and continue the lease. Declaration of Bryan Brouillard ISO Opposition to Motion for Class Certification (Dkt. 57) ("First Brouillard Decl.") ¶37; Second Brouillard Decl. ¶8.

A number of problems are created if a merchant in default attempts to return the leased equipment to First Data before the end of the lease term. Chief among them is the fact that returned equipment cannot simply be cleaned up and re-leased to the next merchant. Software needs to be updated, repairs need to be made *if* the terminal is capable of being repaired, and if the lease is more than one year old, as a general matter First Data would not lease it again in any event. *Id.* ¶36.

---

term, First Data actually can incur a loss in terminating under this provision, based on the amount paid to the alliance to acquire the lease. *Id.*

**B.      The Narrow Issue That Remains To Be Resolved In This Case.**

Madanat initially sought class certification on a broad range of very far reaching and highly factual claims.  *See* Pl. Mem. ISO Mot. For Class Cert. (Dkt. 55); Def. Mem. In Opp'n To Pl. Mot. For Class Cert. (Dkt. 56); Pl. Reply Mem. ISO Mot. For Class Cert. (Dkt. 63). The Court rejected those efforts almost entirely.  *See*  Report and Recommendation (Dkt. 71); Mem. And Order (Dkt. 74).

The only issue that remains is a very narrow one: whether the Default Clause is valid and enforceable as written in Madanat's lease.  Report and Recommendation at 20; Mem. And Order at 1.  The Court certified an "injunction only," Rule 23(b)(2) class on Madanat's declaratory and injunctive relief claims that seek to invalidate the Default Clause.  *Id.*  That led to this Motion, by which Madanat seeks to establish as a matter of law that the Default Clause is not enforceable.

**C.      Madanat's Mischaracterization of the Facts**

As a threshold matter, Madanat seeks an injunction but fails to explain what conduct he wants First Data to be enjoined from doing.  Madanat never once explains, for instance, how an injunction would work or what conduct First Data is prohibited from doing.  And there is a good reason for this failure: Madanat is seeking an injunction based on an interpretation of the Default Clause that *First Data does not even actually engage in.*

The only affirmative actions—and therefore the only conduct that could theoretically even be enjoined—that Madanat complains of is First Data's supposed collection of a triple recovery as a result of the Default Clause.[4]  Mot. at 9.  In the world according to Madanat, First Data collects the following under the Default Clause, which Madanat calls a "triple recovery": (1) all remaining lease payments; (2) the fair market value of the terminal; and (3) payments obtained from another merchant by re-leasing the re-possessed terminal.  *Id.*

---

[4] First Data's other complaints about (1) the existence of an "optional liquidated damages clause" and (2) the Default Clause not being supported by difficult to ascertain actual damages are not affirmative conduct that could be enjoined.

But this world is make believe. The "triple recovery" exists only within his attorneys' pleadings. In the real world created by First Data's *actual conduct* and the words of the Default Clause, itself, there is no triple recovery.

*First*, the Default Clause does not even contemplate the merchant's return of the terminal, much less require it. Pl. Mot. Ex. 1 at §32.12(b)(ii).

*Second*, in the instances where a terminal is actually returned to First Data at the lessee's own volition, First Data does *not* charge the merchant the fair market value of the terminal. Second Brouillard Decl. ¶7.

*Third*, the notion that First Data regularly re-leases terminals is patently false. First Brouillard Decl. ¶¶36-37. The evidence in the record shows that re-leasing the terminals is an unlikely, if not impossible, scenario for a variety of reasons, including age and condition of the hardware and software. *Id.*

So the only alleged conduct that Madanat could possibly point to for an injunction does not even actually occur. Madanat's request for an injunction under these circumstances amounts to a request that the Court render an improper advisory opinion, since Madanat is seeking an injunction based on an interpretation of the Default Clause that does not actually occur.

### D.  The Actual Facts Surrounding Madanat's Lease

Madanat's individual circumstances show that his made up "triple recovery" does not actually happen. After Madanat defaulted, he had a conversation with First Data's collections department and agreed to a payoff amount of $2026.72. Second Brouillard Decl. ¶¶9-10. This is reflected in the June 24, 2010 letter sent to him by First Data, which he attached to his complaint in this case as Exhibit E and is attached to the accompanying Second Brouillard Declaration as Exhibit A. *Id.* The letter states that First Data "will accept the offer of $2026.72" in order to relieve Madanat of any further obligations under the lease. *Id.*

However, that amount—$2026.72—did not include the fair market value of the terminal. *Id.* First Data was willing to excuse Madanat from his lease obligations, in other words, for less than what the Default Clause authorized. *Id.* Instead, the $2026.72 consisted of $1883.64 in

remaining lease payments owed under the lease (44 remaining payments, at $42.81 each ($39 plus tax) = $1883.64) and $143.08 in various late charges and fees due to Madanat's three missed payments and First Data's efforts to collect up to that point. *Id*. There was no charge for the terminal, even though First Data was authorized to do that. Had First Data chosen to charge for the fair market value of the terminal, there would have been an additional $204.05 ($ 187.20 + 9% tax) added to the payoff amount, for a total of $2230.77. *Id*.

What's more, Madanat never actually paid any of this. First Data's records still show that he owes $2026.72. *Id*.

## ARGUMENT

Madanat proffers two unrelated theories for why he thinks the Default Clause is unenforceable. As a threshold matter, he does not even have standing to make either of these arguments or bring these claims. Nevertheless, his first theory is that the Default Clause allows First Data to choose between either (1) actual damages, or (2) liquidated damages. That is wrong as a matter of fact. But even if it were not, it is perfectly legal under the UCC, which governs the lease at issue.

Second, Madanat argues that actual harm from a breach is easy to ascertain and the liquidated amount is disproportionate to that harm. At a minimum, these are factual questions for which Madanat offers no evidence and are therefore not properly resolved on summary judgment. Still, all of the evidence in the record shows that his argument is simply wrong.

## I. MADANAT LACKS STANDING TO BRING HIS CLAIMS AND ASKS THIS COURT TO RENDER AN ADVISORY OPINION

A plaintiff must have standing to bring his claims. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) ("[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III."). To have standing, a plaintiff must "have suffered injury in fact" by the defendant's conduct. *See Rajamin v. Deutsch Bank Nat. Trust Co*., 2014 WL 2922317 *5 (2d. Cir. June 30, 2014) (no standing where plaintiffs' allege only injuries that were hypothetical); *see also Southern Walk at Broadlands Homeowner's Ass'n, Inc. v. Openband*

*At Broadlands, LLC*, 713 F.3d 175, 182-83 (4th Cir. 2013) (no standing where the plaintiff was not harmed by the contractual provision at issue).

Here Madanat has no standing to seek to invalidate the Default Clause because it was not enforced against him, much less did he suffer any injury from it.

Specifically, after Madanat defaulted, First Data and he agreed to a "buyout" amount of $2026.72. Second Brouillard Decl. ¶9; Compl. Ex. E. That amount constituted neither the total amounts past due plus repossession of the terminal (subsection (b)(i) of the Default Clause) *nor* the total amount of remaining lease payments plus the fair market value of the terminal (subsection (b)(ii) of the Default Clause). Second Brouillard Decl. ¶¶9-10. And even as to the $2026.72 (which did not derive from the Default Clause), Madanat has not *paid* it and First Data is not seeking to *collect* it. There is simply no plausible basis for which Madanat has standing to attack the Default Clause here. *See Rajamin*, 2014 WL 2922317 at*5 ("The record in this case reveals that plaintiffs' Third Amended Complaint alleged only injuries that were hypothetical . . . We conclude that plaintiffs failed to allege injuries sufficient to show constitutional standing to pursue their claims.").[5]

---

[5] To be sure, the mere fact that the Default Clause is contained in a lease to which he is a party is not enough to create standing since it was never enforced against him and he suffered no harm from it. The law is clear that Madanat must actually suffer harm as a result of the Default Clause. *See Hollingsworth v. Perry*, 133 S. Ct. 2652, 2663 (2013) ("Petitioners have no role—special or otherwise—in the enforcement of Proposition 8. . . . They therefore have no 'personal stake' in defending its enforcement that is distinguishable from the general interest of every California citizen. No matter how deeply committed petitioners may be to upholding Proposition 8 . . . that is not a 'particularized' interest sufficient to create a case or controversy under Article III." (citations omitted)); *see also Lujan*, 504 U.S. at 564 (holding plaintiffs' "some day" intentions "without any description of concrete plans, or indeed even any specification of when the some day will be" were insufficient in satisfying the requirement that injury in fact be actual or imminent.); *Port Washington Teachers' Ass'n v. Bd. of Educ. of Port Washington Union free Sch. Dist.*, 478 F.3d 494, 500 (2d Cir. 2007) ("Because the plaintiffs have not established that civil liability or professional discipline is actual or imminent, the theoretical possibility that either might occur in the future does not amount to injury in fact.")); *Southern Walk*, 713 F.3d at 182 ("Although a party to a contract containing allegedly illegal provisions often will have standing to challenge that contract, simply being a party to the contract does not alone establish Article III standing. An organizational plaintiff must still demonstrate personal harm both traceable to the challenged provisions and redressable by a federal court."). If this were not the law, anybody could challenge a provision in a contract without actually suffering an injury from it.

## II. EVEN IF MADANAT DID HAVE STANDING, HIS CLAIMS FAIL AS A MATTER OF LAW AND FACT.

### A. "Optional" Liquidated Damages Clauses Are Valid And Enforceable Under The UCC, *Which Controls Here*, And The Default Clause Does Not Give First Data The Option To Seek Actual Damages In Any Event.

#### 1. The UCC Controls And Permits A Choice Between Actual And Liquidated Damages.

Madanat's entire brief completely ignores the threshold question of what law controls this lease. The answer is the UCC Article 2-A: "New York has adopted Article 2A of the Uniform Commercial Code, which 'applies to any transaction . . . that creates a lease.'" *Wells Fargo Bank Northwest, N.A. v. Taca International Airlines, S.A.*, 315 F.Supp.2d 347, 350 (S.D.N.Y. 2003) (alteration in original) (quoting N.Y. U.C.C. § 2-A-102); *Western Intermodal Services, Ltd. v. Singamas Container. Indus. Co.*, Ltd., 2000 WL 343780, *2 n.1 (S.D.N.Y. Mar. 31, 2000) ("Section 2-A of the New York Uniform Commercial Code governs lease agreements."); *Mollins v. Nissan Motor Co., Ltd.*, 2007 WL 315352, *2 (N.Y. Sup. Ct. Jan. 31, 2007) ("This transaction is subject to the provisions of the Uniform Commercial Code ("UCC") Article 2–A–Leases. Article 2–A applies to any transaction that creates a lease. UCC §2–A–102.").

And under the UCC it is well-settled that "providing for actual damages as an alternative to liquidated damages" is perfectly acceptable and enforceable. *See Wells Fargo*, 315 F.Supp.2d at 350. The lessee in *Wells Fargo*, for instance, challenged a default provision for allowing the lessor to pursue actual damages as an alternative to the liquidated amount set in the lease. *Id.* The lessee cited a handful of non-UCC cases that purported to find such provisions unenforceable. *Id.* The court soundly rejected the lessee's position. Since the UCC controlled, and "Article 2A expressly permits 'unrestricted selection' of a remedy," there was absolutely nothing wrong with the alternative choices in the *Wells Fargo* lease. *Id; see also* N.Y. U.C.C § 2-A-501 Official Cmt. 4 (1994) ("[c]umulation, and largely unrestricted selection, of remedies is allowed in furtherance of the general policy of the Commercial Code, stated in Section 1-106, that remedies be liberally administered to put the aggrieved party in as good a position as if the other party had fully performed. Therefore, cumulation of, or selection among, remedies is

available to the extent necessary to put the aggrieved party in as good a position as it would have been in had there been full performance.").

It follows that Madanat's attack on the Default Clause as an illegal "optional" liquidated damages clause is misplaced and meritless from the outset. The cases he cites in support of his argument are all non-UCC cases,[6] which have no bearing on the lease here. *See Wells Fargo*, 315 F.Supp.2d at 350 (refusing to follow non-UCC cases when evaluating the validity of a UCC lease). The UCC, which controls, permits a choice to pursue actual damages or liquidated damages. To the extent the Default Clause gives First Data the option of pursuing actual damages—it actually doesn't, as explained below—it therefore remains fully valid and enforceable.

### 2. The Default Clause Does Not Give First Data The Alternative Choice Of Pursuing Actual Damages In The First Place.

Leaving aside the UCC's applicability, Madanat's argument here is a complete "straw man." He blithely declares that subsection (b)(i) of the Default Clause gives First Data the option of suing for actual damages.[7] Pl. Mot. at 6. But subsection (b)(i) does no such thing. It

---

[6] *See* Pl. Mot. at 4-6. *Dalston Constr.* and *Jarro Bldg. Indus.* involved construction contracts. *Dalston Constr. Corp. v. Wallace*, 214 N.Y.S.2d 191 (N.Y. Sup. Ct. 1960); *Jarro Bldg. Indus. Corp. v. Schwartz*, 281 N.Y.S.2d 420 (N.Y. App. Term 1967). *Trilegiant* involved a services contract. *Trilegiant Corp. v. Sitel Corp.*, 2013 WL 2181193 (S.D.N.Y. May 20, 2013). *U.S. Fid. & Guar.* involved a surety bond. *U.S. Fid. &Guar. Co. v. Braspetro Oil Servs. Co.*, 369 F.3d 34 (2d Cir. 2004). *Stock Shop* involved a licensing contract. *Stock Shop, Inc. v. Bozell &Jacobs, Inc.*, 481 N.Y.S.2d 269 (N.Y. Sup. Ct. 1984). *Grossinger Motorcorp* involved a real estate contract. *Grossinger Motorcorp, Inc. v. Am. Nat'l Bank & Trust Co.*, 607 N.E.2d 1337 (Ill. App. Ct. 1993). None of those cases involved a lease of goods like the one at issue here.

Note that the *CIT Group* case cited by Madanat did involve a lease of goods, but the UCC did not control in that case because the parties executed their lease in 1986, nine years before New York's version of Article 2–A of the UCC became effective, on June 30, 1995. *See General Electric Capital Corp. v. National Tractor Trailer School Inc.*, 667 N.Y.S.2d 614, 618 (N.Y. Sup. Ct. 1997) (2-A became effective on June 30, 1005 and only applies to leases executed on or before that date). Further, the *CIT Group* court did not actually hold that a clause giving the lessor the option to choose between actual or liquidated damages was invalid. *CIT Group/Commercial Servs., Inc. v. Holladay-Tyler Printing Corp.*, 1995 WL 702343 (S.D.N.Y. Nov. 29, 1995). It simply noted in dicta that such a clause might be problematic—*not* under the UCC—before ultimately ruling that the clause at issue *was enforceable*. *Id.* at *3.

[7] To be sure, Madanat's argument is that subsection (b)(i) of the Default Clause allows First Data to recover actual damages. *See* Pl. Mot. at 6 (arguing that subsection (b)(i) "expressly states that First Data may, in the event of a default, and at its option, terminate the lease and proceed with collection of any and all charges due and payable (**i.e., actual damages**) (emphasis added). Madanat concedes that subsection (b)(ii) constitutes liquidated damages. *Id.*

merely authorizes First Data to terminate the lease and collect any past due lease payments. *See* Pl. Mot. Ex. 1 at §32.12(b)(i) ("terminate the lease and our future obligations under this Lease Agreement, repossess the Leased Equipment and proceed in any lawful manner against you for collection of all charges that have accrued and are due and payable"). *Actual damages*, on the other hand, would be much different than just the amount of lease payments past due at the time a lessee breaches.

Indeed, Madanat himself agrees. In a different section of his brief, he contends that First Data's actual damages from a merchant breach are the sum of all remaining lease payments less any mitigation:

> First Data's damages from a merchant breach are simple to ascertain. Once a lease is terminated, the fixed monthly lease payments for any months remaining in the lease period—not taking into account any mitigation that First Data can easily do— can simply be added to calculate First Data's loss.

Pl. Mot. at 7-8. If actual damages are the sum of remaining lease payments less mitigation, then how could subsection (b)(i) of the Default Clause—which merely allows First Data to collect *past due* lease payments, but nothing prospectively—possibly give First Data the choice of pursuing actual damages? It can't, of course. Madanat's argument does not even hold up according to his own brief.

Moreover, the sum of remaining lease payments is only *one element* of actual damages here. Actual damages must "place the nonbreaching party in as good a position as it would have been had the contract been performed." *In re Food Management Group, LLC,* 2007 WL 4352225, *2 (S.D.N.Y. Dec. 10, 2007); *see also Boyce v. Soundview Tech. Group., Inc.*, 464 F.3d 376, 384 (2d Cir. 2006) ("damages for breach of contract should put the plaintiff in the same economic position he would have occupied had the breaching party performed the contract.") Therefore, in addition to the sum of remaining lease payments, actual damages necessarily also include the fair market value of the leased terminal. That is because if the lease had been fully performed, the terminal would have been either returned to First Data or paid for by the lessee. Pl. Mot. Ex. 1 at §32.7.

And still there's more.  Actual damages also must include any consequential damages that the breach caused.  *See, e.g., Inchaustegui v. 666 5th Ave. Ltd. P'ship,* 706 N.Y.S.2d 396, 399 (N.Y. App. Div. 2000) ("all actual economic injury that the breaching party had reason to know would arise from the breach, both direct or general damages . . . and consequential damages, consisting of other economic injury the breaching party would have had reason to foresee as a probable result of the breach").  Those would inevitably vary and be hard to predict depending on the circumstances of each breach.

It follows that Madanat's argument is simply wrong as a matter of fact.  Subsection (b)(i) of the Default Clause does not give First Data the option of suing for actual damages—that is *any past due lease payments + the remaining lease payments + the fair market value of the leased equipment + any consequential damages*.  It simply calls for the collection of all past due lease payments to date, which is totally different.

By contrast, all of the non-UCC cases cited by Madanat actually did involve contracts that allowed for (1) a choice between liquidated and actual damages, or (2) *the combination of* a liquidated amount and actual damages.  *See  Dalston Constr. Corp. v. Wallace,* 214 N.Y.S.2d 191, 192 (N.Y. Sup. Ct. 1960) (in addition to liquidated damages the contractor "may if it sees fit sue at law for reasonable counsel fees at the rate of ten percent and *such additional or other damages that it may establish*) (emphasis added); *Jarro Bldg. Indus. Corp. v. Schwartz*, 281 N.Y.S.2d 420, 421 (N.Y. App. Term 1967) (liquidated damages provision "shall not preclude the Company if it sees fit to sue for such actual damages as it may establish); *U.S. Fid. &Guar. Co. v. Braspetro Oil Servs. Co.,* 369 F.3d 34, 40 (2d Cir. 2004) (liquidated damages "to be imposed for each day of delay . . . were *in addition to, not in lieu of*, the Consortium's other liability for 'losses or damages'") (emphasis added); *Stock Shop, Inc. v. Bozell & Jacobs, Inc.*, 481 N.Y.S.2d 269, 271 (N.Y. Sup. Ct. 1984) ( contract allowed parties to "disregard liquidated sum and sue for actual damages")(emphasis added); *Grossinger Motorcorp, Inc. v. Am. Nat'l Bank & Trust Co.*, 607 N.E.2d 1337, 1339 (Ill. App. Ct. 1993)("the earnest money shall be forfeited to the [defendant] to be retained by the [defendant] as liquidated damages, or at [defendant]'s option,

[defendant] may exercise *any other remedy available at law*") (emphasis added). It follows that even were these cases applicable to the UCC lease at issue here (they are not), they do not support Madanat's position, at all.

**B.     Madanat's Argument That the Default Clause Is Punitive And Provides For A Disproportionate Recovery Is Also Wrong.**

Next, citing a handful of non-UCC cases, Madanat argues that the entire Default Clause is unenforceable because (1) actual harm is easy to predict, and (2) the liquidated amount of damages (limited subpart (b)(ii), according to Madanat) is "grossly disproportionate" to the actual harm from a breach. He is wrong as a matter of law and fact.

**1.     The UCC Does Not Require That Damages Be Difficult To Ascertain.**

Here again, Madanat starts with a faulty premise. Under the UCC, difficulty in ascertaining actual loss is not a prerequisite for liquidated damages. Parties to a UCC lease are free to include liquidated damages regardless of whether actual harm is easy to predict.

Specifically, section 2-A-504 of the New York UCC authorizes liquidated damages in UCC leases. *See* N.Y. U.C.C. § 2-A-504 (1994). Its only requirement is that the liquidated amount be "reasonable in light of the then anticipated harm caused by the default or other act or omission." *Id*. at § 2-A-504(1). It "does not incorporate . . . difficulties of proof of loss and inconvenience or nonfeasibility of otherwise obtaining an adequate remedy." *Id*. at § 2-A-504 Official Cmt. ("This section does not incorporate two other tests that under sales law determine enforceability of liquidated damages, *i.e.*, difficulties of proof of loss and inconvenience or nonfeasibility of otherwise obtaining an adequate remedy"); *see also Coastal Leasing Corp. v. T-Bar S. Corp.*, 128 N.C. App. 379, 383 (N.C. Ct. App. 1998) ("drafters of Article 2A chose not to incorporate . . . the difficulties of proof of loss and the inconvenience or nonfeasibility of otherwise obtaining an adequate remedy").

Madanat's entire argument that the Default Clause is invalid because actual damages are easy to determine (*see* Pl. Mot at 7-8) is therefore against established law and should be ignored.

### 2. Actual Damages Are Difficult To Ascertain, Nonetheless.

Madanat contends that all damages flowing from a breached lease are easy to figure out: he says it is just the sum of all remaining lease payments. *See* Pl. Mot. at 7-8. True, that is an element. *See* part A2, *supra*. But there is also much more. Actual damages must also account for past due lease payments, the fair market value of the leased terminal, and all consequential and incidental damages. *See* part A2, *supra*.

These items of damages are notoriously difficult to quantify. Not surprisingly, before the UCC abolished the requirement that damages be difficult to ascertain, New York courts would routinely uphold liquidated damages in equipment leases on the ground that actual loss for breach of such a lease is incapable of precise estimation since it depends on the physical condition of the equipment, market conditions, and various other contingencies, all of which are difficult, if not impossible to quantify. *See, e.g.*, *Leasing Serv. Corp. v. Justice*, 673 F.2d 70, 74 (2d Cir. 1982); *PacifiCorp Capital, Inc. v. Tano, Inc.*, 877 F. Supp. 180, 184 (S.D.N.Y. 1995) (value of leased equipment would depend "upon its physical condition and market conditions at that time" and since "these values are of such uncertain nature and any calculation of damages would depend on these figures, courts are inclined to view a damage provision in a lease agreement as a liquidated damages clause rather than a penalty."); *Penn Intermodal Leasing, Inc. v. Shipping Corp. of India*, 1997 WL 431087, *7 (S.D.N.Y. July 30, 1997) ("the amount of anticipated damages depended on uncertain factors such as future market conditions" and "highly speculative [in] nature."); *Ames Linen Service v. Katz*, 779 N.Y.S.2d 600, 601 (N.Y. App. Div. 2004) (holding that plaintiff's damages are not easily ascertainable because of "difficulty in ascertaining the useful life of [the rental] items").

The very same uncertainties exist here and Madanat offers no argument, much less the evidence needed to support summary judgment, that they do not exist.

### 3. The Liquidated Amount Is Not Unreasonable In Relation To Actual Damages.

In a "last gasp," Madanat argues that subsection (b)(ii) of the Default Clause is not enforceable because of a fanciful idea about "triple recovery." Pl. Mot. at 8-9. Subsection (b)(ii)

results in a disproportionate and "triple" recovery, so the story goes, because it "allows First Data to obtain" (1) all remaining lease payments, (2) the fair market value of the terminal, and (3) payments received by re-leasing the terminal.[8] *Id*. at 9.

This theory assumes key facts: that First Data takes possession of the terminal when it invokes subsection (b)(ii) of the Default Clause and that First Data then re-leases the terminal. Yet the lease says the exact opposite. Unlike subsection (b)(i), subsection (b)(ii) *does not* say that First Data will repossess the terminal.[9] Instead it fully contemplates that the lessee will *keep the terminal*. Specifically, whereas subsection (b)(i) provides that First Data will "repossess the Leased Equipment," Pl. Mot. Ex. 1 at §32.12(b)(i), subsection (b)(ii) says nothing of the sort. It simply says that, upon First Data's election of that option, it will collect all remaining lease payments plus the fair market value of the terminal. *Id*. at §32.12(b)(ii) Nothing whatsoever says that First Data will repossess the terminal or that the lessee is otherwise required to send it back. *See Id*. Nor is there even a suggestion that First Data *re-leases* terminals when it invokes subsection (b)(ii). *Id*.

That leaves Madanat in a land of hypotheticals. The Default Clause does not call for, or even contemplate, returned and re-leased terminals, so his argument rests on the theoretical possibilities that (1) someone will return a terminal to First Data *and* (2) First Data will re-lease that terminal. Madanat's argument is that because these theoretical possibilities exist, subsection (2) allows for a recovery that is "grossly disproportionate" to actual harm. *See* Pl. Mot. at 8-9. There is no support for that conclusion.

Liquidated damages amounts are judged by what the reasonable anticipated harm is at the time the lease is executed. *Koylum, Inc. v. Peksen Realty Corp.*, 2004 WL 5599307, *5 (E.D.N.Y. Dec. 2, 2004). Just because a different result can theoretically happen, or sometimes

<hr>

[8] Madanat does not, because he cannot, argue that there is anything wrong with any other aspect of subsection (b)(ii). He makes no argument against the sum of remaining lease payments as a component of the liquidated amount. Nor does he quarrel with the manner in which the fair market value of the terminal is calculated.

[9] This argument only targets subsection (b)(ii), since subsection (b)(i)—though it actually does call for First Data to repossess the terminal—does not call for all remaining lease payments. Pl. Mot. Ex. 1 at §32.12(b)(i).

even does happen, does not mean that a liquidated damages clause is unenforceable. *See DAR & Associates, Inc. v. Uniforce Services, Inc.*, 37 F.Supp.2d 192, 203 (E.D.N.Y. 1999). As articulated by this Court, "[t]hat plaintiffs can conjure a hypothetical breach (an extremely unlikely one at that) that would produce minuscule actual damages does not undermine the validity of the [liquidated damages] clause." *Id.* "To hold otherwise would essentially require contracting parties to bear the negotiating costs of tailoring liquidated damages provisions to calibrate damages differently depending on the various factors that can affect actual losses." *Id.* "This would largely defeat the central purpose that such provisions serve." *Id.*; *see also Coastal Leasing Corp. v. T-Bar S. Corp.*, 128 N.C. App. 379, 383 (N.C. Ct. App. 1998) ("no courts should strike down a reasonable liquidated damage agreement based on foresight that has proved on hindsight to have contained an inaccurate estimation of the probable loss" and "the fact that there is a difference between the actual loss, as determined at or about the time of the default, and the anticipated loss or stipulated amount or formula, as stipulated at the time the lease contract was entered into … does not necessarily mean that the liquidated damage agreement is unreasonable.").

And here, the most logical result upon a merchant's breach is that (1) the merchant will retain possession of the equipment and (2) First Data will not re-lease the terminal. Since subsection (b)(ii) of the Default Clause neither requires nor even contemplates returning the terminal or re-leasing it, that is certainly the most likely result. Pl. Mot. Ex. 1 at §32.12(b)(ii). Likewise, the evidence in the record shows that re-leasing the terminals is an unlikely, if not impossible, scenario for a variety of reasons, including age and condition of the hardware and software. In short, POS Terminals are more akin to personal computers than to automobiles or heavy equipment. They have a short shelf-life and are unlikely to be re-leased even were merchants to return them to First Data.[10] *Id.* at ¶11.

---

[10] This is, of course, a purely factual issue. All of the evidence in the record establishes that there is no genuine dispute as to whether the parties should expect that terminals will be returned and re-leased under subsection (b)(ii) of the Default Clause: they should not. That means that Madanat's claim fails as a matter of law. *King v. Crossland Sav. Bank*, 111 F.3d 251 (2d Cir. 1997)("Summary judgment, however, is nonetheless appropriate when the [plaintiff] has

It follows that the sum of all remaining lease payments and the fair market value of the terminal is a perfectly reasonable estimation of harm from breach, as calculated at the time of entering a lease like Madanat's. Subsection (b)(ii) of the Default Clause does not say that the terminal needs to be returned or that terminals will be re-leased if they are returned. So the parties would have no reason to expect that result and Madanat has not provided any evidence to the contrary. Indeed, the evidence shows they should expect the opposite. *Id.* at ¶10. The mere fact that someone could return a terminal even when subsection (b)(ii) is invoked does not somehow invalidate the provision, as Madanat suggests.

The only case that Madanat cites in support of his cause—*Atel Finance*—involved completely different facts. The lease at issue there *actually did* contemplate repossessing and re-leasing the equipment . *See Atel Financial Corp. v. Quaker Coal Co.*, 132 F.Supp.2d 1233, 1241 (N.D. Cal. 2001) (noting that the liquidated damages clause "seems to assume or anticipate that the lessee has defaulted to such an extent that Atel would terminate the lease and repossess the equipment and relet it"). Since the lease called for repossessing and re-leasing the equipment, it was too much, according to the *Atel* court, for the liquidated damages provision to also charge for the residual value of the leased equipment. *Id.*

## CONCLUSION

For the foregoing reasons, the Court should deny the plaintiff's motion.

---

failed to set forth any facts that go to an essential element of the claim.") Should the Court not be persuaded by the evidence in the record, however, that simply means that a genuine dispute of fact as to this issue remains, and Madanat's Motion must therefore be denied on that ground. *Covey v. Simonton*, 481 F.Supp.2d 224 (E.D.N.Y. 2007). To be sure, Madanat has introduced no evidence, whatsoever, on this issue.

August 6, 2014

**PERKINS COIE** LLP

Bobbie J. Wilson (*pro hac vice*)
J. Patrick Corrigan (*pro hac vice*)
Brian P. Hennessy (*pro hac vice*)
Four Embarcadero Center
Suite 2400
San Francisco, California 94111
Telephone:     (415) 344-7000
Facsimile:      (415) 344-7050
E-mail:          bwilson@perkinscoie.com
                pcorrigan@perkinscoie.com
                bhennessy@perkinscoie.com

By: /s/ Patrick Corrigan
       J. Patrick Corrigan

*Attorneys for Defendants First Data
Corporation and First Data Merchant Services
Corporation*

## CERTIFICATE OF SERVICE

I, Jennifer Ilas, hereby certify that a true and correct copy of the following documents:

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**DECLARATION OF BRYAN BROUILLARD IN SUPPORT OF OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

**DEFENDANTS FIRST DATA CORPORATION AND FIRST DATA MERCHANT SERVICES CORPORATION'S RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS AND STATEMENT OF MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1**

have been served via Electronic Mail and Overnight Delivery to:

Mitchell M. Breit
HANLY CONROY BIERSTEIN SHERIDAN FISHER & HAYES LLP
112 Madison Avenue
New York, NY 10016
Email: mbreit@hanlyconroy.com

T. Christopher Tuck
RICHARDSON PATRICK WESTBROOK BRICKMAN LLC
1037 Chuck Dawley Boulevard, Building A
Mount Pleasant, SC 29464
Email: ctuck@rpwb.com

Ali Abtahi
Idene Saam
ABTAHI LAW FIRM
1012 Torney Avenue
San Francisco, CA 94129
Email: aabtahi@abtahilaw.com
Email: isaam@abtahilaw.com

August 6, 2014                                  /s/ Jennifer Ilas
                                               Jennifer Ilas